H3K8MUN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

NEHMIAS MUNOZ,

      Plaintiff,

    v.           14 Cv. 6628 (DLC)

POLICE OFFICER ROBERT REID,
POLICE OFFICER STEPHEN JONES,
SERGEANT BRIAN FLYNN, and
SERGEANT JAMES KELLY,

      Defendants.

------------------------------x

            March 20, 2017
            9:45 a.m.

Before:

        HON. DENISE COTE

            District Judge

        APPEARANCES

NEHMIAS MUNOZ
   Pro Se Plaintiff

ZACHARY CARTER
   Corporation Counsel of the City of New York
ARIEL LICHTERMAN
CAROLYN K. DEPOIAN
   Assistant Corporation Counsel

H3K8MUN1

1              (Case called)

2              THE DEPUTY CLERK:  Mr. Munoz, are you ready to

3    proceed?

4              THE COURT:  Well, you're here.  You're present in

5    court, Mr. Munoz?

6              MR. MUNOZ:  Yes.  I would like to say one thing.

7              THE COURT:  I will give you a chance to talk.  Right

8    now we are just taking attendance to make sure that the court

9    reporter can record the fact that you're present in the

10   courtroom for the beginning of trial.

11             Good morning to you, sir.

12             MR. MUNOZ:  Good morning to you, ma'am, and everyone

13   else in this courtroom.

14             THE COURT:  Thank you.

15             THE DEPUTY CLERK:  For the defendants, please state

16   your name for the record.

17             MR. LICHTERMAN:  Ariel Lichterman, from the New York

18   City Law Department, for Defendants Reid, Jones, Flynn and

19   Kelly.  Good morning, your Honor.

20             MS. DEPOIAN:  Good morning, your Honor.  Carolyn

21   Depoian, from the law department also, for the same defendants.

22             THE COURT:  Good.  Thank you.  Welcome, everyone.

23             I have a number of things I want to discuss with

24   everyone, and I want to give Mr. Munoz and defense counsel an

25   opportunity to be heard as well.

H3K8MUN1

1          We probably have about half an hour before we are

2     going to get a jury so that gives us time to cover a number of

3     issues together.

4          I want to begin by indicating that I issued some

5     orders at the end of last week, and I want to make sure that

6     Mr. Munoz has received copies of them.

7          One order had to do with requiring the defendants to

8     order a copy of the final pretrial conference transcript.

9          Another order had to do with the defendants giving

10    notice to the plaintiff about the passages in his prior

11    testimony, his deposition testimony, that they wish to use if

12    they were going to offer them as evidence in chief at trial.

13         Another order had to do with providing Mr. Munoz with

14    clothing.  We were able to contact our Federal Defenders office

15    in this district, which is a group of criminal defense lawyers

16    that represent defendants in criminal cases who do not have

17    money to retain their own lawyers.  They had some clothing

18    available for their own clients.  They very generously worked

19    with our chambers, my chambers' staff, in order to get clothing

20    for Mr. Munoz, and I am happy to say that he is wearing a suit

21    today in court.

22         MR. MUNOZ:  I am very appreciative of all you people

23    who participated in making that happen with proper attire for

24    court today.

25         THE COURT:  Thank you, Mr. Munoz.  Happy to do it.

H3K8MUN1

1          Of course, I want to thank my staff as well.

2          Then another order had to do with the ability of the

3    defendants to bring the firearm I think seized at the time of

4    the arrest into the courthouse.

5          Ms. Rojas, would you provide copies of these orders to

6    the plaintiff?

7          THE DEPUTY CLERK:  Yes, your Honor.

8          THE COURT:  Thank you.

9          Let's talk about the voir dire process.  When I say

10   voir dire, I mean the jury selection process.

11         I don't think that you have any need to read those

12   now, those orders I just described to you on the record, Mr.

13   Munoz.  It's just for your records so your records are

14   complete.

15         I want to begin by reading one more time, as I told

16   you I would do last week, the opening statement I am going to

17   give to the jury that describes this case, because if it's

18   incomplete or inaccurate in any way, I want everybody to be

19   able to, Mr. Munoz and defense counsel, to be able to make a

20   request of me.  OK?  So I am going to read this slowly.

21         The plaintiff in this case, that is the person

22   bringing the claims, is Nehmias Munoz.

23         Mr. Munoz, am I pronouncing your name correctly?

24         MR. MUNOZ:  That is accurate, ma'am.

25         THE COURT:  Thank you.

H3K8MUN1

1          His claims arise out of events that occurred on

2     September 13, 2011, in the Parkchester area of the Bronx.   On

3     that day, he committed an armed robbery and was arrested.   At

4     the time of his arrest, the plaintiff had a gun.   He later

5     pleaded guilty to robbery.   These events are not in dispute at

6     this trial.

7          So far is that accurate, Mr. Munoz?

8          MR. MUNOZ:   Can you repeat that, please?

9          THE COURT:   Sure.

10          The plaintiff in this case, that is the person

11     bringing the claims, is Nehmias Munoz.   His claims arise out of

12     events that occurred on September 13, 2011, in the Parkchester

13     area of the Bronx.   On that day, he committed an armed robbery

14     and was arrested.   At the time of his arrest, the plaintiff had

15     a gun.   He later pleaded guilty to robbery.   These events are

16     not in dispute at this trial.

17          I have much more to say, but I just want to make sure

18     that this beginning is accurate.

19          Is it accurate, Mr. Munoz?

20          MR. MUNOZ:   That's accurate, ma'am.

21          THE COURT:   Next paragraph.

22          This trial concerns something else.   Mr. Munoz asserts

23     that after the arresting officers had subdued him and placed

24     handcuffs on him, he was beaten and injured.   He contends that

25     the injuries he sustained from that beating consisted of

H3K8MUN1

1    lacerations and broken ribs.  He has sued the four officers.

2              MR. MUNOZ:  May I interject, your Honor?

3              THE COURT:  Excuse me one second.

4         He has sued the four police officers who were present

5    at or near the scene of his arrest to recover damages from them

6    for those injuries.

7         Now, that brings me to an issue of what damages the

8    plaintiff may seek at this trial.

9         Let me review with you one issue that is in dispute,

10   whether the plaintiff may seek damages for any loss of vision

11   or any injury to his knee.  And I am going to address that in a

12   moment, but I just want to save that topic, I just want to make

13   sure that other than those two disputes, is everything I said

14   correct, Mr. Munoz?

15             MR. MUNOZ:  That's correct.  There is one officer who

16   is not being present right now in this courtroom.  He is the

17   black officer.

18             THE COURT:  Fine.  He will be present at this trial.

19   Not everyone needs to show up who is a witness immediately, or

20   even a defendant.

21        I am continuing now with the statement I will give the

22   jury.

23        There will be also evidence introduced at trial that

24   Mr. Munoz has received treatment for a drug addiction and

25   mental health problems.  Every person, whether they committed a

H3K8MUN1

crime or not, and whether they have health problems or not, is

protected by our Constitution.  The police may not use

excessive force against anyone in making arrests.  While it may

be necessary to use force in making an arrest, any force used

at the time of an arrest must be reasonable in light of the

facts and circumstances that existed at the time of the arrest.

          The jury chosen in this trial must decide whether the

police used excessive force against Mr. Munoz after he was

handcuffed, and if they did, whether any injuries that Mr.

Munoz may have sustained at the time of his arrest were caused

by the use of that excessive force after he was handcuffed.

          Is that correct, as far as you understand it, Mr.

Munoz?

          MR. MUNOZ:  Can you repeat the last three sentences

please, ma'am?

          THE COURT:  Sure.  The jury chosen in this trial must

decide whether the police used excessive force against Mr.

Munoz after he was handcuffed, and if they did, whether any

injuries that Mr. Munoz may have sustained at the time of his

arrest were caused by the use of that excessive force after he

was handcuffed.

          Is that correct?

          MR. MUNOZ:  Yes, ma'am, that's correct.

          THE COURT:  Thank you.

          I will continue to tell the jury:

H3K8MUN1

1            Mr. Munoz is proceed being pro se, that is,

2    representing himself.  He is currently incarcerated as a result

3    of his robbery conviction.  I instruct you that the protections

4    provided by our Constitution apply to sentenced prisoners, just

5    as much as they apply to those who never committed a crime and

6    who are not incarcerated.  Every person in this country is

7    entitled to be free from the excessive use of force by the

8    police.  In addition, every person who believes that he has a

9    claim that can be redressed in court is entitled to bring a

10   lawsuit and represent himself in that lawsuit.

11           You are not to treat Mr. Munoz any differently than

12   you would any other litigant simply because he is representing

13   himself, because his claims arise from a time when he committed

14   a crime, or because he is currently incarcerated.  All

15   litigants in this court are equal and entitled to the full

16   protection of our law.

17           Does that seem right, Mr. Munoz, to you?

18           MR. MUNOZ:  That's very accurate, ma'am.  Thank you.

19           THE COURT:  Let me continue then.

20           This case concerns the events that occurred on

21   September 13, 2011.  It is not about other incidents on other

22   dates concerning other individuals in which police officers

23   have been accused of using excessive force.  If chosen as a

24   juror, you must base your verdict solely on the evidence

25   received at this trial regarding the plaintiff's claim that the

H3K8MUN1

1   defendants used excessive force against him on September 13,

2   2011, and in doing so injured him on that day.

3          Is that agreeable to you, Mr. Munoz?

4          MR. MUNOZ:  Can you repeat that, ma'am, please?

5          THE COURT:  This case concerns the events that

6   occurred on September 13, 2011.  It is not about other

7   incidents on other dates concerning other individuals in which

8   police officers have been accused of using excessive force.  If

9   chosen as a juror, you must base your verdict solely on the

10   evidence received at this trial regarding the plaintiff's claim

11   that the defendants used excessive force against him on

12   September 13, 2011, and in doing so injured him on that day.

13          Any problem with that, Mr. Munoz?

14          MR. MUNOZ:  No, ma'am.  Thank you.

15          THE COURT:  You're welcome.

16          Do defense counsel have any issues they wish to raise

17   with me?

18          MS. DEPOIAN:  Yes, your Honor.  We would like the

19   language inserted at some point, appropriate point, that the

20   defendants deny the allegations and claim that any injuries

21   occurred before he was handcuffed.  And one more thing after

22   that.

23          THE COURT:  The defendants deny the plaintiff's

24   claims.  They assert, among other things, that any injuries

25   that plaintiff sustained on September 13, 2011 --

H3K8MUN1

1          MS. DEPOIAN:  Occurred before he was subdued and

2   handcuffed.

3          THE COURT:  -- occurred before he was handcuffed.

4   Thank you.

5          Anything else?

6          MS. DEPOIAN:  One more thing.  In the paragraph that

7   begins "his claims arise out of events that occurred on

8   September 13, 2011," before the sentence that says "these

9   events are not in dispute at this trial," could we add the

10   sentence, "force was used to disarm and subdue plaintiff"?

11   That is also not in dispute at this trial.

12          THE COURT:  No, I am going do decline that request.

13          MS. DEPOIAN:  Thank you, your Honor.

14          THE COURT:  Let's go to the issue of injuries and what

15   injuries you can ask the injury to give you compensation for at

16   this trial, Mr. Munoz.

17          I am going to deny your request that you present

18   evidence to the jury that would, in essence, ask them to give

19   you damages for any injury to your knee or to your vision, and

20   I want to explain why.  OK?

21          I basically looked at four different things in this

22   case to make a decision about whether it would be fair or

23   appropriate to add claims about vision and knee issues to this

24   trial.

25          First, in the first amended complaint filed in

H3K8MUN1

September of 2014, which is roughly three years after the incident, and it was a complaint prepared on your behalf by a lawyer, there was no mention of any knee or vision problem.

In the pretrial statement that you filed this year, there was no mention of any knee problem, but there was a mention of a vision problem.

In between those two events, you were deposed, and you did mention that at your deposition, as I understand it, a problem with a knee and a problem with some loss of vision in your left eye.

Certainly, at the final pretrial conference, you mentioned a loss of vision, you indicated that you now need reading glasses, and you mentioned that your left knee is not all that great either.

The defendants have told us -- you received a copy of this letter as well -- that their examination of the medical records indicate that there were some knee issues in 2014 and '15, which would be three and four years after the incident, and no evidence of any vision problems that they could find in those records.

So why am I going to rule that based on this record you cannot ask this jury for damages due to a loss of vision or a knee problem?

First, these are medical issues.  Normally, when you have medical issues, you need a doctor.  Why?  Because a doctor

H3K8MUN1

1    can provide evidence to the jury that explains how the body

2    works, what could cause, for instance, a loss or deterioration

3    in vision, what could cause, for instance, a knee to start

4    aching or hurt.  And if you raise that kind of issue in a

5    timely way in the lawsuit, then the defendants can hire

6    experts, can hire doctors, and explain that if there was a

7    vision problem, it should have, for example, arisen earlier if

8    it was the result of the 2011 beating or not.

9            So because the complaints about the knee and the

10   vision are the kinds of complaints that medical testimony would

11   normally be admitted on to show causation that this event in

12   2011 created this problem in 2014 or '15 or '16 or '17, and

13   because the jury will not have that kind of expert medical

14   testimony, I am not going to allow them to render any damages

15   in your favor for a knee or vision injury.  It would require

16   them to simply speculate as to whether or not those problems

17   arose because of the 2011 incident.

18           Now, I want to make sure that --

19           MR. MUNOZ:  Can I interject, your Honor?

20           THE COURT:  Certainly, Mr. Munoz.

21           Mr. Munoz, I want to ask you, normally in a courtroom,

22   when someone addresses me, they stand.  Do you have any problem

23   with standing and addressing me when you speak?

24           MR. MUNOZ:  No, ma'am.  But I wish I would have known

25   that, because I would have definitely gotten up and give you

H3K8MUN1

1   your respect.  I apologize for that.  They never gave me the

2   trial ready instructions.

3           THE COURT:  No problem, Mr. Munoz.  So just please

4   stand.  And just stand up straight and the mic will pick up

5   your voice.  But this is good practice in front of the jury as

6   well.

7           MR. MUNOZ:  Yes, ma'am.

8           THE COURT:  Did you have a question or a comment?

9           MR. MUNOZ:  Yes, ma'am.

10          We was here at pretrial, final pretrial, and I mention

11  about the vision and the knee, and Mr. Ariel Lichterman said

12  that that was never mentioned.

13          December 23, 2015, I do mention, and I have the copy

14  here --

15          THE COURT:  That's your deposition?

16          MR. MUNOZ:  Yes.  Of the deposition, examination

17  before trial.  I do mention it.  I think I wrote it down about

18  where I mention my eye vision and also on my knee.

19          Now, due to the fact that it was a little bit after

20  2011 was for the simple fact that Mr. Mouton was the one that

21  helped me get my civil docket number.  So I never knew I had a

22  case whatsoever.  So that's why it's kind of like years after

23  about the loss of vision and the knee, but it is medically

24  documented.

25          THE COURT:  Thank you very much, Mr. Munoz.

H3K8MUN1

1          So let's talk a little bit about the procedures we

2     will follow in choosing a jury.

3          So, Mr. Munoz, at some point here the jury clerk is

4     going to tell us that they are ready to send up a number of

5     jurors to the courtroom.  These are people who I will place

6     questions to.

7          Ms. Rojas, could you give everyone a copy of the voir

8     dire, or have you already done that?

9          THE DEPUTY CLERK:  I have done that.

10          THE COURT:  We will mark that as a court exhibit.

11          THE DEPUTY CLERK:  Court Exhibit 1.

12          THE COURT:  So what this means is that I will read

13     these questions to each of the prospective jurors, and they

14     will answer.  We will put 14 people in this jury box right over

15     here, and so you will be able to watch them as they answer my

16     questions.  There will be 14 people.  We are going to select

17     eight people as jurors.

18          So how do we get from 14 to eight?  How we do that is

19     you, Mr. Munoz, have a right to object to three of the people,

20     three of the 14, and the defendants have a right to object to

21     three of the 14 people.

22          Now, you don't have to give me any reason whatsoever

23     to object to those.  You can just use whatever standards you

24     believe are important to you.  But besides having a right to

25     just essentially get rid of three jurors for no reason

H3K8MUN1

whatsoever, you also have the right to tell me that any one of
them, or all of them, can't give you a fair trial because they
are so biased or prejudiced.

So there is going to come a point after this
questioning of the jury where I am going to ask you, Mr. Munoz,
and the jury is going to know you're in custody so you can come
up with one of the officers who is guarding you, up here to
meet with me here and with defense counsel, and we will speak
quietly here at the sidebar, and I will ask you, is there any
one you want to exclude from this jury just because you think
they cannot give you a fair trial because they are so biased or
prejudiced?  We call those challenges for cause.

If you have a challenge for cause, I will hear you.
If defense counsel has a challenge for cause, I will hear you.
I will decide whether or not to kick somebody off because of
that reason or not.  If I kick them off, then we will put
someone else in their place.  I will ask them questions.  And
then will come the moment when you, Mr. Munoz, can select three
jurors you don't want on this trial, and defense counsel can do
the same.

I am going to ask Ms. Rojas right now to give you a
slip of paper and give defense counsel a slip of paper you can
use to make your three challenges.  You will see that it's a
slip of paper that has three lines on it with numbers, I
believe, 1, 2, and 3.  So that is the piece of paper you will

H3K8MUN1

1   fill in to tell me who you don't want on this jury.  You don't

2   have to justify the reasons, whoever it is.  And lawyers, Mr.

3   Munoz, have different ways of handling this procedure.

4   Sometimes -- and every juror will give their name -- sometimes

5   they use the jurors' names and write in Mr. Smith or Ms. Jones

6   on those lines.  Other times they just write the number of the

7   seat in which people are.

8           So, Ms. Rojas, can you stand by the jury box and point

9   out seat number 1.

10          THE DEPUTY CLERK:  Yes, your Honor.

11          THE COURT:  Ms. Rojas will show you where seat number

12  1 is, and I will make this clear as well.  That's 1, then we

13  have 2, and then we go right down the road, 3, 4, 5, 6, 7.

14          Then Juror No. 8.

15          Ms. Rojas, can you point to chair number 8?

16          THE DEPUTY CLERK:  Yes, your Honor.

17          THE COURT:  Thank you.  8, 9, 10, 11, 12, 13, 14.

18          So I will make it clear.

19          MR. MUNOZ:  Your Honor --

20          THE COURT:  Yes, Mr. Munoz.

21          MR. MUNOZ:  I can't see really -- seated down, I

22  cannot see juror 4 or 5.

23          THE COURT:  You will when they are seated in the

24  chair.  Don't worry.  Everyone will be more visible when the

25  chair is filled.  Good.

H3K8MUN1

1          Of course, if you have a problem seeing anybody during

2     the trial, I will make sure that we deal with that.

3          MR. MUNOZ:  Thank you, ma'am.

4          THE COURT:  Ms. Rojas is reorganizing the seating

5     there so hopefully it will be easier for you to see everyone.

6          Let's deal with what is going to happen after we

7     choose a jury.

8          After we choose a jury will be the time for opening

9     statements.

10          Now, Mr. Munoz, I think you may remember that last

11     week when we met I talked about the difference between sort of

12     when you're testifying under oath, on the witness stand, and

13     telling the jury what you remember, and what you felt and

14     heard, and describing the events to them.  That's testimony.

15     That's evidence.  The jury can rely on that in deliberating and

16     deciding whether you have proven your claim or not.  But every

17     time else that you speak to the jury during this trial, it's

18     not evidence.  It's like you're wearing a lawyer's hat.  It's a

19     chance to describe to the jury what you think the evidence will

20     show or what you're hoping they will find that the evidence did

21     show.

22          Do you understand that?

23          MR. MUNOZ:  Yes, I do, ma'am.

24          THE COURT:  So the opening statement, if you would

25     like, we will move that podium sort of to the center of the

H3K8MUN1

```
 1   jury box, and after we choose a jury you can stand behind that

 2   podium and speak to the jury -- it's called an opening

 3   statement -- and describe to them what you believe the evidence

 4   will show at trial.

 5          Do you have any questions for me about that phase of

 6   the trial proceedings?

 7          MR. MUNOZ:  No, ma'am, I understand clearly.  Thank

 8   you, ma'am.

 9          THE COURT:  OK.  So opening statements, let me ask

10   defense counsel, how long will your opening statement be?

11          MR. LICHTERMAN:  About 15 minutes.

12          THE COURT:  That's a little long, but that's fine.

13   That's fine.  No time limits there.

14          Mr. Munoz, you should feel free to take 10 or 15

15   minutes or the time you feel you need to describe what you

16   think this case will show when the evidence is presented.  OK.

17          Then after the opening statements, the plaintiff, you,

18   Mr. Munoz, has a right to call your first witness.

19          Excuse me one second.

20          If I remember correctly, Mr. Munoz, what you wanted to

21   do was to be the first person to testify at this trial.  Is

22   that right?

23          MR. MUNOZ:  Yes.  That's right, ma'am.

24          THE COURT:  So after the opening statements, I will

25   ask you, Mr. Munoz, "Mr. Munoz, do you wish to take the stand?"
```

H3K8MUN1

```
 1   And you will stand up and say, "Yes, I do, your Honor."  And
 2   you will come up here to the witness stand, you will sit down
 3   in that chair -- before you sit down, we will administer the
 4   oath to require you to testify truthfully to the jury.  Then
 5   you will sit down and turn to the jury -- there is a microphone
 6   up here -- and give them your testimony.  OK?
 7           MR. MUNOZ:  Yes, ma'am.  So once I reach the stand,
 8   it's just to give my testimony, my story?
 9           THE COURT:  That's right.
10           Now, did you make an outline like I suggested last
11   week or not?
12           MR. MUNOZ:  I did an outline, but it's not all that
13   great because my paperwork was given to me late by Mr. A.
14   Johnson from the Federal Bureau.  It was given to me a day
15   after I was supposed to get it.
16           THE COURT:  Well, defense counsel I think has provided
17   you with a full set of discovery materials.  What day did you
18   get those, Mr. Munoz?
19           MR. MUNOZ:  I was supposed to get it the 16th.  I got
20   it the 17th.
21           THE COURT:  So you got it on Friday instead of
22   Thursday.
23           MR. MUNOZ:  Yeah.  I couldn't really, you know, do
24   what I was supposed to, but I try my best.
25           THE COURT:  Well, it's more important -- so feel free
```

H3K8MUN1

1    to take that piece of paper to the jury stand with you, your

2    outline, to help you, and there will be no rush.  You will have

3    a chance to look it over.  I will ask at the end of your direct

4    testimony if you want to just take a moment to review the piece

5    of paper and make sure you have covered everything you would

6    like to say.  OK?  Good.  Then there will be cross-examination,

7    no doubt.

8           I have a few issues to cover with everyone, but I

9    think we will reserve that for our lunch break.

10          The names of the prospective jurors are being called

11   now.  So we are going to take a five-minute recess so everyone

12   can use the facilities and then come back to the courtroom

13   promptly.

14          The record should reflect that the fourth defendant

15   has now arrived and is seated at defense counsel table.

16          So we will take a very brief recess and then I will

17   see you again.

18          (Recess)

19          (Jury selection commenced)

20          (Continued on next page)

21

22

23

24

25

H3K8MUN1

1          THE COURT:  I want to thank everyone for their

2     cooperation during the jury selection process.  We now have a

3     jury.  We are going to take a brief recess while the jury uses

4     the facilities.  When you come back, I will have a few opening

5     remarks, and then I expect we will be able to have opening

6     statements and then break for lunch.

7          Again, Mr. Munoz, let me just remind you about what

8     this phase of the case is.  This is a chance for you to

9     stand -- and we will move that podium so it's facing the jury.

10    You can stand at the podium and tell the jury what you believe

11    the evidence will show at trial.  You can spend however much

12    time you want, 5, 10, 15 minutes.  Defense counsel will then

13    stand up and spend, 5, 10, 15 minutes giving their opening

14    statement to the jury, again describing what they expect the

15    evidence will show.

16         This opening statement is not evidence.  Nothing you

17    say during the opening statement and nothing defense counsel

18    says during the opening statement is evidence.  It's simply

19    helpful to the jury to understand what you expect the evidence

20    will be.  This is basically the point in time where you're

21    wearing that attorney's hat.  It's a kind of statement a lawyer

22    would give if your lawyer were beside you.

23         Again, it's hard to predict how our time will go, but

24    then I expect we will take a luncheon break.  When we take the

25    lunch break, I will speak to everyone a few minutes without the

H3K8MUN1

1    presence of the jury to talk about how this afternoon will go.

2    But after the luncheon break, that's the time, Mr. Munoz, when

3    you have a chance to come up here and take the witness stand

4    and be placed under oath and give your testimony to the jury.

5    That's the evidence part of the case.

6              Do you understand what I have just explained?

7              MR. MUNOZ:  So, your Honor, ma'am?

8              THE COURT:  Yes.  You don't have to bend down.  The

9    mic will pick up your voice.

10             MR. MUNOZ:  So first will be the statement and then

11   second will be the testimony.

12             THE COURT:  You've got it.

13             MR. MUNOZ:  In the statement, I get to address my

14   questions towards the defendants?

15             THE COURT:  After you testify this afternoon, because

16   this is your case, you told me you wanted to be the first

17   witness to take the witness stand and testify, right?

18             MR. MUNOZ:  Right.

19             THE COURT:  After that, you can make a decision as to

20   what you want to do.  I believe you wanted to call each of the

21   defendant officers on your case to take the stand and testify.

22   Am I right?  Do I remember that correctly?

23             MR. MUNOZ:  Yes.  I would also like to address some

24   questions.

25             THE COURT:  That's right.  When you call them, and you

H3K8MUN1

1    can call them in whatever order you want, they will come up one

2    at a time to the witness stand.  They will be placed under

3    oath.  We will move that podium probably a little back from

4    where it is now.  You will stand behind that podium and you

5    will get to ask the officers, once they are on the witness

6    stand and sworn to tell the truth, you will get to ask them the

7    questions you want about what happened that day.

8             Do you understand that?

9             MR. MUNOZ:  I understand.  I am a little bit confused

10   with the statements part.

11            THE COURT:  I know it is odd.  It is odd.  Because I

12   have told you over and over again, and I have told the jury

13   over and over again, that they have to return their verdict

14   based solely on the evidence, and the evidence is what the

15   testimony is from the witness stand or the exhibits that are

16   received into evidence.  But in addition to the testimony, we

17   give the parties, and it's usually lawyers, at the very

18   beginning of the case and at the very end of the case, a chance

19   to speak directly to the jury to basically give what is, in

20   essence, usually the lawyer's explanation to the jury of what

21   they believe the evidence shows.  OK?

22            So let me give you an example.  In your opening

23   statement, when you're standing at that podium and facing the

24   jury, nothing you say is evidence, but you could say something

25   like this:  This afternoon, ladies and gentlemen, you're going

H3K8MUN1

1    to see Mr. Munoz take the stand, and he is going to describe to

2    you what he believes happened on that date in 2011.  And he

3    will be telling you -- of course you're describing

4    yourself -- he will be telling you about what he experienced

5    that day, and let me give you some examples.

6           Then when you take the stand this afternoon and are

7    sworn under oath, you can turn to the jury and say, I am now

8    telling you what happened to me that day.  I am under oath and

9    I am telling you what I remember I was doing and what the

10   defendants were doing on that day.

11          Does that help?

12          MR. MUNOZ:  Yes, it does help.

13          During the statements, am I permissible to show jurors

14   copies of the evidence?

15          THE COURT:  Sometimes yes, sometimes no.  It depends.

16   What kind of evidence did you want to show during your opening?

17          I will tell you this, basically.  This is the general

18   rule.  The general rule is at the time of summation, at the end

19   of the trial, which is the last time you speak to the jury,

20   that's the time when we know actually what came into evidence,

21   then, of course, you could show the pieces of evidence to the

22   jury.  At the opening, it's a little hard to know precisely

23   what is going to come into evidence.  So it's a little harder

24   for me to just say yes or no that you could show something to

25   the jury.

H3K8MUN1

```
1              So what did you want to show the jury during your

2      opening statement?

3              MR. MUNOZ:  I wanted to show evidence of the .38

4      revolver with the two rounds.  I have a copy of that.

5              THE COURT:  Do you have a photograph of that?

6              MR. MUNOZ:  Yes, ma'am.  I also have all my medical

7      Xerox copies when I was injured in the hospital.

8              THE COURT:  OK.  Do the defendants have any objection

9      to the plaintiff during his opening statement holding up a

10     photograph of the gun?

11             MS. DEPOIAN:  Yes, your Honor.

12             I don't believe the photographs of the gun were on the

13     pretrial order.

14             THE COURT:  It may not be on the pretrial order.  Do

15     you have any objection to the plaintiff holding up a picture of

16     the gun in his opening?

17             MS. DEPOIAN:  If we could just look at the photograph

18     first.

19             THE COURT:  Sure.  You're planning to display the gun

20     to the jury, right?

21             MS. DEPOIAN:  Yes.  I am just not familiar with which

22     photograph he is referring to.

23             THE COURT:  So you have no objection other than you

24     would like to look at the photograph first to make sure that

25     it's the right gun, etc.
```

H3K8MUN1

1          MS. DEPOIAN:  Yes, your Honor.

2          THE COURT:  You said medical records, Mr. Munoz.  We

3     don't know yet what medical records are going to come into

4     evidence.

5          So why don't you in your opening just describe your

6     injuries, what you think the evidence will show about what

7     injuries you received.  Would that be OK?

8          MR. MUNOZ:  That would be all right.  It's just the

9     fact that the counsel, Mr. Lichterman, does not have the full

10    set of the photocopies of the medical injuries that I had

11    during Jacobi Hospital.

12         THE COURT:  Excuse me one second.

13         In the opening, just describe what you think the

14    evidence will show as to your injuries.  That will be helpful

15    to the jury.

16         MR. MUNOZ:  I could also mention I do have copies of

17    that, Xerox of those medical injuries.

18         THE COURT:  Good.  I would like you to, during our

19    luncheon break, show defense counsel what part of the medical

20    records you would like to offer in evidence, and I expect

21    everyone will agree as to what comes in evidence with respect

22    to those medical records.  But if there is any disagreement, I

23    will be happy to hear everybody and sort it out.  OK?

24         MR. MUNOZ:  Yes, ma'am.

25         THE COURT:  Good.  Terrific.

H3K8MUN2                    Preliminary Instructions

1            Does anyone need a brief recess before the jury comes

2    back or can we proceed?

3            MR. MUNOZ:  Yes, I would like, ma'am.

4            THE COURT:  We will take a very brief recess.  Make it

5    very short.

6            The jury is ready.  So make it very short.

7            (Recess)

8            THE COURT:  Bring in the jury.

9            Everyone will remain seated while the jury is brought

10   in.

11           Did you look at the photograph of the gun?

12           MS. DEPOIAN:  We did not, your Honor.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H3K8MUN2                        Preliminary Instructions

 1           (Jury present)

 2           THE DEPUTY CLERK:  Jurors, I am going to ask you to

 3   stand and please raise your right hand.

 4           (Jury sworn)

 5           THE COURT:  Thank you, ladies and gentlemen.

 6           I have a few instructions to give you and then we will

 7   proceed to opening statements.

 8           As I already mentioned, in our system of justice in

 9   this country, the jury and the judge have separate roles.  Your

10   role as jurors will be to decide all of the fact disputes in

11   this trial.  My role as a judge is to give you instructions as

12   to the law.

13           Nothing I say during this trial should intrude in any

14   way on your role as the exclusive fact finders.  I am going to

15   take a lot of notes in this trial just to help me with my job,

16   so don't be distracted by that.  OK?

17           So what is the evidence?  The evidence consists of the

18   following.  Testimony from this witness stand by witnesses who

19   will be testifying under oath and giving you their recollection

20   of what happened.  There may be some documents or exhibits

21   received into evidence.  That's evidence as well.  And there

22   could be a third thing, some agreements by the parties.  And if

23   that happens here, that's evidence as well.  We call those

24   stipulations.  That's it.  That's all the evidence.

25           Now, that means that opening statements, when someone

1  is standing behind this podium and addressing you, or closing

2  statements, when somebody is standing behind this podium and

3  addressing you, that's not evidence.  And, of course, nothing I

4  say is evidence.

5          Even when someone asks a question of a witness, that

6  is not evidence.  Obviously, you will listen carefully to the

7  question, because only when you hear the question can you

8  understand what the answer is, because you need the context for

9  the answer, but it is the answer that is the evidence, not the

10  question.

11          There may be objections to questions or answers during

12  the course of this trial.  If there are, I will rule on the

13  objections.  If I exclude testimony, that means you can no

14  longer consider that testimony as part of the evidence in this

15  case.  If I overrule an objection, and allow an answer to be

16  given, that's just fine.  That's part of the evidence then.

17          One of the important things you will have to decide in

18  this case is who is believable, who is credible when they give

19  their testimony.  I will say more to you about this at the end

20  of the trial, but, generally speaking, you can apply the same

21  tests here that you apply in your everyday life.  Did the

22  person who was testifying seem credible?  Did they seem

23  believable?  Did they seem to have a good recollection?  Did

24  they have a motive to testify truthfully or falsely?  Did what

25  they say fit in with the other evidence in the case?  You can

1    use all those tests that you use every day in your life to

2    decide whether something that someone is telling you is

3    reliable or not.

4           As the trial proceeds, you may have some impressions

5    about what happened here.  I am going to ask you, though, to

6    keep an open mind and wait until all the evidence is in.

7    Sometimes it's not until the very end of the trial that you can

8    make a reliable judgment about actually what happened.  So keep

9    an open mind and wait until all the evidence is in.

10          There are a few rules we follow in every trial, and I

11   want to describe those to you now.

12          One of those rules is you may not discuss this case

13   with anyone until the trial is over.  You cannot discuss it

14   even with each other until it's time for you to deliberate.

15          Why do we have that rule?  It's tied in with what I

16   have just told you.  Until you hear all the evidence, you don't

17   have a good basis to make a decision, and we want you to be

18   making your decision based solely on what comes in during the

19   course of this trial in this courtroom.  We don't want it to be

20   based on some conversation you have with someone else.  We

21   don't want you to be discussing the evidence before your

22   deliberations.  Because we know it's human nature.  You will

23   start to argue a point of view.  You will take a point of view.

24   We don't want you to do that.  We want you to keep an open

25   mind.

1              So you can tell family and friends that you have been

2      selected today as a juror in a civil case.  You expect the

3      trial to be over this week.  You have been told by Judge Cote

4      you may not discuss this case at all until it's over.  And when

5      it's over, you will be happy to tell them all about it.

6              Now, the second rule, and this ties in with things I

7      have already told you, is don't do any independent research.

8      Don't go on the Internet.  Don't open a dictionary.  Don't

9      visit a location that's mentioned.  Allow the parties to

10     present to you, in this courtroom, under my supervision, the

11     evidence that you can rely on to base a verdict in this trial.

12             Now, there may be people who enter this courtroom --

13     this is a public courtroom -- that you know.  That's just fine.

14     That's part of the American system of justice.  We don't have

15     secret proceedings in locked courtrooms.  But if you know

16     anyone who comes in, just let Ms. Rojas know and I will give

17     you a further instruction.

18             Also, if somebody comes up to you out in the hallway

19     to discuss the case, just be very polite and tell them you're

20     not free to discuss the case.  Judge Cote has told you you may

21     not discuss the case.  And just tell Ms. Rojas that happened,

22     and I don't expect it's going to happen, but if it does happen,

23     just be very polite and let Ms. Rojas know and I will give you

24     some further instructions.

25             Now, if you run across somebody in the hallways, or

H3K8MUN2                    Preliminary Instructions

1    leaving the courthouse or entering the courthouse, that's part

2    of this trial, they are not going to say good morning to you,

3    they are not going to wish you a good day, they are not going

4    to say have a good evening, because they are to have no contact

5    whatsoever with you outside my presence in this courtroom.  So

6    they are not being rude.  Don't hold it against them.  They

7    cannot speak with you.

8            The bottom line is everyone, every party in a civil

9    case is entitled to your best view of the evidence during your

10   deliberations based solely on the evidence that comes in at

11   this trial and nothing else.

12           So let's talk a little bit about procedure.  I told

13   you that the first thing that's going to happen now is first

14   Mr. Munoz and then counsel for the defendants will each have a

15   brief opportunity to speak to you.  They will use this podium,

16   stand behind this podium, and address you.  It's their chance

17   to tell you what they expect the evidence will show.  It's not

18   evidence.  Nothing they say behind that podium is evidence.

19   But it is helpful for you to understand what they expect you're

20   going to hear during the course of the trial.

21           I expect then we will take our luncheon break.  After

22   lunch, I expect Mr. Munoz is going to take the stand, be placed

23   under oath, and testify, giving you his memory of what happened

24   in the critical events that have caused this lawsuit to be

25   brought.  That is evidence, his testimony under oath will be

evidence.  And then I expect you will hear eventually from each
of the four defendants, and they will again take the stand,
testify under oath and give you their evidence.

At the end of the trial, both defense counsel and Mr.
Munoz will have a final chance to talk to you, standing behind
that podium.  That won't be evidence, but it will be their
chance to suggest to you what they believe the evidence has
shown and why they believe you should render a verdict in their
favor.  At that point, I will give you my charge as to the law.
You will retire to deliberate.  You will go back to that jury
room.  You will reach a verdict, we all hope.  That's the
overview.

So what kind of schedule are we going to follow?  We
are going to have a luncheon recess each day, usually from
about 12:45 to 2:00.  We are going to break promptly each day
at 5:00.  You can count on that.  We won't keep you past 5.  We
will start in the morning promptly at 9:30.  So we will go from
9:30 to 5 each day.  We will have that luncheon recess.  But we
will also have a break sometime in the morning and sometime in
the afternoon that's convenient for one and all so you can
return to the jury room and use the facilities there.

Now, if at any time one of you needs a break and I
haven't yet called it, just raise your hand.  I will be happy
to accommodate you.  There shouldn't be any concern about that.

I believe you have been given phone numbers to reach

1    us in case there is an emergency, and I believe you have given

2    Ms. Rojas phone numbers where we can reach you if there is an

3    emergency.  Good.

4              So let me end by giving you one final instruction in

5    this age of the Internet.

6              As I mentioned, you must decide this case based solely

7    on the evidence that comes in during the course of this trial.

8    That means you can't do any independent research about this

9    case, the matters in the case, the plaintiff or the defendants

10   in this case, defense counsel in this case, even about me.  You

11   just can't do any Internet research.  You can't use any

12   electronic tools or reference materials to obtain any

13   information whatsoever about this trial.  So you can't search

14   for or look at profiles of any of the people in this case on

15   any social media Web site.

16             Now, I have told you you must not discuss this case

17   with anyone during the trial, only with each other when you

18   deliberate.  This means that you can't engage in electronic

19   communications about this trial.  So don't communicate with

20   each other on the telephone or by e-mail or text messages,

21   Twitter or Facebook or other media.  Do not update your status

22   on any Web site or tell anyone through any electronic

23   communication that you're a juror on this trial.  That

24   instruction will govern during the whole length of this trial.

25   When the trial is over, of course you may use electronic

1    communications and do searches.  That's just fine.

2            So, Mr. Munoz, would you like to approach the podium

3    and give the jury a description of what you think the evidence

4    will show in this case?

5            MR. MUNOZ:  Yes, ma'am.

6            THE COURT:  You may.

7            MR. MUNOZ:  Your Honor, thank you.

8            Jurors, thank you very much, most appreciated.

9            My name is Nehmias Munoz.  Basically, I am pro se'ing

10   for myself, as you know.  Basically, what I am going to try to

11   do is I am going to bring some evidence, questioning the

12   officers, and be able to find a contradiction with three

13   testimonies, and including myself and my story, which is going

14   to be truthful, and you will see that it's three different

15   stories.  In other words, there's three different stories.

16   There's a contradiction going on there.  And because of that, I

17   plan to show you that I was really right in the beatings and

18   the excessive force.

19           I will be honest, truthful and very sincere, and I

20   thank you very much.  That's really what I have to say.  I

21   don't have that much legal knowledge, but I am trying my best

22   to show you the argument of the three testimonies.

23           Thank you very much.  That's what I plan to do.

24           I have also photocopies of the exhibits of the

25   evidence that they will show in this trial.  I will be able to

H3K8MUN2                         Opening - Mr. Lichterman

 1   explain that also.  Also, I will be able to produce

 2   questionnaires on, basically, the three defendants.

 3            Thank you very much and thank you for being here for

 4   me.

 5            THE COURT:  You may be seated, Mr. Munoz.  Thank you.

 6            Does defense counsel wish to make an opening

 7   statement.

 8            MR. LICHTERMAN:  Yes, your Honor.

 9            On September 13th of 2011, while high on crack,

10   plaintiff took a gun and robbed an 86-year-old man, and then

11   ran to a bodega, where he pulled the loaded gun out in front of

12   the defendants, Sergeant Robert Reid, Sergeant James Kelly,

13   Sergeant Brian Flynn and Detective Stephen Jones.

14            This case is about the force the defendants used after

15   plaintiff pulled out his gun in front of them.

16            You will learn that before this lawsuit was filed,

17   plaintiff's story was that defendants beat him up while they

18   were struggling to get the gun and handcuff him.

19            At some point, plaintiff's story changed.  During that

20   time, he decided to bring a lawsuit and was convicted and

21   sentenced to ten years in prison for the very arrest made by

22   these defendants.

23            Now, all of a sudden, plaintiff says that after he was

24   handcuffed, the defendants used additional force against him,

25   which was excessive.

1        You will learn, of course, that plaintiff has to say

2   that.  Because otherwise he has no lawsuit.  Here is why.

3        Because even plaintiff can't deny that officers are

4   allowed to use reasonable force when faced with a fatal threat

5   of a man wielding a gun.  And it's true that the officers did

6   use force against him in order to take his gun and handcuff

7   him.  But the judge has already told you that it's up to you as

8   jurors to decide whether excessive force was used after he was

9   handcuffed.  So now plaintiff's only chance of success in this

10  lawsuit is to claim that, after he was handcuffed, the officers

11  used additional force against him.  But that did not happen.

12       Here are some facts that you will learn during this

13  trial that will show you that it didn't happen.

14       Plaintiff had been using crack for three days straight

15  and had barely slept.  While still high from his binge, he took

16  a loaded gun and grabbed an 86-year-old man that he knew from

17  the neighborhood.  He then ran to a nearby bodega.  Then, as

18  soon as he saw the defendants enter the bodega, plaintiff

19  pulled out his gun.  Why?  Because he was high and he had just

20  robbed someone and he didn't want to go to jail.  So he didn't

21  put his hands in the air.  He didn't get on the ground.  He

22  didn't surrender.  No.  He grabbed his gun and he pulled it out

23  from his waist.

24       At that point, the officers had a few choices.  They

25  could draw their own weapons, but that's dangerous for the

H3K8MUN2                    Opening – Mr. Lichterman

1   civilians that are standing right by plaintiff.  And there

2   might not be enough time for them to get their weapons out

3   before plaintiff is able to shoot, especially because his gun

4   was already out.  So the officers charged towards the

5   plaintiff.

6          Let me stop there for a moment.

7          They charged a man with a loaded gun, for the safety

8   of the civilians in the bodega, for the safety of each other,

9   and for the safety of themselves.

10         Sergeant Kelly grabbed plaintiff first, followed by

11  then Officers Flynn and Reid.  They tried to get plaintiff to

12  the ground and get the gun as quickly as possible.  The longer

13  plaintiff had the gun, the higher the risk of shots being

14  fired.  But plaintiff struggled, and he held on tightly to the

15  gun and he began to yell, "You're going to have to kill me.

16  I'm not going back to jail."

17         While still holding on to plaintiff and attempting to

18  gain control of the gun, the officers brought plaintiff to the

19  ground.  Plaintiff fell forward with the gun held in his hand

20  beneath his rib cage.

21         (Continued on next page)

22

23

24

25

1           MR. LICHTERMAN:  And Sergeant Kelly and Officer Flynn

2     fell on top of him.  Well, plaintiff still did not let go of

3     the gun, which he gripped tightly underneath his ribs.  The

4     officers pushed down on plaintiff's back and his head to

5     prevent him from getting just enough space to fire the gun.

6     They punched at his head, back, and the sides of his ribs, in

7     order to get him to loosen his grip on the gun, or move just

8     enough for them to pull the gun out.  And they reached

9     underneath plaintiff and they yanked and pulled at his arms to

10    try and pry the gun out.  Officer Reid was eventually able to

11    recover the gun.  But plaintiff still fought.  He was kicking,

12    he was elbowing, he was spitting, and he was yelling.  And he

13    even bit officer Jones on the wrist so hard, in fact, that it

14    punctured his skin and made him bleed.  And meanwhile, food and

15    drinks from around the bodega were being knocked around and

16    were spilling and splashing.

17          Finally, the officers were able to handcuff the

18    plaintiff.  By the end of the struggle, the officers were

19    sweating, they were out of breath, and when plaintiff was

20    finally in handcuffs and no one was dead, the only feeling they

21    had was relief.  They were simply relieved.

22          Now remember, the judge has already told you that it's

23    up to you to decide whether the force used after plaintiff was

24    subdued and in handcuffs happened and was reasonable.

25    Plaintiff says that after this, additional force was used

H3k1mun2                    Opening - Mr. Lichterman

1    against him.  But you'll learn that plaintiff has no injuries

2    from this alleged force after he was handcuffed.

3           An ambulance came to the scene to treat plaintiff and

4    to take him to the hospital, but plaintiff has no recollection

5    of the ambulance.  After all, he was still high on crack.  And

6    you'll learn that he was yelling so much and was so disruptive

7    at the hospital that medical staff had to give him two doses of

8    a sedative to get him to calm down.

9           As you'll see, plaintiff had a fracture to one rib on

10   his left side, the same area where he fell on the gun and where

11   the officers were punching him.  He also had a laceration above

12   his left eye where the officers punched him, and he had a

13   laceration on his right forearm where the officers were pulling

14   and yanking to try and get the gun while food and drinks were

15   flying around the bodega.  These were plaintiff's only

16   injuries.  And they were caused by the force used before

17   plaintiff was handcuffed, which is not a part of plaintiff's

18   excessive force claim in this case.

19          So plaintiff is asking you now to believe that the

20   defendants used excessive force against him after he was

21   handcuffed even though, as you'll see, he has no injuries from

22   it.

23          After this incident, Sergeant Kelly called the NYPD's

24   Internal Affairs Bureau to report that plaintiff was injured.

25   As you'll learn, it's procedure to do this any time someone

H3k1mun2

1   who's arrested is injured, and Sergeant Kelly followed the

2   procedure, because the officers had nothing to hide.  And

3   you'll learn that investigators from the Internal Affairs

4   Bureau --

5           THE COURT:  I think we'll skip this part.  You may

6   move on.

7           MR. LICHTERMAN:  Again, plaintiff is asking you to

8   award him money.  He concocted a story to get around the fact

9   that the officers only used reasonable force against him.

10  That's the only way he can get money from this lawsuit.

11          Ladies and gentlemen, if you listen to the testimony

12  and you look at the evidence in this case, you will have no

13  doubt that the officers are telling the truth.  You will know

14  that the only force used against plaintiff was the reasonable

15  force used to get the gun and secure him, and you'll conclude

16  that no additional force was used.  Thank you.

17          THE COURT:  So, ladies and gentlemen, we're going to

18  take our luncheon recess now.  I know it's a little early, but

19  I don't want to interrupt the testimony of the first witness.

20  So we'll resume promptly at 2:00.

21          Remember, do not discuss the case.  Have a nice lunch.

22  Thank you.  And Ms. Rojas will show you back to that jury room

23  there.

24          (Jury not present)

25          THE COURT:  Thank you.  Mr. Lichterman, where were you

H3k1mun2

 1   going with the IAB story?

 2           MR. LICHTERMAN:  Yes, your Honor.  Plaintiff gave

 3   testimony before IAB shortly after this incident.  He has a

 4   copy of the transcript.  He sat and listened to the tape.  And

 5   I was going to mention the fact that he did not testify

 6   consistently in that hearing as he did at other points,

 7   particularly in his deposition.

 8           THE COURT:  Okay.  Well, that's fine.  I was afraid

 9   you were going to talk about the conclusions reached by any IAB

10   process.  It's absolutely fine for you to explore with the

11   plaintiff the testimony he gave at any prior proceeding with

12   respect to these issues.  That's fine.  But it would be

13   inappropriate for you to suggest to this jury one way or the

14   other what the IAB process concluded.

15           MR. LICHTERMAN:  Yes.

16           THE COURT:  Okay.  And I think it probably would have

17   been better to just not mention IAB whatsoever.  But that's

18   fine.

19           MR. MUNOZ:  Excuse me, your Honor.

20           THE COURT:  Excuse me, Mr. Munoz.

21           I'm going to give Mr. Munoz and defense counsel an

22   opportunity to ask me any questions you have in just a moment,

23   but I want to complete what I wanted to address this morning

24   and that we didn't get a chance to complete.

25           So during your luncheon recess, I want defense counsel

H3k1mun2

1     and Mr. Munoz to make sure you can identify what medical

2     records or portions of medical records should be received in

3     evidence.  If there's any dispute about what portions of

4     medical records come into evidence, I'll give you a chance to

5     be heard on that, but I want that to happen during the luncheon

6     recess.

7              I got from the city on Friday a copy of the 911 run.

8     What is the city planning to do with those?  We don't have a

9     witness.

10             MS. DEPOIAN:  Your Honor, I think at this point we're

11    not going to move to offer that into evidence.

12             THE COURT:  Okay.  And then we had also a presentation

13    of the CCRB materials, and there was a motion with respect to

14    the use of those materials at trial to examine the defendants

15    when they take the stand.  And to the city, would you please

16    make sure you file on ECF the letter of March 17th where you

17    gave me the CCRB histories and the 911 calls.  You don't have

18    to include the attachments.  That's fine.  And it didn't say

19    that you had given a copy of that letter to the plaintiff.  Did

20    you?

21             MS. DEPOIAN:  I don't think we did, your Honor.  I

22    believe we have a copy with us today.

23             THE COURT:  Good.  So you'll give it to the plaintiff.

24    It's my understanding you'd already given him copies of the 911

25    call and the CCRB materials that were attached.  Is that right?

H3k1mun2

1              MS. DEPOIAN:  Yes, your Honor.  We produced all of the

2      discovery, and those materials were in there.

3              THE COURT:  Okay.  Good.

4              So let me just briefly say that with respect to the

5      CCRB materials, I reviewed each of them, redacted and

6      unredacted.  With respect to each of the defendants, there is

7      no allegation at any time that reflects a falsehood claim, that

8      someone had lied, so it's not proper impeachment because of

9      that kind of allegation.  With respect to I believe it is two

10     of the defendants, there were allegations -- and this is

11     Defendant Reid and Defendant Flynn -- I believe there were

12     allegations of one or more occasion that force was used, but

13     none of them, as I understand it, resulted in any discipline.

14     They were either unfounded, unsubstantiated, complainant wasn't

15     available, the defendant was exonerated, so in any event, these

16     have nothing to do with impeachment.  It would be inappropriate

17     for impeachment in cross-examination.  If there were some

18     incident that was sufficiently similar on its facts, we might

19     have had 404(b) evidence, but we do not have that.  And so I

20     just want to instruct you, Mr. Munoz, that there will be no

21     cross-examination of these defendants because of the CCRB

22     records.

23              MR. MUNOZ:  Your Honor, you're talking about which?

24     Which?  Which paper were you talking about?  The ones -- what

25     date is that on?

H3k1mun2

         1          THE COURT:  These are discovery materials --

         2          MR. MUNOZ:  Mm-hmm.

         3          THE COURT:  -- in which there were records that

         4   certain complaints had been made before the Civilian Complaint

         5   Review Board about one or more of the defendants, and I'm just

         6   saying, they're irrelevant to this trial and you don't need to

         7   worry about them anymore.

         8          MR. MUNOZ:  You're not talking about the transcripts

         9   from the Wade or the Mapp hearing?  You're not talking about

        10   that, right?

        11          THE COURT:  That's right.  If a defendant testified in

        12   those hearings in a way that's inconsistent with this testimony

        13   at this trial, you may absolutely examine him about that prior

        14   testimony at those hearings.

        15          MR. MUNOZ:  But you're saying that's not admissible,

        16   ma'am, or is it admissible?  'Cause --

        17          THE COURT:  Let's just --

        18          MR. MUNOZ:  Help me understand that.

        19          THE COURT:  Okay.  Let's make sure.  Now we're moving

        20   to a new topic, and that is, the defendants gave testimony at

        21   hearings during your criminal prosecution.  That's what I'm

        22   talking about now, okay?

        23          MR. MUNOZ:  All right.  And that's gonna back up my

        24   story.

        25          THE COURT:  Good.  You may examine the defendants

H3k1mun2

```
1    about that prior testimony that they gave at those hearings in

2    connection with your criminal trial, all right?  You may do

3    that.

4              MR. MUNOZ:  Okay.

5              THE COURT:  Good.

6              MR. MUNOZ:  Thank you, ma'am, for that.

7              THE COURT:  Okay.  Good.  I'm just applying the rules

8    of law and the rules of evidence with respect to both the

9    plaintiff and the defendants.

10             Now I don't think there are any open issues on the

11   defendants' motions in limine.  Is that right, counsel?

12             MR. LICHTERMAN:  That's right, your Honor.

13             THE COURT:  Okay.  So Mr. Munoz, before we take our

14   luncheon break, did you have any question you wanted to ask me?

15             MR. MUNOZ:  It's just kind of hard just representing

16   myself.

17             THE COURT:  Please stand.

18             MR. MUNOZ:  It's just kind of hard just representing

19   myself, you know, asking for pro bono and no pro bono was

20   granted.  I wish I had at least standby counsel, something.

21   It's just kind of real hard, I mean, just getting the paper

22   late, day late.  Like I'm figuring everything is -- everything

23   is -- shouldn't be that way.  I feel I should -- it should be

24   more fair, more fair for me.  You know, I'm pro se, and I

25   feel -- I had all my paperwork on time.  I don't think that's
```

H3k1mun2

1    fair.

2              THE COURT:  So Mr. Munoz, I certainly appreciate that

3    feeling.  It's such a comfort to any party to have a lawyer

4    represent them.  And you had a lawyer when this lawsuit was

5    first filed.

6              MR. MUNOZ:  And he never saw me, though.

7              THE COURT:  That's fine.  But then the judge that was

8    presiding over this case tried to get you another lawyer, and

9    we contacted the office after I got this case too, the office

10   in this courthouse that tries to assist people who don't have

11   lawyers, and they were unable to, despite repeated efforts, to

12   get a lawyer to volunteer to come in and represent you.  And

13   remember when I saw you last week, I explained that there are

14   different rules in civil proceedings and criminal proceedings.

15   You have a right to an attorney in a criminal proceeding.  You

16   don't have a right to an attorney in a civil proceeding.

17   Someone has to agree or volunteer to come in to represent you

18   in a civil case.  And no one has, despite the best efforts of

19   the court to help you in that regard.  So, you know, I think

20   actually, in the circumstances, I know how difficult this is

21   for you.  I mean, I absolutely appreciate that.  But we're

22   going to take this slow, one step at a time, and let me tell

23   you that this afternoon is going to be very important because

24   it is your chance -- this is why you filed this lawsuit -- it

25   is your chance to take this witness stand and to tell your

H3k1mun2

1    story to the jury, okay?  So that's what you should focus on

2    now.

3              MR. MUNOZ:  I'm trying to focus, but I -- I really

4    should -- think I should -- this should like postpone or

5    something because I don't have -- I don't have -- each part in

6    this trial is like new to me.  Like right now, during the

7    statements, I think I'm doing my best.  We have professionals

8    like Mr. Lichterman and his -- and Ms. Depoian.  I'm nowhere

9    near that, nowhere near that.

10             THE COURT:  But the jury can see that you don't have a

11   lawyer.  We've told them that.  So the most important thing --

12             MR. MUNOZ:  I have a lot of things going on here

13   that's not benefit for me.

14             THE COURT:  Okay.  Well, Mr. Munoz, this is your

15   chance to have a trial in front of a jury.  I think actually

16   that this afternoon is very important.  It's your chance to

17   tell them what you remember happened.  So I would focus on what

18   you're going to say this afternoon to this jury.

19             MR. MUNOZ:  I can't even focus.  They don't even let

20   me bring in my material.  They keep me in the bullpen and -- in

21   the pen by myself.  They don't even let me study my legal work,

22   so how can I know -- how can I really defend myself?  I'm not

23   even allowed to look at my legal work.  Then on top of that,

24   they don't even provide me with a pen.

25             THE COURT:  Well --

H3k1mun2

1          MR. MUNOZ:  It's not fair.

2          THE COURT:  Excuse me one second.

3          MR. MUNOZ:  Not fair at all.  This is what I'm going

4     through.  How can I defend myself?  I can't even look at my own

5     notes.

6          THE COURT:  Wait one moment, Mr. Munoz.  Wait one

7     minute.

8          So Mr. Munoz, we need to make some phone calls to see

9     what we can arrange during the luncheon recess for you, but

10    it's important that you eat, okay, and take a break.  And it's

11    important now that you meet with defense counsel and talk about

12    what medical records are coming in.  So we'll make some phone

13    calls and see what we can arrange during the luncheon recess

14    for you.  But we're going to try to make an effort to

15    accommodate what you just asked.  We'll see what we can do.

16         MR. MUNOZ:  I'm trying my best, your Honor.  I mean, I

17    wish I would have had my own material, my legal papers so I

18    could be able to study so I could represent myself more better,

19    but I haven't gotten the opportunity here.

20         THE COURT:  Well, Mr. Munoz, this is your chance for

21    trial.  We're not going to adjourn it.  So this is the

22    situation.  Your papers are really the most important thing

23    right now, other than perhaps that one piece of paper that I

24    told you to prepare, or suggested that you might wish to

25    prepare when we met last week.  This is a chance to just sit

H3k1mun2

1    quietly, have your lunch, and think about what you want to tell

2    the jury when you take the stand.

3          MR. MUNOZ:  It's going to be real hard without --

4    without what I -- it's going to be real hard without what I

5    wrote.

6          THE COURT:  Would you like some time to have lunch

7    now?  We're going to continue with this trial, Mr. Munoz.

8    You've done a terrific job so far participating, and I want to

9    make sure that continues this afternoon.

10          Good.  So defense counsel, is there anything else we

11    need to address during this luncheon recess?

12          MR. LICHTERMAN:  No, your Honor.

13          THE COURT:  So I'd like you to show, as quickly as

14    possible, please, the plaintiff what medical records you think

15    are relevant and should be introduced before the jury so if he

16    has additional records that he'd like, he can describe that to

17    you.  Thanks so much.  See everyone at 2:00.

18          THE DEPUTY CLERK:  All rise.

19          (Luncheon recess)

20

21

22

23

24

25

H3k1mun2

AFTERNOON SESSION

2:00 p.m.

THE COURT:  I want to thank the Marshals for making
accommodations so that Mr. Munoz could remain in the courtroom
with his materials and pen during the luncheon recess and also
be able to eat lunch, which is important.

Bring in the jury.

MS. DEPOIAN:  Excuse me, your Honor.

THE COURT:  Please be seated.

THE DEPUTY CLERK:  Jurors entering the courtroom.

(Jury present)

THE COURT:  Please be seated.

Ladies and gentlemen, one of you, or maybe more than
one of you, asked Ms. Rojas about whether or not you could take
notes.  Let me give you an instruction with respect to
note-taking.

If you wish to take notes during this trial, you may,
but if you do take notes, those notes can only be used by you.
They cannot be shown to anyone else during the trial or during
your deliberations.

The fact that a particular juror has taken notes will
entitle that juror's view to no greater weight than the view of
any other juror during deliberations.  And if you take notes,
the notes cannot substitute for your recollection of what the
evidence was.

H3k1mun2

1          You'll see we have a court reporter here.  If during

2     your deliberations at any time any one of you has difficulty

3     remembering what the evidence was with respect to a particular

4     issue, you will have the opportunity to send me a note, asking

5     specifically for the testimony on a particular issue to be read

6     back to you.

7          Also, if you decide to take notes, make sure it

8     doesn't interfere with you listening to the evidence.  Your

9     focus should be on what the testimony is, what the evidence is

10    during the course of this trial and not your note-taking.

11         Thank you.

12         So Mr. Munoz, would you like to give the jury your

13    testimony at this trial?

14         MR. MUNOZ:  Yes, ma'am.

15         THE COURT:  Do you want to come up here and take the

16    witness stand, please.

17         MR. MUNOZ:  Yes, ma'am.

18         THE DEPUTY CLERK:  Mr. Munoz, watch your step.  There

19    are wires in front of you.  Okay.

20         (Witness sworn)

21         THE COURT:  Mr. Munoz, you may turn to the jury now

22    and tell them what you would like them to know about your case.

23    Remember to give them your best recollection as to what

24    happened.  Thank you.

25     NEHMIAS MUNOZ,

1        the Plaintiff,

2        having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4        MR. MUNOZ:  Your Honor and the juror, good afternoon.

5    I am Nehmias Munoz, born and raised in New York City.  I went

6    to St. Francis Xavier Catholic School up to the sixth grade,

7    and I dropped out of the tenth grade.  I got my high school GED

8    at the age of 32, and now I'm currently enrolled in Nyack

9    College in Fishkill Correctional Facility in Beacon campus for

10   my bachelor's of science, organizational management.

11       I'm going to bring it back to the day that the

12   incident happened.  On the day in question, of September 13,

13   2011, I will be here to explain the day of the incident that

14   took place in the deli bodega located at 1890.  I was

15   previously intoxicated and partaking in drug use.  At the time

16   I was high on crack.  I was up for up to -- for three days.  I

17   bumped into a gentleman who I know from the area.  And I used

18   to sell him movies back at that time.  I asked him for a small

19   loan of $10, and he rejected my request.  I -- once he rejected

20   my request, I took the pistol out of my left pocket halfway and

21   I showed it to him.  He told me to put the gun away.  This is a

22   older fellow that knew me from the neighborhood.  And at the

23   time I was high on crack, I was on psychiatric medication,

24   'cause I have a mental ill problem at the time, so I kind of

25   like self-medicated with the crack.  He then reached in his

1    pocket to remove his wallet, and which he did, and he told me

2    he can only give me a dollar or two.  And me being under the

3    influence of drugs and up to about three days that I was high

4    on three days, I kind of snatched his wallet.  I snatched his

5    wallet and I ran.  I never pointed the gun at him or nothing

6    like that.  He had a lot of expensive jewelry that day.  I

7    didn't go for that.  I was basically fiending for more crack

8    and -- and I was also hungry, didn't have no money, so my

9    intention was to just snatch his wallet and run.

10          A while later I went to the deli bodega at 1890 Archer

11   Avenue.  When I was inside the store, an employee at the

12   counter was a Mexican, so I ordered me a sandwich.  I went and

13   got me a Arizona piña colada, I put it on the counter and I was

14   waiting for my sandwich, which was a pastrami hero, Swiss

15   cheese, lettuce and tomatoes, mayo, with vinegar and oil.

16          I noticed that as I was waiting for the sandwich, it

17   was kind of taking kind of like a while.  There was only two

18   employees at the time.  It was a Dominican -- it was a

19   Dominican guy who was watching for the beverages so that nobody

20   would steal, and it was the Mexican guy, employee who was

21   behind the counter serving my sandwich.  Once I was waiting for

22   the sandwich and I knew that it was taking kind of like a

23   while, I felt kind of a little uncomfortable.  Because I had

24   just committed a robbery.  I knew where I was at.  My attention

25   was -- I knew my awareness, my conscious was back.  As you

1   could see, I was ordering a sandwich.  The effects of crack was

2   gone, 'cause the -- I was -- crack don't really last in my

3   system because I -- I was -- I'd been smoking it for a while so

4   it didn't really last that long.  It's a very short period of

5   time high.  So my conscious was back.

6          So as I was ordering the sandwich, I felt a tap on my

7   left shoulder, and once I looked back that I went to turn

8   around and face, it was at the time Officer Brian Flynn.  And

9   he's the second from the left in the gray suit.  At the time he

10  was a officer.  He wasn't a sergeant at the time.  He didn't

11  identify himself.  He didn't pull out his shield or nothing.

12  He was in plainclothes too.  So I kind of acknowledged that he

13  was an officer because -- and everyone I met in the Bronx is

14  not really that many Caucasian people, and as you could see,

15  he's Caucasian.  I seen the police chain also and the -- and

16  the -- his bulletproof vest.  You could tell he -- I could tell

17  he had a bulletproof vest.  I thought he was a little bit

18  shorter than me.  I'm actually like five-six and change, but I

19  believe he's a lot taller than me.

20         So once he did -- once he tapped me on the shoulder

21  and I turned around, I reached in my left pocket and I pulled

22  out the firearm with the finger off the trigger, pointed the

23  nose -- pointed the nose towards the ground, and I told him,

24  This ain't for you.  'Cause I acknowledged he was an officer,

25  and I also acknowledged that I also committed a crime.  So once

1  I -- I pointed the -- the firearm, and the finger off the

2  trigger, I had tissue around the -- I had toilet paper, which

3  is tissue, around the handle, because I didn't want to have

4  fingerprints on that gun, you know.  That gun didn't have my

5  fingerprints on it, you know.  I made sure that when I touched

6  it, I touched the tissue part, not -- not the -- not the

7  firearm without the tissue whatsoever.  Once I did that, next

8  thing you know, a few officers came, and that's when the

9  beat-down -- a lot of blows in my head, a lot of punching, a

10 lot of kicking.  I could acknowledge that it was Mr. Flynn and

11 Jones.

12         The third guy was Officer Reid, which is the only

13 black officer at the whole team.  He -- he never identified

14 himself also as a police officer.  He never pulled out the

15 shield.  But eventually I really knew that he was an officer

16 because he came -- he came into the excessive force with --

17 also with Flynn and Jones.  I never pointed the gun towards the

18 officers 'cause I know that if I would have ever done that, I

19 wouldn't have probably been here.  I believe the firearm was

20 unloaded for the simple fact that I had four rounds in it and I

21 emptied it, I took out the bullets myself, but at that time I

22 was so intoxicated and I was so scared that I had got

23 incarcerated, I might have said that, "That's a loaded gun.

24 I'm not going back to jail.  You gonna have to kill me."  At

25 that time I was about 42, 42 -- almost 43 years old.  So I had

1    a lot of mental ill issues going on with myself.  And I was on

2    some real strong medications.  But now this day, I'm not on no

3    medications, and actually, I'm trying to do better for myself.

4    Even though I'm incarcerated in a medium prison.

5            So because of -- because of not taking the medications

6    and being high on crack, I kind of like knew what was going on

7    in the store 'cause I had my conscious back, but then I was

8    like -- kind of like losing it too because of the fact that I

9    had three days up and numerous blows they gave to my head.

10   Those numerous blows were towards my left eye, which gave me

11   lacerations above my left eye and towards my rib and my right

12   arm, my right forearm.

13           I never acknowledged Sergeant Kelly coming in first.

14   The first one that was in the store was Mr. Flynn, Brian Flynn.

15   There was only two employees at the time, the Mexican and the

16   Dominican guy.  There was never no -- no food, no -- no meat

17   kicking or spitting or acting real violently.  That never

18   really occurred.  I know that the outburst that I said was that

19   that's a loaded gun, 'cause I probably thought that it was

20   loaded at the time because I was high, and that I also said

21   that, "You gonna have to kill me.  You're not taking me to jail

22   alive."

23           During the -- the excessive force, I know the firearm

24   went from my left hand to my right hand in the tussle.  I never

25   landed on the firearm where my ribs was at.  That's not how my

H3k1mun2                         Munoz - Direct

1   rib was fractured.  Actually, it was two of them.  One was

2   fractured and one was slightly fractured.  What happened was,

3   during the tussle with that gun, they didn't give me a

4   opportunity -- I was -- I was at a stage where, should I flee

5   for my life or should I stay.  So during the tussle, the

6   firearm moved from one hand to the other, and I dropped it.  I

7   know it fell to the ground.  So one of the officers cuffed me

8   to a machine there.  So as he cuffed me to the machine, they

9   went and retrieved -- I believe the word "retrieved" is getting

10  the gun.  They went and got the gun.  So they went and got the

11  gun.  Being the fact that the gun had tissue around the handle,

12  there's no fingerprints.  This is why I say that they planted

13  those two bullets, because the four bullets in the gun were all

14  silver.  They weren't copper with a red copper that they have

15  in the original copy of that -- of that evidence that they're

16  gonna produce today at trial.  There were never copper and they

17  never -- with a copper red head.  They were all silver, and I

18  believe those bullets are for targeting practicing.

19          So they made me -- as they uncuffed me, the one hand

20  that was cuffed to the machine, they -- blue lights kept on

21  bending my arms and bending my fingers so they could be able to

22  get the fingerprints on the gun.  As they did that, they took

23  me outside.  There was never no back door.  I never mentioned

24  there was a back door.  I mentioned that as I was towards the

25  counter, I looked back -- and there was only one door in the

H3k1mun2                          Munoz - Direct

1    front of the store.  That's why I said, towards the back,

2    'cause towards the back of me was the front door.

3              So as they -- after the excessive force, they

4    immediately took me and they laid me down on the ground.  And

5    outside of the -- of the deli bodega store, 1890, it's sort of

6    like a triangle.  There's a deli here, there's a -- there's a

7    parking lot, and there's a park.  And then further in the

8    corner they have that I believe to this day is called a VIP

9    Taxicab Service.  Now when they lay me on the ground, there

10   were so many people with their phones, either recording it,

11   or -- the incident.  I saw people with a couple of -- couple of

12   phones at the time.  IPhones were out at that time.  Happened

13   in 20 -- 2011.  And they laid me on the ground and they stood

14   me and -- they sit me.  They didn't stand me up.  They seated

15   me, sitting me down on the sidewalk, so there was never a park

16   bench.  They saying that they put me in a park -- in a bench.

17   There was never a bench.  They seated me on the sidewalk, and

18   half of my face was blooded, so I couldn't really, really see.

19             So at that time I was going through a lot because I

20   had a -- a lot of pain in my ribs and the head concussion

21   was -- I couldn't really focus, and in my vision, I couldn't

22   really see because the numerous of blood dripping from my

23   left -- on my left eye.  So I didn't even really acknowledge if

24   the -- if they got me inside the ambulance 'cause I was so

25   gone, and it wasn't because the effects of drugs.  It was the

1   effects because of the excessive force that these officers put

2   on me.  They put me in the ambulance and they took me to the

3   hospital and -- Jacobi Hospital.

4           As they took me to Jacobi Hospital, these officers

5   treated me like animals.  I asked for simple water.  They

6   didn't want to give me water.  They -- they took a little cup,

7   medicine cup, and they were pouring it down my throat as if I

8   was like an animal.  Then -- I understand -- I understand I

9   committed a crime.  Then they cuffed me to the bed, where I

10  know those are procedures, but if I have one arm -- I'm

11  unarmed.  I don't have no weapons.  Why couldn't you just give

12  me a small cup when I'm thirsting for water and I'm hungry?

13  'Cause that was the main reason why, besides fiending for

14  crack, I was also hungry.  That's why I was in the store

15  purchasing a sandwich.  Not because of crack.  'Cause I would

16  have took the money and I would have bought crack.  I would

17  have bought crack.  And I chose not to buy crack.  I was

18  hungry.  So they kept on treating me like an animal in the

19  hospital.

20          So I was asking for pain medication.  And they gave me

21  pain medication.  I don't know if it was Percocet, I don't know

22  if it was ibuprofen.  So I told them that -- I got kind of

23  upset, you know.  I said, well, if you don't -- you guys don't

24  cooperate with me, then I'm not gonna cooperate with y'all.  At

25  that time I believe I was like 230 pounds.  I'm kind of like a

H3k1mun2                              Munoz - Direct

muscular guy 'cause even though I relapsed on crack, I was a
while clean.  You know, I went through a couple of family
issues here.  So at the time I was like 230, 230, 235 pounds,
brawny, 'cause I work out, you know.  And I told them, If you
guys don't help me, then I'm not gonna cooperate.  So I started
moving the bed because I had pain, you know, I -- I had
committed a crime.  And my main acts was from depression.  So
because of that, then I spoke to a doctor and he finally gave
me some pain medication, and I -- I guess is what they saying,
the sedative, whatever you call that, to calm me down, I guess
that was that.  So I wound up -- I wound up real -- I real -- I
was kind of more calm and relaxed, and I guess because of the
pain I went through, I guess I fell out.  And also because the
amount of days that I -- I didn't rest, my body was really
tortured.  Besides my physical torture of being up, up for
three days high, and with their, you know, excessive force.

        I don't think that -- I don't think that if -- if I --
if I have a firearm and I'm in the store and I'm not exhibiting
that firearm and they come in the store and they don't see no
firearm and I pull out the firearm and I'm saying, This ain't
for you, why they couldn't say put the gun down, you know?  Why
couldn't they just say that, put the gun down, turn, put your
hands behind your back?  That can't -- that store has a --
surveillance cameras.  Where they at?  They don't even have the
surveillance cameras to the store, you know, they -- they never

H3k1mun2                         Munoz - Direct

1    provided that for me, you know, so -- even the store owner's

2    not even present now, and he's -- he was the one who cooperated

3    also with -- with the story of what the officers said.  So how

4    come he's not here now, you know?  So no -- no type of evidence

5    in those recorded videos.  They were never produced.  I wish

6    they would have.  It would have definitely shown -- it would

7    have definitely shown my honor as the true story.

8            But like I say, I'm pro se.  I'm doing my best.

9    Actually, I'm really proud of myself.  I'm really proud of

10   myself today for -- for being a changed man.  I'm -- I'm

11   upstate in prison right now.  I got a couple of years in, and

12   hopefully, when this is over, I'll be able to go back to

13   society and not do drugs again.  Because that's why I'm here,

14   'cause of drugs.  If I would have never did drugs, I would have

15   never been here.

16           And then after that, I was out on bail, I was out on

17   bail, and I caught me two other -- I guess I didn't learn my

18   lesson.  I caught me two other crimes.  Out of the four months

19   that I was out on bail, I caught me two other crimes because of

20   not seeking help, treatment for my mental illness, and I wound

21   up smoking crack again.  I caught two more -- two more cases,

22   which got acquitted.  They had something to do with an

23   undercover came up to me and asked me where could he buy crack

24   and heroin, and I took his money and I never purchased him the

25   crack or heroin.  I got acquitted.  And I believe the other one

H3k1mun2                         Munoz - Direct

1   was for selling movies.

2          And I bumped into Mr. Flynn.  Actually, he was pretty

3   nice with me, and pretty shocking that I was out on bail, on

4   $35,000 bail that my fiancée bailed me out.

5          And that's my story.  I didn't point the gun at

6   Mr. Catalina LaCourt.  I never robbed him at gunpoint.  It

7   should have been just a grand larceny and just faced the

8   possession of firearm, but I took that because of my prior

9   history that I have.  You know, and that's what happened to me

10  that day.  Hopefully I could be able to prove y'all right.

11  That's my side of the story.  Thank you.

12         THE COURT:  Thank you, Mr. Munoz.

13         Mr. Munoz, I think you mentioned two lacerations and a

14  fractured rib?

15         THE WITNESS:  Yes, ma'am, that's correct.

16         THE COURT:  Do you want to just tell the jury

17  briefly -- you don't have to, but if you'd like to, just tell

18  the jury briefly what that felt like, the two lacerations, how

19  long it took you to recover.  And the rib.

20         THE WITNESS:  The lacerations on the eye, throughout

21  my years, kind of made me lose a little vision on my left --

22         THE COURT:  No, no, no.  Ladies and gentlemen.  Sorry,

23  Mr. Munoz.  I think you mentioned that you had a laceration

24  above your eye?  There's no claim here of a loss of vision

25  related to this incident.  I think you now wear glasses, am I

H3k1mun2                          Munoz - Cross

```
1    right, Mr. Munoz?

2               THE WITNESS:  Yes, ma'am.  I suffer --

3               THE COURT:  All right.  So this isn't a vision case.

4    But there was a laceration above your eye, is that right?

5               THE WITNESS:  Yeah, this laceration above my left eye.

6               THE COURT:  And there was a laceration on an arm?

7               THE WITNESS:  I think the laceration on my left eye, I

8    don't know if it's -- anywhere from six stitches.

9               THE COURT:  And the --

10              THE WITNESS:  And so is my eyebrow.  And the

11   laceration on my right forearm and about maybe the same, six or

12   seven.  What really, really hurted me the most was my left eye

13   and the fractured ribs due to the fact that you can't -- you

14   only could get certain pain medication when you in -- when you

15   in Rikers Island, so they got to heal on itself.  So that's

16   numerous of times not sleeping.  I couldn't really sleep from

17   that side.  It took about like maybe two and a half months for

18   them to heal.  I couldn't work out, I couldn't do no type of

19   sports activity.  But eventually I kind of hang in there and

20   here I am.

21              THE COURT:  Thank you very much, Mr. Munoz.

22              Cross-examination.

23              MS. DEPOIAN:  Yes, your Honor.

24   CROSS EXAMINATION

25   BY MS. DEPOIAN:
```

1   Q.  Good afternoon, Mr. Munoz.

2   A.  Good afternoon.

3   Q.  Mr. Munoz, you testified that you have a mental illness, is

4   that right?

5   A.  Yes, ma'am.

6   Q.  And that mental illness is paranoid schizophrenia, correct?

7   A.  I do suffer paranoia, yes.

8   Q.  And one of the symptoms of your paranoid schizophrenia is

9   auditory hallucinations, right?

10  A.  Not really.

11  Q.  So is your testimony --

12  A.  Not really.

13  Q.  -- that you don't ever hear voices?

14  A.  Yeah, but that's -- that's in the past.  That's -- that's

15  way in the past, like when I was in my 20s.  I'm now 49, so --

16  Q.  So in the past you have heard voices.

17  A.  Yeah, also 'cause of the usage of all sorts of drugs, so --

18  Q.  And is another symptom of your schizophrenia paranoia?

19  A.  That's what basically the relaxation program.  Ms. Aponte

20  put down on the letter for my counsel to represent me, trying

21  to get me a program, which Mr. Lichterman got his hands on,

22  basically more trying to help me.  I was monitored and all

23  that.  Axis, the main axis, diagnosis axis is depression for my

24  mental illness, so --

25              THE COURT:  Excuse me one second.  Thank you very

H3k1mun2                        Munoz - Cross

1    much, Mr. Munoz, for giving your answer to the attorney.  But

2    let me just give you an instruction.  I'm going to ask you to

3    listen carefully to the question she's asking and try to just

4    respond to that question, and if at the end of her questioning

5    you want to come and address the jury again, you know, just

6    turn to them when she's done with her questions and explain

7    anything further, I'll give you another chance, okay?

8              MR. MUNOZ:  Okay, ma'am.

9              THE COURT:  So listen to the question and just try to

10   respond to the questions she's asking you now.

11             MR. MUNOZ:  Yes, ma'am.

12   BY MS. DEPOIAN:

13   Q.  So my question, Mr. Munoz, was if paranoia is a symptom of

14   your schizophrenia.

15   A.  Maybe 'cause I was high on crack.

16   Q.  So is that a yes or a no?

17   A.  Maybe yes.

18   Q.  And is anger also a symptom of your schizophrenia?

19             THE COURT:  Counsel, I don't think he's agreed with

20   your question, your fundamental premise there.  He never

21   answered yes to schizophrenia.

22             MS. DEPOIAN:  Okay.  Thank you, your Honor.

23             (Continued on next page)

24

25

H3K8MUN3                          Munoz - Cross

1   Q.  Mr. Munoz, do you suffer from schizophrenia?

2   A.  Not really.  Depression.

3          MS. DEPOIAN:  I am going to direct the Court to what

4   has been marked for identification purposes as Defendants'

5   Exhibit P.

6          Permission to approach the witness, your Honor.

7          THE COURT:  Yes.  You don't need to ask my permission.

8   Q.  Mr. Munoz, do you recognize this document?

9   A.  Actually, I believe a clerk helped me with this paperwork

10  while I was incarcerated upstate.

11  Q.  If you could turn to page 15.  Is that your signature on

12  the bottom of that page?

13  A.  Yes, it is.

14  Q.  So you reviewed this document before you signed it, is that

15  right?

16  A.  Once again, I was helped by a clerk.  So maybe I saw it,

17  maybe --

18  Q.  It's your signature on the bottom of the page?

19  A.  Yes.

20  Q.  So you saw this document before you signed it, right?

21  A.  If I saw the document before I signed it?  Actually, I

22  don't even have a copy of this, but yeah, I signed it.

23  Q.  Did you read it before you signed it?

24  A.  Not all of it.

25  Q.  Did you submit it to the court under penalty of perjury in

1    this case?

2    A.  No.  I submitted it because it was a document that was

3    going to help me for trial, to be here for trial.  This is what

4    the summary judgment is about, this is it right here?

5    Q.  I am just asking you whether you reviewed this document

6    before you signed it?

7    A.  Yeah.  This is summary judgment, yeah.  I was being helped

8    by a clerk.

9    Q.  Can I direct your attention to page 11 of this document.

10              Do you see where it says, "Mr. Munoz admits that he is

11   an Hispanic man who suffers from paranoid schizophrenia, other

12   psychological disorders, drug addiction and substance abuse and

13   has been prescribed medications for those continues through

14   September 2011."

15   A.  OK.

16   Q.  Do you see where it says that?

17   A.  Yeah, I see it.

18   Q.  Is that true?

19   A.  I don't know about the schizophrenia, but I could say maybe

20   paranoia.

21   Q.  So it's your testimony that it says that you're a paranoid

22   schizophrenic in this document that you signed, but that you're

23   not?

24   A.  That's basically what the doctors gave me, but actually

25   it's not what I'm saying.  Just like they told me I can take

H3K8MUN3                         Munoz - Cross

1   medication for the rest of my life, and I'm not taking none
2   till this day.
3   Q.  But you admit that you were diagnosed with paranoid
4   schizophrenia at one point, right?
5   A.  Yes.
6   Q.  You're actually prescribed medications for your paranoid
7   schizophrenia as well?
8   A.  In the past, yeah.
9   Q.  And when you take medication, it alleviates the symptoms of
10  your schizophrenia, right?
11  A.  Not really because look at me.  I don't take no
12  medications.  I'm functioning very well.
13  Q.  But in the past doctors have prescribed you medications for
14  schizophrenia, right?
15  A.  Since a little child, they told me I have to take
16  medication for the rest of my life.
17  Q.  At some point in the beginning of September 2011 you
18  actually stopped taking your prescribed medications, right?
19  A.  That's correct.
20  Q.  After that you started self-medicating, right?
21  A.  I self-medicated with crack.  That's what really caused me
22  this crime.
23  Q.  You testified earlier that around early September 2011 you
24  smoked crack for three straight days, right?
25  A.  True.

H3K8MUN3                          Munoz - Cross

1    Q.  In fact, you said you were fiending for more crack on

2    September 13, 2011, right?

3    A.  That's what crack does, cocaine crack does that.

4    Q.  In other words, you were desperate to buy more crack,

5    right?

6    A.  In a way, yeah.

7    Q.  But you didn't have any money to buy crack, right?

8    A.  But I was really fiending for more food than crack.

9    Q.  But you were also fiending for crack, right?

10   A.  Yes.  I mentioned that before.

11   Q.  It's your testimony that on September 13, 2011, you

12   happened to find a handgun in the park, right?

13   A.  That's correct.

14   Q.  This gun that you found just happened to be in a brown bag

15   on a bench you were sitting on, right?

16   A.  That's correct.

17            MS. DEPOIAN:  I would like to show the witness what

18   has been previously marked for identification as Defendants'

19   Exhibit L.

20            I am just going to show it to him because I don't

21   believe I --

22   Q.  Can you see this?

23   A.  I just see a firearm.  I don't see the two rounds.

24   Q.  You could see a firearm, right?

25   A.  Yeah, but I don't see the two rounds.

H3K8MUN3                            Munoz - Cross

1   Q.  Do you recognize this firearm?

2   A.  If you can bring it closer?  You're showing it to me in

3   like a scary way.  I need to see.  I'm not going to snatch it.

4   I would like to see it.  I know the model.

5           THE COURT:  Mr. Munoz.

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  I am going to ask the officer if he could

8   assist here, if he could come forward and assist.

9           MARSHAL:  Yes, ma'am.

10          THE WITNESS:  Bring it up closer.

11  A.  I can't seem to see the name of the model.  I can't even

12  see the name.

13          THE WITNESS:  Is it all right if maybe I could be able

14  to see my photocopy of the same firearm.

15          THE COURT:  Absolutely.

16          THE WITNESS:  I have a problem identifying it.

17          THE COURT:  I think the photograph is on your table.

18  Am I right, Mr. Munoz?

19          THE WITNESS:  Yeah.  I believe it also has a serial

20  number.

21          THE COURT:  OK.  After counsel finishes her questions,

22  we are going to let you step down and find the photograph that

23  you would like to show the jury.  And we will receive that into

24  evidence if you would like.

25          THE WITNESS:  It looks real similar.  I don't see the

1     two rounds that supposed to be there on the gun ballistic.

2              THE COURT:  Thank you.

3              Counsel, you may continue.

4     BY MS. DEPOIAN:

5     Q.  It's your testimony that this gun looks very similar to the

6     gun that you found on September 13, 2011, right?

7     A.  Yeah.  It looks very similar.  It's been so long, I haven't

8     seen it.  Maybe it could be me.

9     Q.  After you found the gun on the bench, you decided to take

10    the gun, right?

11    A.  Yes.  It was in a brown paper bag.

12    Q.  You said you wrapped a tissue around the gun, right?

13    A.  Yes.

14    Q.  That was so your fingerprints wouldn't get on the gun,

15    right?

16    A.  That's correct.

17    Q.  Because you were fiending for crack and you had no money,

18    you took the gun and you robbed a man named Catalina LaCourt,

19    right?

20    A.  Robbed but not at gunpoint.

21    Q.  But you used your gun to rob him, right?

22    A.  Not really.  That's why he told me put the gun away.  He's

23    a friend of mines.  He knows I was under the influence of

24    something.

25    Q.  You don't actually remember robbing Mr. LaCourt, do you?

H3K8MUN3                          Munoz - Cross

1   A.   In the beginning, not really.  But then afterwards, yeah,

2   because I was capable of seeing him after bail, when I was out

3   on bail.  He's from my neighborhood.

4   Q.   At the time when you stole his wallet, you don't remember

5   that, right?

6   A.   I'm not really sure.  I think I did.

7   Q.   Mr. Munoz, you gave a deposition in this case, right?

8           I am going to show you that deposition.

9           Mr. Munoz, you were under oath at the time of this

10  deposition, right?

11  A.   Yes.

12  Q.   You took an oath to tell the truth?

13  A.   Yes.

14  Q.   The same oath you took today, right?

15  A.   Yes.

16  Q.   At this deposition on December 23, 2015, you were asked

17  about Mr. LaCourt and what happened that day, right?

18  A.   Yes.

19  Q.   I am going to direct your attention to page 68, line 23.

20          Were you asked this question and did you give this

21  answer:

22  "Q.  Do you remember how long your interaction was with him?

23  "A.  I don't remember.  I don't remember.  I can't remember."

24          Were you asked those questions and did you give that

25  answer?

H3K8MUN3                          Munoz - Cross

1    A.  Repeat that again.

2    Q.  Sure.  Were you asked the following questions and did you

3    give the following answer:

4    "Q.  Do you remember how long your interaction was with him?

5    "A.  I don't remember.  I don't remember.  I can't remember."

6            Were you asked that question and did you give that

7    answer?

8    A.  Yes.  Yes, I did.

9    Q.  The reason you can't remember robbing him is because you

10   were high, right?

11   A.  In a way, yeah.  But maybe it was because I was being under

12   the pressure of Mr. Lichterman.  This took place in Fishkill,

13   these minutes here.  I didn't have no lawyer representing me at

14   the time.  I was by myself and I was being under the pressure.

15   He was like pressuring me, and he was kind of like speeding to

16   get an answer right away.  I was feeling very uncomfortable.

17   As a matter of fact, he even said that I have to be there.  I

18   couldn't leave there.  I had to be there seven hours.

19   Originally, that's not true, because the correction officer was

20   the one who told me no.

21   Q.  The reason that your testimony was different at the time of

22   your deposition from today is because counsel was pressuring

23   you to answer questions?

24   A.  He was pressuring me.  Not only that, he was being real

25   fast with the questions.  He was like wanted an answer right

H3K8MUN3                          Munoz – Cross

1    away.  I'm not sure if -- I think I was off medication at the

2    time when this occurred.

3    Q.  Do you recall what you did after the robbery?

4    A.  Repeat that, please.

5    Q.  Do you recall what you did after the robbery?

6    A.  I could remember what I did that day of the robbery, yes, I

7    could remember now.

8    Q.  Do you remember -- you actually don't remember where you

9    ran, right?

10   A.  Yes, I do remember where I ran.

11   Q.  I am going to direct your attention to page 69 of your

12   transcript, Mr. Munoz.

13   A.  I'm on 69.  OK.

14   Q.  Line 6, were you asked this following question and did you

15   give the following answer:

16   "Q.  Where did you run?

17   "A.  I don't remember, man.  Not that I don't want to give you

18   an answer.  I just don't remember.  All I remember is me being

19   inside the store and somebody tapping me on my shoulder.  I

20   looked back and it was the officer.  That's what I remember."

21        Were you asked that question?

22   A.  I said that out of anger because I didn't really want

23   to -- I didn't really want to give no answers that would

24   probably haunt me to this day of trial due to the fact that I

25   had no lawyer representing me and it was just him.  The notary

1   public, Ms. Erin Shimmery was her name, or something like that,

2   I felt real uncomfortable in the room with just him and not

3   being represented by an attorney on my behalf.  I was really

4   frustrated with the way he was treating me.  I just wanted to

5   get it out the way, this right here, I want to get it out the

6   way.  I didn't think it was going to be that important for me.

7   But I actually remember everything that happened after a while.

8   It took me a while, but I did remember.  I do remember to this

9   day.

10  Q.  So you lied during your deposition, is that your testimony?

11  A.  I did not lie.

12  Q.  Is it the truth that you don't remember?

13  A.  What am I lying about?  Tell me.

14  Q.  I can reread the question and answer and you can tell me if

15  that's the truth or not.

16  A.  Then I don't remember where I ran.

17  Q.  So the question was:

18  "Q.  Where did you run?

19  "A.  I don't remember, man.  Not that I don't want to give you

20  an answer.  I just don't remember.  All I remember is me being

21  inside the store and somebody tapping me on my shoulder.  I

22  looked back and it was the officer.  That's what I remember."

23          Is that the truth?

24  A.  That's the truth then.

25  Q.  That you don't remember, right?

H3K8MUN3                          Munoz - Cross

1   A.   Yeah.

2   Q.   That's because you were intoxicated, right?

3   A.   If you want to put it that way, yeah.

4   Q.   And you still had the handgun when you were inside the

5   bodega, is that correct?

6   A.   Yes, that's correct.

7   Q.   When you saw the police officers when you were inside the

8   bodega, you immediately recognized that they were police

9   officers, right?

10  A.   I saw Mr. Brian Flynn, which is a sergeant now.  He was the

11  first one that tapped me on my left shoulder.

12  Q.   You knew they were law enforcement officers when you saw

13  them, right?

14  A.   I didn't know till I took a look at him.  He was in plain

15  clothes.  He wasn't in no NYPD police department uniform.

16  Q.   The officers had bulletproof vests on, right?

17  A.   He did, yeah.  I notice that he was an officer because I

18  had committed a crime.  He's the only Caucasian inside the

19  store on that particular area in the Bronx, in Parkchester,

20  Archer Avenue.  It's not that many Caucasian people around that

21  area.  It's mostly Latinos and blacks.

22  Q.   My question is just, you immediately recognized that these

23  individuals were law enforcement officers, right?

24  A.   Well, I knew -- I acknowledge he was a officer.  That's why

25  I withdraw the firearm the way I withdraw it.  The nose

```
 1   pointing down with the finger off the trigger.  I think that's

 2   why I am alive to this day.

 3   Q.  Is that a yes, Mr. Munoz, that you immediately recognized

 4   these people?

 5   A.  I recognized him.  You're saying these people.  You're

 6   talking about Mr. Flynn first.  He is the first one that went

 7   into the store.  You're saying these people.

 8   Q.  When you saw Officer Flynn, you immediately knew that he

 9   was a police officer, right?

10   A.  Right.

11   Q.  When you saw Officer Flynn, you knew you were going to be

12   arrested, right?

13   A.  Yes, I knew.  That's why I withdraw the gun and I said what

14   I had to say.

15   Q.  You didn't want to be arrested, did you?

16   A.  No.  I think I answered that.

17   Q.  You were worried about being arrested, right?

18   A.  Yes.  I'm worried.  I have a lot of felonies.

19   Q.  You told the officers, I'm not going back to jail, right?

20   A.  That's right, I did say that.  Those statements are true.

21   Q.  In fact, the very first thing you did when you saw Officer

22   Flynn was pull out your handgun, right?

23   A.  I pulled it out of my left pocket, that's right.

24   Q.  So that's a yes?

25   A.  Yes.
```

H3K8MUN3                          Munoz - Cross

1   Q.  After you pulled out the gun, you didn't hand it to any

2   officer, did you?

3   A.  I didn't have no chance.

4   Q.  You didn't drop it on the floor, did you?

5   A.  Maybe through the tussle, yeah.

6   Q.  After you pulled it out, you did not drop the gun on the

7   floor, right?

8   A.  No.  He never had his gun drawn out.  He never had his

9   firearm drawn out.  Usually an officer will come in, identify

10  himself, and if he sees that I'm pulling out a firearm,

11  automatically he will withdraw.  Put the firearm down.  I'm a

12  police officer.  I could have just put the firearm down.  None

13  of that happened.

14  Q.  When you pulled out your gun, you did not drop it on the

15  floor, right?

16  A.  I told you -- I explained the way I withdraw the gun.  I

17  did explain how I did it.

18          THE COURT:  Mr. Munoz, I am going to ask you, if you

19  can answer with a yes or no fairly, to do that.  OK?

20          THE WITNESS:  OK.

21  A.  Yes, I did withdrew the gun.

22  Q.  My question was, you did not drop it on the floor, right?

23  A.  No.  Not at that specific moment.

24  Q.  When you pulled out your gun, you did not put up your

25  handed in the air?

H3K8MUN3                          Munoz - Cross

1    A.  I put one -- my right hand I put up, and the second one I

2    pulled out and told him, this ain't for you.  That's exactly

3    what I said.

4    Q.  After you did that, after you pulled out the gun, the

5    officers tried to get the gun away from you, right?

6    A.  Well, they just came and -- they just came and started

7    punching me.

8    Q.  So is that a yes then, they tried to get the gun away from

9    you?

10   A.  Yeah.  They came and beat me up.  That's how they did it.

11   Q.  You testified earlier that you had a laceration above your

12   eye, right?

13   A.  Yes.

14   Q.  That was your left eye?

15   A.  Yes, ma'am.

16   Q.  In fact, it was the very first punch that caused the injury

17   to your eye, right?

18   A.  I believe so.  A knock-out punch.

19   Q.  You received the injury to your eye while you were still

20   holding the gun, right?

21   A.  I mean, I'm not sure of that.  I'm not sure if my eye was

22   busted.  I can't really answer that question.

23   Q.  I am going to direct your attention to your deposition on

24   page 96.

25   A.  OK.  I'm on 96.

H3K8MUN3                              Munoz - Cross

1   Q.  Were you asked these questions and did you give these

2   answers?  I am starting on line 5:

3   "Q.  Were you hit before or after --

4   "A.  I got hit in the eye.

5   "Q.  Let me finish my question.

6               -- "before or after you were on the ground?

7   "A.  You're going to debate here?  Is this going to go on for

8   the whole interview?

9   "Q.  Mr. Munoz.

10  "A.  There's no sense in my being here, man.

11  "Q.  I'm not debating.  I am trying to understand what you're

12  saying.

13  "A.  I told you yes.

14  "Q.  While you were standing?

15  "A.  Yes.  That was the first hit, it busted my eye open."

16  A.  Then that's how it was.  And as you could see, as you're

17  reading, that I'm saying I'm not debating here, this, this and

18  that.  It was the pressure that Mr. Lichterman was giving me.

19  I really didn't want to be there without being represented by

20  an attorney.  He kind of said I have to be there, it was an

21  obligation I had to be there, like I had to be there.  I didn't

22  think I had to, but I didn't know.  I was very uncomfortable.

23  Q.  Mr. Munoz, your eye was busted open while you were still

24  holding the gun, right?

25  A.  Yeah, I believe so, yeah.

H3K8MUN3                        Munoz - Cross

1   Q.  You don't remember which officer actually punched you with

2   that first punch, right?

3   A.  No.  I don't know if it was Mr. Flynn.  I don't know.  To

4   be honest, I don't know which of them.  I know it wasn't

5   Sergeant Kelly.  I know that for a fact.  But anywhere between

6   Flynn, Jones and Mr. Reid.  I'm not sure.

7   Q.  After you were hit that first time, you still didn't let go

8   of the gun, did you?

9   A.  When he hit me, no, because I was holding it in a way that

10  it wasn't threatening.  They could have just took the gun if

11  that's the case.  Why didn't he just take the gun right away

12  out of my hand?

13  Q.  Your answer is, yes, you were still holding the gun?

14  A.  I probably was, yeah.  I probably was.

15  Q.  You actually struggled with the officers, right?

16  A.  Well, they was struggling to try and get the firearm out of

17  my hand, because I was holding it tight because it had toilet

18  paper on it.  So I guess through the tussle we all fell down,

19  and that's when the firearm went on the floor at a distance.

20  It went from, I believe, my left hand to the right hand, and

21  then it went from a distance away from me, and that's where the

22  officer -- one of the officers handcuffed me to a machine

23  inside the deli, and that's how they retrieved the gun.

24  Q.  But after you were hit, you continued to hold tight to the

25  gun, right?

H3K8MUN3                         Munoz - Cross

1    A.  Up in the air, yeah.  I still had it like that.

2    Q.  There came a time when you ended up on the ground, is that

3    correct?

4    A.  That's correct.

5    Q.  After you were on the ground, you continued to struggle

6    with the officers even more, right?

7    A.  I wouldn't call that struggle.  I would call that I was

8    screaming, because the excessive punches going in my head and

9    all over my body, actually kicks were involved.  I was

10   basically -- not really a tussle.  It was more of my body

11   movement because of the blows that were hitting me to try to

12   move the gun.

13   Q.  At this point, you told officers they were going to have to

14   kill you, right?

15   A.  I told them when I was on foot, not on the ground.

16   Q.  This was all happening right in front of the deli counter,

17   right?

18   A.  That's correct.

19   Q.  The officers were eventually able to get the gun out of

20   your hands, right?

21   A.  That's correct.

22   Q.  But before they were able to do that, they punched you a

23   few more times, right?

24   A.  They punched me all the way, even when the gun was out my

25   hand.  That's why they cuffed me on the machine.  Then

H3K8MUN3                          Munoz - Cross

1    they -- after they cuff me to the machine and they retrieve the

2    gun, they still wind up bending my arms and twisting my fingers

3    and still hitting me with blows.  There was no need for that.

4    They already had the gun and I was already in -- how you say --

5    in a position where I was sustained.  They had me cuffed.  I

6    don't understand that.

7    Q.  But before the officers got the gun out of your hands, they

8    punched you in your body a few more times, right?

9    A.  They punched me through the whole thing until I was cuffed

10   to the machine.  That's when they took a break from hitting me

11   to retrieve the gun.

12   Q.  So that's a yes then, they punched you in your body before

13   you let go of the gun, right?

14   A.  Before and after, you could say that.

15   Q.  You don't recall which officers were punching you in your

16   body at this point, right?

17   A.  I'm not sure, but I know it was Flynn and Jones had a lot

18   to do with hitting, I believe, and Mr. Reid.  I could say all

19   three of them really.

20   Q.  When you were on the ground and you still had the gun, you

21   actually bit one of the officers, right?

22   A.  Yeah.  I did that because it was too much for me.  I had to

23   defend myself one way.  I knew they were officers, but the way

24   they were hitting me, it was just too much.  I feared for my

25   life there, you know.  I was going through a lot of pain.  So I

1    saw one of the officers on me and I bit him so I could try to

2    stop the beating one way.  That was my way of self-defense

3    there, at least.  That's the only way I thought of doing that.

4    Q.  You actually broke the skin on Officer Jones' wrist when

5    you bit him, right?

6    A.  It's a bit mark, nothing compared to the way I was, nothing

7    to compare.  I just did that to -- again, I mentioned, to stop

8    one of them from hitting me because I had like three of them

9    hitting me.

10            THE COURT:  I am just going to ask you again, Mr.

11   Munoz, to listen carefully to the question that's asked and

12   answer that question.

13   A.  To be honest, I never seen his arm after the bit mark.  I

14   just told him that in the hospital he was going to be all

15   right, because basically he was concerned about being HIV, and

16   I told him, don't worry about it, I am not HIV positive, I am

17   HIV negative.

18   Q.  The reason they were concerned about that was because he

19   was bleeding, right?

20   A.  I never seen -- I never seen his bit mark, never.  I never

21   got to see his arm at all.  Even in the photocopy that I have,

22   which I want to show it to the jurors, it's nothing but a

23   black, black, I can't even see his forearm.  A few of those

24   Xerox copies that were provided for me, a lot of them are like

25   that.  You can't even see.  You can't even -- if you was to

1    look at it, it would be hard to identify his arm.  But you

2    could see mines in the hospital when I had my stitches.  I

3    don't get it.  Why you can see mines and you can't see his

4    forearm, where he got bit in the forearm, or wherever he got

5    bit?  I know it was in the arm.  I don't understand why I

6    couldn't be able to see that in my copies and you could see

7    mines.  I didn't understand that one bit.

8              THE COURT:  Place your next question, counsel.

9    Q.  It's your claim in this case, Mr. Munoz, that the officers

10   continued to punch you after you were already in handcuffs,

11   right?

12   A.  Yeah.  They kept on bending my arms too.

13             THE COURT:  So that's a yes?

14             THE WITNESS:  Yes.

15   Q.  But you didn't testify about that at all on direct earlier,

16   did you?

17             THE COURT:  Sustained.

18             Next question.

19   Q.  There came a time after this incident where you spoke to

20   investigators about what happened to you, right?

21   A.  If that was in the precinct, that's what you referring to,

22   ma'am?

23   Q.  Yes.

24   A.  Yeah, they came, but they had a non-visible audio tape

25   recorder.  I believe it must have been in their pocket.  And

H3K8MUN3                          Munoz – Cross

1   you got to understand, when they came, they came with pen and

2   pads.

3            THE COURT:  OK.  So the answer is yes, you were

4   interviewed?

5            THE WITNESS:  Yes, I was interviewed, but not a fair

6   interview.  I say that.

7            THE COURT:  Let's get the next question.

8   Q.  That statement was recorded, right?

9   A.  It was recorded from a non-visible tape recorder.  I'm

10  going to keep on mentioning it.

11  Q.  So that's a yes that it was recorded?

12  A.  Yes.

13  Q.  The investigators told you that they wanted to find out how

14  you got your injuries, right?

15  A.  That's correct.

16  Q.  And they told you they were going to investigate any police

17  misconduct, is that correct?

18  A.  That's correct.

19  Q.  And you told the investigators about the robbery, right?

20  A.  Yeah.  You have that audio, I just listened to it earlier,

21  yeah.

22  Q.  And you told the investigators that you struggled with the

23  officers, right?

24  A.  Yeah.

25  Q.  Is that a yes?

H3K8MUN3                          Munoz – Cross

1   A.  I probably did because of the firearm, yeah.

2   Q.  But you didn't tell the investigators that any force was

3   used on you after you were already in handcuffs, right?

4   A.  I don't really remember, to be honest.  I don't remember

5   that.

6        MS. DEPOIAN:  Can we play a portion of that audiotape?

7   A.  Why don't you play the whole audio?  Have the jurors listen

8   to the whole thing.  I don't mind.

9        THE COURT:  Excuse me, Mr. Munoz.

10        Is this marked as an exhibit?

11        MS. DEPOIAN:  Yes, your Honor.  This is Exhibit D.

12        THE COURT:  D as in David?

13        MS. DEPOIAN:  It's Exhibit D, your Honor.

14        THE COURT:  Do you want to lay a foundation?

15        MS. DEPOIAN:  Yes.

16        THE COURT:  Was this tape played for you recently, Mr.

17   Munoz?

18        THE WITNESS:  Yeah.  And I'm not really too happy

19   about it because it's unfair.

20        THE COURT:  Let me just ask you, did you recognize

21   your voice on the tape?

22        THE WITNESS:  Yes, ma'am.

23        THE COURT:  OK.

24        Counsel.

25        MS. DEPOIAN:  Yes.

H3K8MUN3                        Munoz - Cross

 1              THE COURT:  What portion are you going to play?  Is

 2      there a portion you can identify for the record?

 3              MS. DEPOIAN:  I can identify it by the time stamp on

 4      the audio recording.

 5              THE COURT:  Can you give us those numbers?

 6              MS. DEPOIAN:  It's the 15 minute mark at 23 seconds.

 7      15:23.

 8              THE COURT:  To where?

 9              MS. DEPOIAN:  16:14.

10              THE COURT:  You may play it.

11              (Audiotape played)

12      BY MS. DEPOIAN:

13      Q.  Were you able to hear that, Mr. Munoz?

14      A.  Yeah.  What's your point on that?

15      Q.  Did you hear yourself mention that you were punched after

16      you were handcuffed?

17      A.  That was only one hand.  They stop.  I mentioned that they

18      stop when they cuff me to the machine.  And that's exactly what

19      you heard.  Then the sergeant said eventually they uncuffed you

20      and put both hands.  That's all I heard, really.  I didn't hear

21      nothing after that.

22      Q.  Did you hear yourself say that you then went outside right

23      after that?

24      A.  Yeah, but what you getting at?

25      Q.  Did you mention that you were punched while you were in

H3K8MUN3                          Munoz - Cross

1    handcuffs?

2    A.  He didn't ask me if I was still being hit when I was

3    handcuffed.

4    Q.  Did you tell the police officers, who were there to

5    investigate police misconduct, that you were punched -- if I

6    could just finish my question -- after you were already placed

7    in handcuffs?  Did you tell that to the IAB investigators?

8    A.  He didn't mention that.  They took me after that and they

9    seated me on the sidewalk.  That I mentioned.

10   Q.  So you did not mention that you were punched after you were

11   in handcuffs to the IAB investigators, right?

12   A.  He didn't mention that.  I mentioned that I was cuffed one

13   hand towards the machine.

14   Q.  You mentioned that you were punched?

15   A.  I mentioned that I was cuffed, one hand, just one hand to

16   the machine.

17   Q.  But did you mention that you were punched after you were

18   placed in handcuffs to the IAB investigators?

19   A.  Maybe not in that non-visible recorder, if that's what

20   you're trying to get at.  But he didn't ask me that question.

21   So you're trying to address an issue that was never questioned.

22   Q.  Mr. Munoz, you listened to the entire recording earlier

23   today, right?

24   A.  Yeah.  Yes, I did.  I also have the transcript.

25   Q.  In the transcript, and when you listened to the audio

1   recording, at no time do you mention that you were punched

2   after you were placed in handcuffs?

3   A.   That was in the precinct.  That was like the next day or

4   the very same day after I was -- I was still high.  I still had

5   the symptoms of high on crack.  If you listen to that tape

6   recording, I was still under the influence, the side effects of

7   the drug.

8           THE COURT:  So, Mr. Munoz, I am going to ask you to

9   listen carefully to the question that's asked and answer that

10  question.

11          Counsel.

12  Q.   So my question is, you did not mention the fact that you

13  were punched after you were placed in handcuffs to the IAB

14  investigators following this incident, is that correct?

15  A.   I would have to hear it again because like the ending part

16  you can't really hear it.  You can't really understand the

17  ending part.  And I would also have to go on my transcript.  He

18  never mentioned -- never mentioned that.  I guess that's where

19  I am going to stay at, with that answer.

20          THE COURT:  Next question.

21  Q.   The reason you didn't mention it is because it didn't

22  happen?

23          THE COURT:  Counsel, next question.  Form.

24  Q.   Mr. Munoz, the first time you ever mentioned the fact that

25  you were punched after you were handcuffed was when you brought

H3K8MUN3                        Munoz - Cross

1   this lawsuit, is that right?

2   A.   I didn't even know I had a lawsuit until a friend of mines

3   helped me file the complaint.  Actually, I did it in 2014.  So

4   it's kind of like three years after, almost three years.  I

5   thought it was just a beat down from the NYPD and I'm

6   incarcerated for a crime that I did.  I didn't know I had

7   rights or none of that.

8   Q.   Mr. Munoz, you don't know how many times you were punched

9   after you were in handcuffs, right?

10  A.   I say a lot.

11  Q.   I would like to turn your attention to your deposition at

12  page 107.

13  A.   OK.

14  Q.   Line 17.  Were you asked these questions and did you give

15  these answers:

16  "Q.   Did any of the officers hit you after you were handcuffed?

17  "A.   No.  They didn't hit me after I was cuffed.  They did hit

18  me while I was cuffed inside the store.  They hit me a few

19  times.  Then once they took me outside the store and sat me

20  down on the sidewalk, where everyone was looking at the

21  scenery, at the crime scenery, they didn't hit me outside the

22  store, but they did hit me inside the store."

23       Were you asked that question and did you give that

24  answer?

25  A.   Yeah.  But maybe I was confused.

H3K8MUN3                         Munoz – Cross

1   Q.  But you testified at your deposition that they hit you a

2   few times, right?

3   A.  Yes.

4   Q.  You can't remember which officer punched you when you were

5   handcuffed inside the store, right?

6   A.  Like again I said, it had to be all three.  I believe it

7   was Mr. Flynn, Jones, the one who I bit, and Mr. Reid.

8   Sergeant Kelly, I never even seen him in the excessive force,

9   only afterwards.  Only afterwards I got to see him.

10  Q.  It's your testimony that Sergeant Kelly did not hit you

11  after you were handcuffed, right?

12  A.  I don't think he hit me.  I didn't see him at all.  I

13  acknowledge his face.  Actually, I acknowledge all four of

14  them, really.  I acknowledge Sergeant Kelly from after -- the

15  crime I committed after the armed robbery, when I was out on

16  bail, I believe he was talking to my fiance at the time.  I

17  know who Sergeant Kelly is, and I know the rest of the four

18  officers.

19  Q.  So is it your testimony, I just want to make sure --

20  A.  I didn't see Sergeant Kelly hit me.  I don't really recall

21  that.

22  Q.  After you were placed in handcuffs when you were inside the

23  store, Sergeant Kelly was not in the store, right?

24  A.  I didn't see him in the premises at all.  The first one

25  that I saw was Mr. Brian Flynn, who is now a sergeant.  I seen

1    Jones and I seen Mr. Reid last because he's the black officer.

2    Q.  You don't know if Officer Jones hit you after you were

3    handcuffed, do you?

4    A.  He was hitting me.  They were both hitting me.

5    Q.  I just asked you about Officer Jones.  You don't know if

6    Officer Jones was hitting you after --

7    A.  I'm not trying to get confused here, really.  I don't

8    really have knowledge of this legal stuff that's read in the

9    transcripts and all that.  It's going way back.  I'm talking

10   about when I was on psychiatric medications and high on crack.

11   I will be honest, I don't really want to answer that because I

12   don't really have a answer for that.

13   Q.  Is it your testimony that you don't recall, you don't

14   remember?

15   A.  I probably don't recall it.  I can't remember, you know.  I

16   probably said, but don't remember.  Lots of times I say

17   something and I don't remember.

18   Q.  So you don't remember how many times you were hit, right?

19   A.  I could say a lot.  I keep on telling you a lot.

20   Q.  You don't remember who hit you, right?

21   A.  Not really, to be honest.  Everything happened so fast.

22   But I know that it was Mr. Flynn and Jones at first and then

23   Reid.  I could say that.  As a matter of fact, Officer Reid was

24   the one who said I love my job at the end.

25   Q.  Just so we are clear, you're not alleging that any

H3K8MUN3                       Munoz - Cross

1    excessive force was used on you once you were outside the

2    store, right?

3    A.  Yeah.  Once I was outside the store, they couldn't even

4    continue with the excessive force because there was such a big

5    crowd; there was way more than five people.

6    Q.  So that's correct, right?

7    A.  It was a real big crowd out there.

8    Q.  So no force was used on you outside the store?

9    A.  No.  They laid me on the sidewalk though.  I don't think

10   that was appropriate.

11   Q.  Once you were outside, Mr. LaCourt came by and he pointed

12   you out as the person that had robbed him, right?

13   A.  I didn't acknowledge him coming out the van.  I did

14   recognize him in the van telling the NYPD officer, who I now

15   know as Sercavo.  I believe he was the one who was transporting

16   in the NYPD vehicle van Mr. Catalina LaCourt.  He definitely

17   identified me as the one who robbed him.

18   Q.  You were searched by one of the officers when you were

19   outside, right?

20   A.  I was searched and I have --

21         THE COURT:  Is that a yes?

22   A.  Yes, I was searched.

23   Q.  You don't remember which officer searched you, right?

24   A.  There were so many of them searching me.  It wasn't just

25   one.  It was Flynn and Jones, the ones that were really close

1    to me outside the store.  Officer Ray was kind of in front of

2    me, but he was at a distance.

3    Q.  Your answer is that you don't remember which officer

4    searched you?

5    A.  I don't know if it was Flynn or Jones.  I know they didn't

6    find the crack pipe all the way until I was in the hospital

7    when I -- how you say -- I surrendered it.  It was actually in

8    my sneaker.  I had a pair of blue Nikes on, I remember.  They

9    were blue with the white dash.  I had the crack pipe in my

10   sneaker.  Actually, I surrendered it, I don't know if it was to

11   Mr. Flynn or Jones, it was one of them, and I asked them if

12   they going to put that on the charges.  It was a real small

13   crack pipe, it was about maybe two inch, no more than that,

14   real small, small enough to go in my sneaker.  I didn't want to

15   get caught with it.

16   Q.  When the officers searched you back at the scene, they also

17   found Mr. LaCourt's wallet on you, right?

18   A.  Yeah.  They found the wallet, but none of his --

19            THE COURT:  That's a yes?

20   A.  Yes.

21   Q.  You were convicted of armed robbery in the first degree for

22   that crime, right?

23   A.  Yes, ma'am.

24   Q.  You're currently serving a sentence of ten years, right?

25   A.  Yes, ma'am.

H3K8MUN3                          Munoz - Cross

1    Q.  You were also convicted of criminal sale of a controlled

2    substance in April of 2006, is that right?

3    A.  That's the past.

4    Q.  Is that a yes?

5    A.  I have got a lot of crimes in the past, yes.

6    Q.  You were sentenced to 30 months for that crime, right?

7    A.  Yeah, but that's the past.  What's that got to do with

8    this?

9    Q.  You don't remember getting treated by EMS before you went

10   to the hospital, right?

11   A.  Not really.  I'm going to be honest.  All the blows in my

12   head and the blood, and the amount of days that I was high on

13   crack, here I go again, not proper arrest, being up for three

14   days, it was all taking effect.  I don't really remember

15   getting on the ambulance.  I can't remember that part.  I think

16   I probably fell out.

17   Q.  When you arrived at the hospital, you were disruptive, is

18   that right?

19   A.  I came in.  These were the officers.  Here I go again.

20   They were treating me like a animal.  All I asked for was for

21   water and food.

22   Q.  Is it your testimony that you were disruptive when you were

23   at the hospital?

24   A.  That's what the hospital is going to say.  They're

25   cooperating with the officers.

1        THE COURT:  Excuse me, Mr. Munoz.  If you can answer

2   the question with a yes or no, please do so.

3   A.  I don't think I was disrespectful towards nobody.  I'm

4   going to say no.

5        THE COURT:  I think the word counsel used was

6   disruptive.  Do you know what that means?

7        THE WITNESS:  Making a lot of noise or something like

8   that?

9        THE COURT:  Is that what you understand it to be mean?

10       THE WITNESS:  I don't know.

11       THE COURT:  Place another question, counsel.

12   BY MS. DEPOIAN:

13   Q.  You were given sedatives to calm you down when you were at

14   the hospital, right?

15   A.  Yeah.  As for what I know now.  I didn't know at that time.

16   I asked for pain medication.  I was in a lot of pain.

17   Q.  You testified before that you had a cut above your left

18   eye, is that right?

19   A.  Yeah, due to excessive force, yes.

20   Q.  I am going to show you what has been marked for

21   identification purposes as Defendants' Exhibit A1.

22       Do you recognize this document, Mr. Munoz?

23   A.  Yes, I do.  That was at the precinct.

24   Q.  That's you in the photo?

25   A.  Yes, ma'am.

H3K8MUN3                        Munoz – Cross

1   Q.   When was this photo taken?

2   A.   I don't know.  I think part of the next day, to be honest.

3   I can't recall if it was September 13.  I believe it was part

4   of the next day, right after the hospital.  That's why I was

5   stitched up.

6              MS. DEPOIAN:  Your Honor, I would like to offer

7   Exhibit A1 into evidence.

8              THE COURT:  Received.

9              (Defendants' Exhibit A1 received in evidence)

10             MS. DEPOIAN:  Permission to show it to the jury?

11             THE COURT:  Yes.

12             Can you see that, Mr. Munoz, on your screen?

13             THE WITNESS:  Yeah.  I could see it on my copy here.

14             THE COURT:  Good.  Thank you.

15  Q.   Mr. Munoz, this photo shows the injury to your left eye

16  that you received from the first punch that day, right?

17  A.   That's accurate.

18  Q.   That's an accurate depiction of the stitches to your eye

19  the day after your arrest?

20  A.   Yeah.  I could say yeah.

21  Q.   You testified earlier that you received two fractured ribs,

22  is that right?

23  A.   Well, it's one fracture and one slightly.  It's in the

24  medical records.  So if you read it, it says it.

25             MS. DEPOIAN:  I would like to draw the Court's

1    attention to what has been marked for identification as

2    Defendants' Exhibit F, which are plaintiff's medical records

3    from Jacobi Hospital.

4    Q.   Do you recognize these documents, Mr. Munoz?

5    A.   Yeah.  This is the EMS.

6    Q.   Do you want to look through them?  There's a couple of

7    pages.

8    A.   Yeah, I want to look through them.

9    Q.   Mr. Munoz, are these your hospital records from Jacobi

10   Hospital?

11   A.   I'm trying to read.

12   Q.   OK.

13   A.   Give me a minute, please.

14           THE COURT:  I will let you place a question, counsel.

15   Q.   Mr. Munoz, you fractured only one rib that day, right?

16   A.   One rib and a slightly one.  That's what I read in my

17   paperwork.  That's what I read.  I don't have glasses right now

18   so it's kind of hard for me to read.  I'm trying my best.

19           MS. DEPOIAN:  I would like to move these records into

20   evidence at this time.

21           THE COURT:  We will deal with that at the break.

22   A.   Maybe if you show me where it says fractured rib, maybe I

23   could --

24           THE COURT:  Next question.

25   Q.   Mr. Munoz, you don't know how the injury to your rib

1   occurred, do you?

2   A.  Yeah.  It occurred not the way they say, that I fell on the

3   firearm, not that way.  The fractured rib was for the blows and

4   the kicks that were thrown by the officers.

5   Q.  You were punched before you let go of the gun, right, in

6   your ribs?

7   A.  I don't know.  I know I was being hit real hard.

8   Q.  You were punched before you were handcuffed, correct?

9   A.  Yes.  I was being punched before I was handcuffed, yes.

10  Q.  Mr. Munoz, you said you had a cut on your forearm, right?

11  A.  Yes.

12  Q.  I want to show what has been marked for identification as

13  Defendants' Exhibit A5.

14          Do you recognize this photo, Mr. Munoz?

15  A.  Yes, I do.

16  Q.  What is that a photo of?

17  A.  That's my cut on the right -- my right forearm.

18          MS. DEPOIAN:  I would like to offer this into

19  evidence, your Honor, Exhibit A5.

20          THE COURT:  Received.

21          (Defendants' Exhibit A5 received in evidence)

22          MS. DEPOIAN:  I am just showing the jury Exhibit A5 at

23  this time.

24          THE WITNESS:  Bring it down.  There you go.

25  Q.  This shows the injury to your forearm, right?

1   A.  Yes.  That's correct.

2   Q.  You don't know how you got this injury, do you.

3   A.  I got it that day with the excessive force.  I didn't have

4   that injury.  As you could see, it's a fresh wound, just like

5   my eye.

6   Q.  The bodega was a mess after the officers got the gun from

7   you, right?

8   A.  I can't acknowledge that.  I know I didn't kick no drinks

9   of any kind.  I was up front in the counter so I was nowhere

10  near the other stuff.

11  Q.  Items had fallen off the shelves after you were placed in

12  handcuffs, right?

13  A.  I'm not sure.  There was a tussle going on.  I'm not sure.

14  I know the drinks -- the drinks are in the refrigerator.  I go

15  to the store and I purchase food there.  As far as any drinks

16  being spilled, they're in a refrigerator.

17          THE COURT:  OK.  Thank you.

18          Next question.

19  Q.  Mr. Munoz, other than your rib, your eye and your forearm,

20  you didn't have any other injuries from that day, right?

21  A.  My ribs, my forearm, no.  Those were the injuries that were

22  caused.

23          MS. DEPOIAN:  I would like to show Exhibits A4, A6 and

24  A7 to Mr. Munoz.

25  A.  More bruises.  All right.

H3K8MUN3                        Munoz - Cross

1    Q.  Do you recognize those photos, Mr. Munoz?

2    A.  I recognize them now because it's me.

3    Q.  It's you.  OK.

4           MS. DEPOIAN:  I would like to offer these three

5    exhibits into evidence as well, your Honor.

6           THE COURT:  Received.

7           (Defendants' Exhibits A4, A6 and A7 received in

8    evidence)

9           MS. DEPOIAN:  I am going to show the jury what is

10   marked as A4.

11   Q.  Mr. Munoz, that's the right side of your face, right?

12   A.  That's correct.

13   Q.  This was taken the day after the incident, correct?

14   A.  Correct.  Nothing but scratches.

15   Q.  And there's no bruising, visible bruising you can see on

16   your face, right?

17   A.  I don't really see.  I just see minor, maybe scratches,

18   nothing really major.

19   Q.  There's no bruises on the right side of your face?

20   A.  I don't see none, no.

21          MS. DEPOIAN:  I am now going to show the jury what has

22   been marked as A6.

23   Q.  What is this a photo of, Mr. Munoz?

24   A.  I don't know.  I think that's hospital procedures.  There

25   was never no cut.  As you could see, that's hospital tape,

1   maybe blood drawn out.

2   Q.  That's the bandages from a needle, right?

3   A.  I mean, I think so, yeah.

4   Q.  There's no marks on your body in that photo, is there?

5   A.  Maybe as far as the EKG, they want to check my heart, but I

6   don't see nothing spectacular on this photo.

7   Q.  So the little marks on your body with the white stickers,

8   those are hospital equipment, right?

9   A.  All of that is hospital.

10  Q.  Other than that, there is no bruising on your body or any

11  visible injuries that you received from this incident, right?

12  A.  I mean, if you pertaining to the ribs, I mean, you can't

13  really see the ribs there, if that's what you want to get at.

14  Q.  There's no visible bruising on your body in that photo,

15  right?

16  A.  On that front body, no.

17  Q.  I am going to show Defendants' A7.

18        Mr. Munoz, this is the left side of your body, right?

19  A.  That's correct.

20  Q.  You can't see any bruising in this photo, can you?

21  A.  Maybe just like a reddish skin texture, that's about it.

22  You don't see no bruises, really.  I don't see none.

23  Q.  The reddish color could just be from the photograph, right?

24  A.  Yeah.  You could see in the upper of my left and lower

25  back, and maybe the front, right here, right here, and right

H3K8MUN3                          Munoz – Cross

1    here.

2    Q.  Mr. Munoz, you don't really have any visible injuries that

3    were caused from being punched after you were already in

4    handcuffs, right?

5    A.  Yes, I do.  I mean, it's got to be the fractured ribs

6    because that's where the kicking and all that took place, and

7    the punching towards my ribs.

8    Q.  You don't have any bruises from the punching to your ribs,

9    do you?

10   A.  No, I don't, but it's what I felt.  It's the pain that I

11   felt.

12             MS. DEPOIAN:  I am done for now.

13             THE COURT:  No further questions?

14             MS. DEPOIAN:  No further questions.  I would just like

15   to discuss the hospital records.  After that, no further

16   questions.

17             THE COURT:  So, ladies and gentlemen, we will take our

18   mid-afternoon recess.  Let Ms. Rojas know when you're ready to

19   resume.  Feel free to take five or ten minutes for a break.

20             (Jury exits courtroom)

21             THE COURT:  So before we take our own recess, could

22   everyone be seated.

23             (Continued on next page)

24

25

H3k1mun4

1           THE COURT:  On the hospital records, did defense

2     counsel and Mr. Munoz discuss them during the luncheon recess?

3           MS. DEPOIAN:  We did, your Honor.

4           THE COURT:  Did you reach agreement that they would be

5     admitted at this trial?

6           MS. DEPOIAN:  We reached agreement that -- I don't

7     want to put words in his mouth -- that they were admissible.

8     It was just the issue of which portions would be admissible.  I

9     don't think we have any objection to the entire portion -- I

10    think Mr. Munoz wanted the entire full records to be admitted,

11    and we have no objection to that.

12          THE COURT:  Okay.  Counsel, could you just hand

13    Mr. Munoz the documents so there's no confusion.

14          Mr. Munoz, I understand that both you and the

15    defendants wish to offer in evidence the Jacobi hospital

16    records.  A copy has just been handed to you right now.

17          And it's marked as what exhibit, counsel?

18          MS. DEPOIAN:  F, your Honor.

19          THE COURT:  Defendant's Exhibit F.  Do you want the

20    Jacobi hospital records to be admitted in evidence at this

21    trial, Mr. Munoz?

22          MR. MUNOZ:  Yes, I would like.

23          THE COURT:  Fine.  I didn't want them to be received

24    at trial until I made sure that that was agreeable to you.

25    Good.  So after the break, defense counsel may offer Exhibit --

H3k1mun4

1    is it F?

2              MS. DEPOIAN:  Yes, your Honor.

3              THE COURT:  Okay.

4              MR. MUNOZ:  Also, I have my own copies.  This is not a

5    complete here, I believe so, and also I have two additional

6    photos that I addressed to Counsel Lichterman and Ms. -- I

7    believe Depoian.  And I told them that there's one photocopy

8    that you can't really see it.  If they could be able to produce

9    a better copy of that.  It's -- I believe it's 150 -- New York

10   City 153.  Let me look for it.

11             THE COURT:  Okay.  Let's take this one at a time.

12   There's no objection to receipt of the Jacobi hospital records

13   into evidence that have been marked as Defendant's Exhibit F.

14             Now, Mr. Munoz, did you want to offer other medical

15   records too?

16             MR. MUNOZ:  I wanted the whole -- the whole Jacobi

17   hospital records, with -- I believe it says one's fractured and

18   one's slightly fractured, and also --

19             THE COURT:  Okay.  Let me just -- counsel, you need to

20   help me here.

21             MS. DEPOIAN:  Yes.

22             THE COURT:  What is Mr. Munoz referring to?  I thought

23   you said F contained all of the Jacobi hospital records.

24             MS. DEPOIAN:  Yes.  I think I gave him the portion.

25   That was my mistake.  There's nothing I know of in the

H3k1mun4

1    records -- and you can correct me as well -- that says there

2    was a slight fracture.  We only have records that there is one.

3    If he wants the whole thing in and point out somewhere that I'm

4    maybe not seeing, we have no objection to that, but I'm not

5    aware of what he's referring to.

6             THE COURT:  Okay.  So F is not the complete Jacobi

7    hospital records.

8             MS. DEPOIAN:  It is.  Yes.  Here is the entire -- this

9    is the entire Jacobi hospital record right here.

10            THE COURT:  And it is F or it isn't F?

11            MS. DEPOIAN:  It is F, yes.

12            THE COURT:  Okay.  So you're handing Mr. Munoz F,

13   which is the entire Jacobi hospital record.

14            MS. DEPOIAN:  Yes.

15            THE COURT:  Mr. Munoz, do you want that entire Jacobi

16   hospital record received into evidence or not?

17            MR. MUNOZ:  I would like -- yes, I would like, but I

18   still don't see the pictures taken in Jacobi hospital.

19            THE COURT:  Okay.  We're going to get to the pictures

20   in a moment.

21            Okay.  We have agreement that the whole Jacobi

22   hospital record comes into evidence.

23            Now you referred as well to two photos, Mr. Munoz?

24            MR. MUNOZ:  Well, actually, it's three.

25            THE COURT:  Three photos?  Do you have copies of those

H3k1mun4

1    right now that you could show defense counsel?

2              MR. MUNOZ:  I have two of myself.  Well, really one of

3    myself.  Well, there's -- there's three of myself and there's

4    one of Officer Jones that I can't -- I can't even see, so --

5              THE COURT:  Now did you want these four photographs,

6    three of yourself and one of Officer Jones, offered into

7    evidence?

8              MR. MUNOZ:  Yes, I would like.  I have them right

9    here, your Honor.

10             THE COURT:  Can you show them to defense counsel.

11             Defense counsel, can you please assist here and

12   identify what exhibit numbers they are.

13             MS. DEPOIAN:  Your Honor, I believe these are

14   Plaintiff's Exhibit 1.  We had had some confusion ourselves

15   about -- when he called them plaintiff's photographs, we

16   assumed they were the photographs that we just went over.

17   They're actually these photographs that he wants to put in as

18   Plaintiff's Exhibit 1.

19             THE COURT:  So Plaintiff's Exhibit 1 is four

20   photographs.

21             MS. DEPOIAN:  Correct.

22             THE COURT:  And they're different photographs than

23   those that you used during your examination.

24             MS. DEPOIAN:  Correct.

25             THE COURT:  Okay.  Any objection to the plaintiff

H3k1mun4

1    offering these four photographs that are Plaintiff's Exhibit 1?

2             MS. DEPOIAN:  None, your Honor.

3             THE COURT:  Okay.  So Mr. Munoz, I want to give you a

4    chance to have a break before we resume testimony.  The jury is

5    ready.  So we're going to give everybody a brief recess here.

6    When you come back to the stand, defense counsel is going to

7    offer the Jacobi medical records, the complete set, and then

8    they're going to say that they have completed their examination

9    of you.  At that point I'm going to turn to you and I'm going

10   to give you an opportunity to explain anything to the jury that

11   you would like that came up on your cross-examination where you

12   think they need more of an explanation than you already gave

13   them.  You don't have to repeat anything.  But if you think

14   anything needs to be clarified that you already testified about

15   when defense counsel was examining you, I'm going to give you

16   an opportunity to speak again to the jury to clarify it.  Do

17   you understand that?

18            MR. MUNOZ:  I understand.  Just basically what -- what

19   just happened right now, me being on the stand and -- and the

20   counsel for, you know, brought up all these exhibits, to clear

21   stuff out, if I need to clear something out, that's what you're

22   referring to, your Honor?

23            THE COURT:  That's perfect.  And at that same time --

24   and I'm going to ask defense counsel to help at this time -- if

25   they don't already have an exhibit tag, I want Plaintiff's

H3k1mun4

1    Exhibit 1 to be attached to those four photographs, and I'll

2    make sure you have an opportunity then, when you're on the

3    stand, to offer those four photographs.  Okay?

4              MR. MUNOZ:  Actually, I have three.  There's one

5    missing.

6              THE COURT:  Okay.  Defense counsel, could you assist

7    here, please.

8              MS. DEPOIAN:  Yes.

9              MR. MUNOZ:  I told you I wanted the copy of Officer

10   Jones' arm, that I had it but it's all black.  You don't see

11   nothing.  You see something black.

12             THE COURT:  Okay.  Defense counsel, it's a little hard

13   for me and probably the court reporter to know what should be

14   on the record here.  So as I understand it, Mr. Munoz just

15   asked for a fourth photograph with Officer Jones' arm on it.

16   Do you have it?

17             MR. LICHTERMAN:  I don't believe so, your Honor.

18             THE COURT:  Do you know of such a photograph?

19             MR. LICHTERMAN:  We are not aware of a photograph of

20   Officer Jones' arm.

21             THE COURT:  Did you produce one in discovery?

22             MR. LICHTERMAN:  No, we did not.

23             THE COURT:  Mr. Munoz, what is the photograph of

24   Officer Jones' arm?

25             MR. MUNOZ:  I have it, but it's not -- I'm not sure if

H3k1mun4

```
1   I have it with me or in my cell, but I do have that copy of --
2   it's supposed to be Officer Jones' arm where I bit him.
3              THE COURT:  Okay.  Well, I will let you offer into
4   evidence the three photographs you have with you here.  If you
5   find the fourth photograph before this trial ends, I'll let you
6   offer that as well.
7              Good.  So take a brief recess, everyone.
8              MR. MUNOZ:  Thank you, ma'am.
9              THE COURT:  And after the plaintiff's testimony is
10  done, he can call his next witness.
11             THE DEPUTY CLERK:  All rise.
12             (Recess)
13             (In open court)
14             THE COURT:  Bring in the jury.  Mr. Munoz, you may
15  step up and take the witness stand again.  Bring your three
16  photos with you.
17             Counsel, have you marked them with a plaintiff's
18  exhibit tag?
19             MS. DEPOIAN:  I will right now.
20             (Continued on next page)
21
22
23
24
25
```

H3k1mun4

1                (Jury present)

2                THE COURT:  So Mr. Munoz, if you could come on up here

3     and take the witness stand.

4                MR. MUNOZ:  Yes, ma'am.  Do I need all of this stuff?

5                THE COURT:  You just need the three photographs.

6     That's all.

7                Thank you.  Counsel, did you have an exhibit you

8     wished to offer?

9                MS. DEPOIAN:  Yes, your Honor.  Defendants would like

10    to offer the Jacobi medical center records into evidence as

11    Defendant's Exhibit F.

12               THE COURT:  Received.

13               (Defendant's Exhibit F received in evidence)

14               THE COURT:  And that completes the questioning of this

15    witness?

16               MS. DEPOIAN:  Yes, your Honor.

17               THE COURT:  Thank you.

18               So Mr. Munoz, as I understand it, you have three

19    photographs that you would like to put in evidence, is that

20    right?

21               MR. MUNOZ:  Yes, your Honor.

22               THE COURT:  And I believe they have an exhibit tag on

23    them, Exhibit A?  And I'm going to ask my law clerk, please, to

24    retrieve those.  Do you have those with you, Mr. Munoz?

25               MR. MUNOZ:  Yes, your Honor.

H3k1mun4

1          THE COURT:  Okay.  Let me look at them for one moment.

2          Okay.  So I'm sorry.  I'm going to correct myself.

3     These three photographs are marked as Plaintiff's Exhibit 1,

4     and I'm going to hand them back to you.

5          And do you want to explain what each of those

6     photographs shows to the jury, Mr. Munoz?

7          MR. MUNOZ:  That explains -- explains -- they were

8     taken at the hospital during the time when I was over there.

9     It's New York -- New York City page 157.  You can't really see.

10    That's me.  I believe that's me.

11         And the second one, as you can see, I was -- I was

12    out.  I fell out.  I guess -- I don't even -- 'cause I was in

13    pain, but they finally -- the doctor gave me the -- what they

14    call that again, the sedatives?  To calm me down.

15         And this is a better one of -- of -- of I guess my

16    right forearm.

17         The fourth one that I wanted to address, I will have

18    to look for it.

19         THE COURT:  Good.  If there is a fourth photograph

20    that the plaintiff can find while this trial is still ongoing,

21    he will be able to offer that in evidence as well.

22         So Mr. Munoz, you were asked questions on

23    cross-examination, and I want to give you an opportunity to

24    tell the jury anything more that you think would help place the

25    answers you gave to defense counsel in context.  Is there

H3k1mun4

1      anything that you'd like to say in addition to clarify any of

2      your answers?

3                  MR. MUNOZ:  I think -- I think basically I did pretty

4      well as -- to my best answering those -- those questions

5      that -- that were -- that were addressed to me, so I think it's

6      kind of clear, so I'll just wait until I'll be able to -- to be

7      able to address any questions for the defendants, your Honor,

8      if that's all right with you --

9                  THE COURT:  That's fine with me.

10                 MR. MUNOZ:  -- and the jurors.  I think I did pretty

11     well.  I tried my best to -- to stay focused and be able to

12     understand this jury system here, this trial system, 'cause

13     I'm -- I'm not really familiar whatsoever, so I'm -- I'm just

14     trying to understand to the best.

15                 THE COURT:  Good.  Good.  So with that, let me ask, is

16     there cross-examination with respect to Exhibit Plaintiff's

17     Exhibit 1?

18                 MS. DEPOIAN:  No, your Honor.

19                 THE COURT:  Okay.  So you may step down, Mr. Munoz.

20     You've finished your testimony.

21                 MR. MUNOZ:  Mm-hmm.  Thank you.

22                 THE COURT:  You may retake your seat at the second

23     table.

24                 MR. MUNOZ:  Thank you.

25                 THE COURT:  So Mr. Munoz, did you want to call one of

1    the officers as a witness and place questions to him or not?

2                MR. MUNOZ:  Yeah.  I wanted to, because --

3                THE COURT:  So Mr. Munoz, which officer would you like

4    to call to the stand first?

5                MR. MUNOZ:  I would like to call Sergeant Kelly.  That

6    would be my first --

7                THE COURT:  Fine.  Fine.  Sergeant Kelly, if you could

8    come up here, please, and take the witness stand.  And if you

9    could remain standing.

10               (Witness sworn)

11               THE COURT:  So Mr. Munoz, you can place questions to

12   Sergeant Kelly.  You can do so by standing up at the table or

13   moving over to that podium and asking questions from there,

14   whichever is more comfortable for you.

15    JAMES KELLY,

16         called as a witness by the Plaintiff,

17         having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. MUNOZ:

20   Q.  Hey, how you doing, Sergeant Kelly.

21   A.  How are you.

22   Q.  My first question was:  Did you enter 1890 deli store --

23   did you enter first?

24   A.  Yes.

25   Q.  And when you entered the deli, why couldn't you identify

1    yourself so I could know who you was, if I committed a crime?

2    A.  As soon as I entered the deli, you were standing at the

3    counter, you looked at me, you must have realized that I was a

4    police officer, and you took -- took the gun out of your

5    waistband.

6    Q.  Okay.  I never seen you at the store, the first individual

7    entering the store, and I never seen you identify yourself as a

8    officer or a sergeant whatsoever.

9            THE COURT:  So can I just pause here for a moment,

10   Mr. Munoz.

11           MR. MUNOZ:  Mm-hmm.

12           THE COURT:  This is your chance to ask Sergeant Kelly

13   questions --

14           MR. MUNOZ:  Okay.

15           THE COURT:  -- not to give testimony.

16           MR. MUNOZ:  Okay.

17           THE COURT:  So if you have other questions for

18   Sergeant Kelly, feel free to ask them.

19           MR. MUNOZ:  Okay.

20   BY MR. MUNOZ:

21   Q.  You entered by yourself.  Who came in next?

22   A.  They were behind me, but it was Officer -- I believe it was

23   Officer Flynn and then Officer Reid.  They might have walked in

24   together.

25   Q.  So did you see Officer Flynn tap me by the shoulder?

H3k1mun4                         Kelly - Direct

1    A.   No.

2    Q.   Okay.  You can't recall which officer came after you?  You

3    can't name which was the second or third?

4    A.   I know it was Officer Flynn and Officer Reid.  I'm not sure

5    which one was -- they were behind me.

6    Q.   Did you stay for the whole period of time of the -- of the

7    incident inside the store?

8    A.   Yes.

9    Q.   Can you please give me a short story of what happened that

10   day in the incident in the deli store of 1890 Archer Avenue.

11            MR. LICHTERMAN:  Objection, your Honor.

12            THE COURT:  Overruled.

13            Do you understand the question?  From the time that

14   you entered the store, can you describe what happened.

15   A.   Yes.  As soon as I walked into the -- the bodega, Mr. Munoz

16   was standing at the -- at the counter like he was ordering

17   something.  As soon as he looked at me -- I'm assuming you

18   realized I was a police officer.  I was in plainclothes.  But

19   the first thing Mr. Munoz did was he took a -- took a handgun

20   out of his waistband.  At that time I was too close -- I feel

21   like I was too close to Mr. Munoz to take out my own gun.  I

22   think that time was of the essence.  The first thing I did was

23   just like run and try to tackle Mr. Munoz.  Thank god

24   Officer -- well, now Sergeant Flynn, Sergeant Reid had exited

25   the store -- had entered the store couple of seconds after,

H3k1mun4                      Kelly - Direct

1     'cause I remember falling to the ground -- pretty much I

2     remember all three of us falling to the ground with -- with

3     you, Mr. Munoz, and you just fighting like crazy, saying we

4     were going to have to kill you, you're not going to jail, you

5     were down for your crown, whatever that means.  It was

6     insanity.  It was crazy struggle.  The whole time I'm praying

7     that this gun doesn't go off, that myself or, god forbid, one

8     of these guys get shot.  It was a long struggle, probably two,

9     three minutes.

10          Finally, I remember Officer -- I remember being on top

11    of Mr. Munoz, punching him, kicking him, kneeing him,

12    everything I could do, primarily trying to keep my weight on

13    him, 'cause I knew that -- I knew you had the gun and you --

14    you're saying left hand.  I remember the gun being in his right

15    hand.  Just thinking, this -- just praying not to hear a bang.

16          At some point I remember being on Mr. Munoz -- at some

17    point I do -- I recall Officer Reid finally getting the gun,

18    and then at some point Officer Flynn, with the help of Officer

19    Jones, we were able to get a cuff onto his left arm.  He was

20    still fighting all over the place.  The bodega was being

21    destroyed, sodas, you know, exploding every -- it was a

22    disaster.

23          Finally, at some point we got the one cuff on.  I

24    remember scrambling to get another set of cuffs, just to make

25    it easier, and then at some point you were -- you were

H3k1mun4                        Kelly - Direct

 1   handcuffed.  And then at that point I remember going right

 2   outside like trying to catch my breath.  It was like a –- it

 3   was a hot day.  It was early September.  Still hot day.  I

 4   remember like undoing my vest, like trying to breathe.  At that

 5   point --

 6           THE COURT:  Let's end it there.  You've told us what

 7   happened in the store.

 8           THE WITNESS:  Okay.

 9           THE COURT:  Mr. Munoz, next question.

10   BY MR. MUNOZ:

11   Q.  Did you enter through a back door?  How many doors did the

12   store -- did the store have?

13   A.  I entered through the front door.  As far as I know, it

14   only has a front door.

15   Q.  And once the incident was over, did you sit me in a bench?

16   Where did you sit me?

17   A.  No.  On the curb outside the store.

18   Q.  So what position did you put me down?

19   A.  Sitting.

20   Q.  It wasn't laying down first?

21   A.  No, not that I recall.  I'm not even sure if it was myself

22   that brought you out, but you were brought out and you were

23   sitting on the curb.

24   Q.  You mentioned that we all, all the officers fell on top of

25   me.  You said I had the firearm in my right hand.  What

H3k1mun4                          Kelly - Cross

1    happened with my left hand, when I pulled it out with my left

2    hand?

3    A.   The whole time your left hand was exposed, your left arm

4    was exposed, you were fighting mostly with your left arm.  The

5    whole time you had the gun in your right hand, underneath your

6    body.  I was pretty much kneeling on your back.  Maybe that's

7    why you don't recall seeing me, but --

8    Q.   The shorts that I had that day had three -- three cuts in

9    my left pocket.  The firearm that I had was a Torres .38, six

10   shots.

11              THE COURT:  Excuse me, Mr. Munoz.  Do you have a

12   question?

13              MR. MUNOZ:  I have a question.

14   Q.   You're saying it was in my right hand when it was in my

15   left pocket and I withdraw it.  Did you see me withdraw it out

16   of my pocket?

17   A.   I remember it being in your right hand.

18   Q.   But did you see me withdraw the firearm out of my left

19   pocket?

20   A.   No.

21              MR. MUNOZ:  Okay, your Honor.  I have no further

22   questions for Sergeant Kelly.

23              THE COURT:  Thank you very much, Mr. Munoz.

24              Cross-examination.

25              MR. LICHTERMAN:  Thank you, your Honor.

H3k1mun4                          Kelly - Cross

```
1    CROSS EXAMINATION

2    BY MR. LICHTERMAN:

3    Q.   Good afternoon, Sergeant Kelly.

4    A.   Good afternoon.

5    Q.   Now you testified just a moment ago that you walked into

6    the bodega and you observed Mr. Munoz.  Can you just describe

7    to the jury exactly how Mr. Munoz was pulling the gun out.

8    A.   He was -- I walked in the bodega, the door was -- if I

9    walked in like this, the counter was on my left, Mr. Munoz was

10   standing at the counter like at the cashier, like waiting for

11   something or ordering -- ordering something.

12   Q.   And can you demonstrate for the jury how he pulled the gun

13   out.

14   A.   I just -- as soon as I walked in, he looked at me and he --

15   I just remember him pulling it out, like this, like it was in

16   his waistband, just holding it like this, pulling it out.

17   Q.   What were you thinking when you saw plaintiff pull the gun

18   out?

19   A.   I guess I had like tunnel vision somewhat, but I just

20   remember like, you know, like holy -- just remembering like --

21   like charging him, like trying to tackle him.

22   Q.   And what was the purpose of that?

23   A.   Honestly, I just didn't have time to draw my own firearm.

24   Like I just -- the only thing I could think of was like get the

25   gun, get like -- got to get that gun from him.
```

H3k1mun4                         Kelly - Cross

1    Q.   When you say there wasn't enough time, what were you

2    worried was going to happen?

3    A.   That he was going to shoot me or -- or somebody.

4    Q.   Then you --

5    A.   I honestly thought he was going to shoot me.

6    Q.   And then you described falling to the ground, correct?

7    A.   Yes.

8    Q.   In what direction did you fall to the ground?

9    A.   Honestly, I don't remember.  Behind Mr. Munoz was a -- it

10   was like a center aisle like all potato chips, potato chip

11   racks, stuff like that.  I just remember -- I don't know --

12   turning around, pretty much I fell like on top of him.  I

13   remember Officer Flynn being on -- on his left and Officer Reid

14   being on his right, like we had fell into like a potato chip

15   rack.  It was like all over the floor.  I remember falling like

16   pretty much on top of him.

17   Q.   When you say on top of him, you're referring to Mr. Munoz?

18   A.   Mr. Munoz, yeah.

19   Q.   And how did Mr. Munoz land on the ground?

20   A.   He landed on his stomach.

21   Q.   And where was the gun when you landed on him?

22   A.   Underneath him.  Still in his right hand.

23   Q.   And what was the plaintiff doing when he was on the ground?

24   A.   I -- just trying to get up, just screaming, you're going to

25   have to kill me, you're going to have to kill me, I'm not going

1    to jail, I get down for my crown, he kept screaming.

2    Q.  You're saying he was fighting.  What was he doing?

3    A.  He was -- everything.  Kick -- trying to get up, kicking,

4    flailing his arms, punching.  I mean, he bit Officer Jones.

5    Just acting as violent as he could possibly act.  I don't know

6    if he was trying to get out of the store, trying to get, like,

7    you know -- like he said, he just did a robbery.  He didn't

8    want to go back to jail.

9    Q.  And what was your impression of plaintiff's mental state at

10   the time?

11   A.  Out of his mind.  Violent, crazy.

12   Q.  And when the plaintiff was fighting and struggling on the

13   ground, what were you doing?

14   A.  Hitting him, kneeing him, you know, I -- I clearly remember

15   having like both knees on his back, just trying to keep weight

16   on him, keep him from getting up.  Like I knew the gun was -- I

17   knew the gun was underneath him.  Honestly, I was just hoping

18   not to hear the gun go off.

19   Q.  And when you hit the plaintiff, where did you hit him?

20   A.  Like the back of his head, all over his back.  I don't

21   know.  Everywhere.

22   Q.  And why were you hitting him?

23   A.  To get the gun, get him into handcuffs.

24   Q.  And why were you kneeing him?

25   A.  Same thing.  Just having him -- needing to subdue, get this

H3k1mun4                         Kelly - Cross

1   guy under control.

2   Q.  And while you were doing that, what was Officer Flynn

3   doing?

4   A.  The same thing.  Kneeing him, punching him.  I remember --

5   a lot of what I remember was Officer Reid primarily just

6   focusing on that right hand, that right arm.  Officer --

7   Sergeant Reid was on the -- on the right of me, just -- I

8   remember him mostly just trying to get that gun.  And then at

9   some point I did see Officer Reid get -- finally retrieve the

10  gun from him.

11  Q.  And what were you thinking when you saw Officer Reid

12  recover the gun?

13  A.  Just relief, you know.

14  Q.  And what did plaintiff do after the gun was recovered?

15  A.  He was still fighting.  I mean, this went on for -- I don't

16  know -- three minutes, four minutes, you know, two, three, four

17  minutes, but that's -- that's a long time.  I finally -- we

18  were lucky enough to get a pair of handcuffs on his left arm,

19  and then at some point I guess -- I guess he gave up, you know.

20  We were able to finally get him handcuffed.

21              (Continued on next page)

22

23

24

25

H3K8MUN5                        Kelly - Cross

1   Q.  Can you describe what the inside of the bodega looked like

2   after the plaintiff was in handcuffs?

3   A.  Destroyed.  It was a mess.  Sodas everywhere broken, all

4   the -- I guess like the whole tray.  It was broken up into two

5   aisles, but it was really just broken up by racks of potato

6   chips and whatnot, all those racks were on the floor.

7   Q.  After plaintiff was in handcuffs, did you punch him?

8   A.  No.

9   Q.  After plaintiff was in handcuffs, did you observe anyone

10  else punch him?

11  A.  No.

12  Q.  Was any force whatsoever used against plaintiff after he

13  was placed in handcuffs?

14  A.  No.

15  Q.  What happened after plaintiff was placed in handcuffs?

16  A.  I remember just we had all gone outside, and I don't

17  remember who exactly but I remember sitting Mr. Munoz on the

18  curb, and I clearly remember myself calling for an ambulance.

19  Q.  Did there come a time when you learned whether the gun was

20  loaded?

21  A.  Yes.  I'm not exactly sure when.

22  Q.  What happened after you called the ambulance?

23  A.  Like right after I called an ambulance, a police van had

24  pulled up, and one of the uniformed officers had gotten out of

25  the van, approached myself and said, we have a victim in the

1   back saying this guy just robbed him at gunpoint.

2            At that time, I remember we stood up Mr. Munoz.  I

3   clearly remember going into his pocket, and he had a wallet in

4   his pocket.  We opened it up and it turned out to be the victim

5   that was in the police van, his ID and all that stuff was in

6   there.

7   Q.  Was plaintiff taken to the hospital?

8   A.  Yes.

9   Q.  Which hospital was he taken to?

10  A.  Jacobi.

11  Q.  Did you interact with the plaintiff at all at the hospital?

12  A.  Officer Flynn and Officer Jones had accompanied him in the

13  ambulance to the hospital.  A short time later, myself and

14  Officer Reid had gone to the hospital, you know, to go see

15  Officer Flynn, Officer Jones, do whatever we had to do.

16  Q.  How was plaintiff acting at the hospital?

17  A.  Crazy.  Crazy.

18  Q.  When you say crazy, what do you mean?

19  A.  He was just going crazy, screaming, yelling.  The sight of

20  Officer Reid, I don't know if you're a racist or something --

21            THE COURT:  Jury, disregard that.

22            Don't put yourself in somebody else's mind.  Just tell

23  the jury what you saw or heard.

24  A.  Just screaming and yelling, curses, just going crazy.

25  Q.  What was the plaintiff yelling and screaming?

1    A.   Just all kinds of curses, a lot of derogatory statements

2    towards Officer Reid and his color.

3    Q.   Did you receive any injuries as a result of this incident?

4    A.   I had a watch that was -- I didn't notice at the time, but

5    I guess it got destroyed, but I had a bad cut on my left wrist.

6    Q.   How was that injury treated?

7    A.   I think they just gave me a tetanus shot, cleaned it up and

8    gave me a tetanus shot.

9    Q.   Did there come a time when you reported this incident?

10   A.   Later back at the precinct, we did like line-of-duty

11   reports for myself and Officer Jones.

12   Q.   Did you report this incident to the Internal Affairs

13   Bureau?

14   A.   Yes.

15   Q.   Why would you do that?

16   A.   Just because whenever you have an injured prisoner, it's

17   just protocol, call internal affairs.

18   Q.   Did you ever return to that bodega at 1890 Archer Street?

19   A.   Yes.

20   Q.   When did you do that?

21   A.   Probably that night.

22   Q.   What was the purpose of you returning?

23   A.   To try to get any witness information.  I remember we were

24   going to see if there was video.

25   Q.   What did you find?

1    A.  They had -- you know, they had the cameras and stuff, but

2    apparently it wasn't recording.

3            MR. LICHTERMAN:  If I may confer for one moment, your

4    Honor.

5            Nothing further, your Honor.

6            THE COURT:  So, Mr. Munoz, do you have any further

7    question you wish to place to this witness because of the

8    answers he just gave?

9            MR. MUNOZ:  Yes, your Honor.

10           THE COURT:  You may ask some more questions then.

11   REDIRECT EXAMINATION

12   BY MR. MUNOZ:

13   Q.  Sergeant Kelly, if you said you came into the deli and you

14   pulled out your shield, don't you think I would have

15   surrendered right there?

16   A.  I didn't say I pulled out my shield.

17   Q.  You claim to say that you identified yourself as a sergeant

18   in front of me.  Did you?

19   A.  As soon as you looked at me, you just took out that gun.  I

20   don't remember saying anything.  I just remember tackling you.

21   Q.  You don't remember saying that you came inside the store

22   and you identified yourself as an officer?

23   A.  No.

24   Q.  Why didn't you give your testimony, based on what happened

25   at the store, why didn't you give testimony during the Mapp,

H3K8MUN5                    Kelly - Redirect

1    Dunaway and Wade hearing?  Why wasn't you present at the time

2    to give your story of what happened inside the store?  Why now

3    you're saying your side of the story, when you could have said

4    it during court?  Why all of a sudden now?

5    A.  This is the first time I have been called to court on this.

6    Q.  Why I didn't get that report of you getting injured because

7    your watch was broken?  Why I never seen no Internal Affairs

8    Bureau report based on you?

9    A.  I have no idea.

10   Q.  But you said there is a protocol so you have to tell

11   Internal Affairs Bureau that, right?

12   A.  I said --

13   Q.  Didn't you say you have to address the issue that you got

14   injured because of your watch due to the fall or tussle with

15   the gun?

16   A.  No.  What I said was it's protocol to call internal affairs

17   due to the fact that we had an injured prisoner, you.

18   Q.  Didn't you state you got injured because of your watch?

19   A.  Yes.

20   Q.  So why I never seen that documentation, Internal Affairs

21   Bureau report?  I never got that document.  And why couldn't

22   you give your testimony on that behalf?  Why didn't you say

23   nothing?

24           THE COURT:  Mr. Munoz, this is the time to ask

25   questions of this witness about the events back in 2011.  Is

1   there any additional question you wish to place to this witness

2   about those events?

3          MR. MUNOZ:  I am trying to think right now.  I have

4   got short period of time.

5   Q.  So you said that I fell on the floor with the gun under my

6   right arm, that's what you said?

7   A.  I said you were holding it in your right hand, yes.

8   Q.  Didn't you say I fell on top of it underneath my right arm?

9   A.  I said you fell on your stomach and the whole time the gun

10  was in your right hand underneath you, yes.

11  Q.  So you think that if I would have fell on the ground

12  holding the firearm in my right hand under my stomach towards

13  my ribs, then that proves that my left rib wouldn't have been

14  fractured if the firearm would have been in my left arm, right?

15         THE COURT:  Mr. Munoz, this isn't the chance to sort

16  of argue a point of view, but, instead, an opportunity to ask

17  factual questions.  OK?

18         Is there a question about the facts that you would

19  like to ask this witness?

20         MR. MUNOZ:  One more question.

21  Q.  Did you know who cuffed me to the machine or was I ever

22  cuffed to the machine?

23  A.  You were never cuffed to a machine, no.

24         MR. MUNOZ:  No further questions, your Honor.

25         THE COURT:  Thank you.

1          Any recross?

2          MR. LICHTERMAN:  No, your Honor.

3          THE COURT:  You may step down.

4          (Witness excused)

5          THE COURT:  Mr. Munoz, do you wish to call one of the

6     other officers to the stand?

7          MR. MUNOZ:  Yes.  I would like to call Mr. Reid,

8     please.

9      ROBERT REID,

10         called as a witness by the plaintiff,

11         having been duly sworn, testified as follows:

12         THE COURT:  State your full name and spell your first

13    and last name for the record.

14         THE WITNESS:  Robert Reid, R-O-B-E-R-T, R-E-I-D.

15    DIRECT EXAMINATION

16    BY MR. MUNOZ:

17    Q.  How you doing, Officer Reid?

18         Can I get your shield number?  Can you say your shield

19    number?

20    A.  Yes.  I'm doing fine.  Thank you.  3724.

21    Q.  Isn't it shield number 16009?

22    A.  As a police officer, yes.  But I have since been promoted

23    sergeant.

24         THE COURT:  Sergeant Reid, could you move that mic

25    down so it's sort of under your chin.  Thanks.

1   Q.  At that time, can you give me a description of what you was

2   wearing that day?

3   A.  Camouflage shorts.  I don't know what -- a T-shirt, but I

4   don't recall what color it was.

5   Q.  Do you remember the description that you gave of myself

6   when you entered the store?

7   A.  No, I do not.

8   Q.  Did you pull out your shield before entering the store?

9   A.  Yes, I did.

10  Q.  What was my height?  What was the description of height?

11  What was the full description you said about me?

12  A.  I do not recall.

13  Q.  Didn't you say on page 47 that I was approximately 6 feet,

14  male Hispanic?

15  A.  I do not recall.

16          MR. MUNOZ:  Your Honor, I have here my transcripts,

17  March 21, 2013, of the Huntley, Dunaway, Mapp, Wade hearing.

18          On page 47, I have the transcripts of the minutes of

19  what, at the time, Officer Reid said during that testimony,

20  during that hearing.  It's on page 47, line 3.

21          It reads:  "Approximately 6 feet, male Hispanic."

22          The next line the court said:  "Sorry.  6 feet?"

23          And he said:  "Male Hispanic."

24          THE COURT:  So, as I understand it, the plaintiff is

25  reading testimony that he believes you gave at a state court

1  hearing.  Do you remember testifying that the plaintiff was 6

2  feet and a male Hispanic?

3            THE WITNESS:  No, I do not.

4            THE COURT:  Next question.

5  BY MR. MUNOZ:

6  Q.  When you entered the store, did you enter by yourself?  Was

7  you first, second, third, fourth?

8  A.  I was second.

9  Q.  You entered by yourself?

10  A.  No, I was second.  I was behind Sergeant Kelly.

11  Q.  Yeah.  But did you enter by yourself or did you have fellow

12  officers with you?

13  A.  Officers were with me.

14  Q.  How many officers were with you, which ones, what were the

15  names?

16  A.  It was Sergeant Flynn, Detective Jones and Sergeant Kelly.

17  Q.  Didn't you testify that you grabbed the gun by yourself?

18  A.  Yes, I grabbed the gun.

19  Q.  Didn't you also testify that you couldn't identify the two

20  rounds that were in the firearm?

21  A.  Yes.

22  Q.  So during the arrest, was it more than two or three

23  minutes?

24  A.  Approximately.

25  Q.  You said on page 53 and 24 that you couldn't recall how

1    long it was.

2              THE COURT:  Do you remember if you said in prior

3    testimony at the state court hearing that you couldn't recall

4    how long it was?  Do you remember what you said then during

5    that hearing?

6              THE WITNESS:  No, I do not.

7    Q.  Didn't you say that it was less than half an hour?

8    A.  No, sir.

9    Q.  On page 54, line 7, New York City 380, you said, "I know it

10   was less than an hour."

11             So which one was it, less than an hour, was it two,

12   three minutes, was it five minutes?

13   A.  Less than an hour in regards to?

14   Q.  In regards to what you're saying right now.

15             THE COURT:  Mr. Munoz, it would be helpful, I think,

16   if you could describe what was supposed to have taken an hour.

17             MR. MUNOZ:  What I'm trying to get at is he's saying

18   he doesn't recall if it was five minutes.  Then it went up to

19   20 minutes.  Then less than half an hour.

20             THE COURT:  Defense counsel, do I have what Mr. Munoz

21   is referring to?

22             MS. DEPOIAN:  Yes, your Honor.  It's in the

23   plaintiff's exhibit binder, number 7, I believe.

24             THE COURT:  Do you have a copy for me?

25             Wait one minute.  I do have it.  What page?  54?

1           MR. MUNOZ:  Yes, ma'am.

2           THE COURT:  Give me just one second.

3           MR. MUNOZ:  It's actually from page 53.  It starts at

4    53.

5           THE COURT:  Hold on one second.

6           So, Mr. Munoz, would it be helpful to ask this

7    witness, before you refer to the prior testimony, how long it

8    took between the time he heard about the robbery to the time he

9    arrived at the bodega?  Would that be helpful for you to ask?

10          MR. MUNOZ:  Yes.  Because he's saying he went in with

11   the officers.

12          THE COURT:  OK.  So why don't you ask him that

13   question.

14          If I may, do you remember, Sergeant Reid, how long it

15   took you between the time you first heard of the robbery till

16   the time you arrived at the bodega, do you remember?

17          THE WITNESS:  It was less than 30 minutes,

18   approximately 30 minutes.

19   BY MR. MUNOZ:

20   Q.  Do you remember the code of that communication?

21   A.  Can you repeat that?

22   Q.  Do you remember the code of the content of that

23   communication you received?

24   A.  I believe it was a 32.

25   Q.  Did you say it was larceny?

H3K8MUN5                           Reid - Direct

1   A.  Yes.

2   Q.  So if it was larceny, then wouldn't a larceny not refer to

3   a weapon?

4   A.  It's possible.

5   Q.  Isn't an armed robbery with a firearm, or isn't larceny

6   without a firearm?

7   A.  I said it's possible.  You could have had one on your

8   person.

9   Q.  So when you went inside the store, you didn't have your gun

10  drawn out?

11  A.  No, I did not.

12  Q.  Why not?

13  A.  I usually survey the scene before I pull my firearm out.

14  Q.  So you are saying you entered the store.  Wasn't Sergeant

15  Kelly in first with me already inside the store?

16  A.  I was right behind him.

17  Q.  So you was also inside the store when Sergeant Kelly came

18  towards me in a way that he said that I saw him then?

19  A.  Yes.

20  Q.  Where was you at?

21  A.  Right behind Sergeant Kelly.

22  Q.  Behind, next to him, towards the refrigerators of the

23  store, where exactly in the store?

24  A.  Behind him.  Only one person can enter at a time.

25  Q.  Actually, that door is big enough for more people to enter

1   if it's more than one person.

2              THE COURT:  Excuse me, Mr. Munoz.

3              The jury should disregard that.  This is the time to

4   ask questions, Mr. Munoz.

5   Q.  So who you enter with again?

6   A.  Sergeant Kelly, Sergeant Flynn, Detective Jones.

7              THE COURT:  I am going to ask you to put that mic

8   further back.

9   Q.  You say on page 69 and 12, you're saying you only entered

10  with P.O. Flynn and Officer Jones.  You never mentioned

11  Sergeant Kelly.  So how can you be next to him if you only say

12  that you entered with Officer Flynn and Jones?  How can you be

13  next to Sergeant Kelly then?

14  A.  Sergeant Kelly entered the location first.

15  Q.  How can it be entered when you saying that you was next to

16  him, that you entered with him?  So which one is it?  You

17  entered with him or he enter first and you came in -- as you

18  say here, on page 69, NYC 396, the question is, Who do you

19  enter with?  And on sentence 12, on page 69, NYC 396, you say

20  you entered with P.O. Flynn and Officer Jones.  You never

21  mentioned Sergeant Kelly.

22  A.  Sergeant Kelly entered the location first.

23  Q.  Are you saying, in other words, now that you never went

24  with Sergeant Kelly then, you went after Sergeant Kelly then?

25  Which one is it?  You went after Sergeant Kelly or you went

1   with Sergeant Kelly, Officer Flynn and Officer Jones?

2              That's not what you're saying on this NYC testimony on

3   the Dunaway, Mapp, Wade hearing.  I have it right here in front

4   of me.

5              THE COURT:  Is there an objection?

6              MS. DEPOIAN:  Yes, your Honor.

7              THE COURT:  Sustained.

8              Next question, Mr. Munoz.

9   Q.  Who went inside the store third?

10  A.  I do not know.

11  Q.  You say on page 69, sentence 25 --

12             THE COURT:  Mr. Munoz, I am going to give you some

13  advice here.  The transcript could be very helpful, but first

14  ask your question about what the witness remembers.  And if you

15  feel he is testifying here before this jury in a way that's

16  inconsistent with prior testimony, then use the prior

17  testimony.  But, first, just ask him what he remembers.

18             MR. MUNOZ:  I apologize for that.  I wish I would have

19  known that first.

20             THE COURT:  That's fine.  No problem.

21  Q.  Are you saying that you went inside with the two other

22  officers, right, and that's when you displayed your shield?

23  A.  I'm sorry.  Can you repeat the question?

24  Q.  You're saying that you went inside the store with the two

25  other officers, that's when you displayed your shield, or did

H3K8MUN5                        Reid - Direct

1    you display your shield before you came inside the store?  And

2    who were the two officers you was with when you displayed the

3    shield inside the store?  Was it inside the store or out?

4    A.  My shield was out before I went inside the store.  Sergeant

5    Kelly went inside the store first.  I proceeded next.  And

6    Jones and Flynn were behind me.  I do not recall which order

7    they were in.

8    Q.  When the incident was over, what happened?

9           MS. DEPOIAN:  Objection, your Honor.

10   Q.  When the incident was over inside the deli, what happened

11   to me next?  Do you kind of remember?

12   A.  You were taken outside.

13   Q.  What happened?  Where was I taken outside?  What happened

14   when I was taken outside?

15   A.  You were placed in an ambulance eventually and taken to the

16   hospital.

17   Q.  Did you see that?

18   A.  No.

19   Q.  How do you know I was taken outside to the hospital?  Did

20   you see the vehicle?

21   A.  Which vehicle?

22   Q.  You kind of confused me and my lawyer when you gave --

23          THE COURT:  No.  Mr. Munoz, again, do you have a

24   question for him?

25   Q.  You don't know what vehicle they put me on when they took

H3K8MUN5                    Reid – Direct

1    me outside?

2    A.   No.

3    Q.   When you reached outside the store, did you see me outside

4    or you didn't see me?  Was I really taken by the vehicle?

5    A.   I saw you outside.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3kWmun6                          Reid - Direct

1    BY MR. MUNOZ:

2    Q.  You're sure you saw me outside?

3    A.  Yes.

4    Q.  So you're not guessing?  You're sure or you're guessing?

5    A.  I remember seeing you outside.

6    Q.  Where was I taken to, the hospital?

7    A.  Jacoby Hospital.

8            MR. MUNOZ:  Your Honor, on page 85, it says that the

9    vehicle took me to the precinct.

10           THE COURT:  Hold on one second.

11           Sergeant Reid, during the state court hearing, were

12   you asked this question and did you give this answer, at the

13   bottom of page 84, line 23, going over to the top of page 85:

14   "Q.  And in fact, you don't even -- that you don't even

15   remember if he was already gone by the time you got outside the

16   bodega, is that right?

17   "A.  Yes, sir.

18   "Q.  So you're sort of guessing that that's how he must have

19   gotten to the area, gotten from the area of the bodega to --"

20           I'm sorry.  There are lots of -- I shouldn't have read

21   that last part.  Let me start again.  I'm going to start a

22   little bit before, on page 84, line 20:

23   "Q.  But you were not involved in taking him to the vehicle,

24   right?

25   "A.  No, sir.

1    "Q.  And in fact, you don't even -- that you don't even

2    remember if he was already gone by the time you got outside the

3    bodega, is that right?

4    "A.  Yes, sir."

5          Sergeant Reid, do you remember if you were asked those

6    questions and gave those answers in prior testimony?

7          THE WITNESS:  Yes, I do.

8    BY MR. MUNOZ:

9    Q.  So you say you exhibited your shield at the time, your

10   badge, your NYPD badge at the store.  You didn't say "freeze,

11   police," none of that?  You identified yourself as police, like

12   you said, or --

13   A.  I had my --

14   Q.  -- did you come inside and pull out your badge and say

15   "freeze, police, NYPD"?  Did you say anything of that nature?

16   A.  My shield was displayed when I entered the store.

17          THE COURT:  Did you say "police, NYPD, freeze"?

18          THE WITNESS:  No.

19   Q.  So Sergeant Kelly also didn't announce "police, sergeant,

20   freeze," none of that, of that nature?

21   A.  I don't recall him saying it.

22   Q.  Was one of the questions, question to you that you kind of

23   don't remember anything like that in that correct way, like you

24   basically don't recall a lot of the story that happened in the

25   deli?

1          THE COURT:  Mr. Munoz, I'm trying to understand your

2     question for the sergeant.  Do you want him to tell you whether

3     he has a clear recollection of what happened inside the deli?

4          MR. MUNOZ:  I just want to know that, did he remember

5     him saying "I don't recall, I don't recall, I don't recall" in

6     the testimony, when he was questioned by my UA at the time

7     during this Wade attorney hearing.

8          THE COURT:  Ladies and gentlemen of the jury, as

9     you've heard, the plaintiff was convicted of a robbery, and

10    that was in state court, and he's told you that he's serving

11    time for that conviction.  In connection with those state court

12    proceedings, there was a hearing, a hearing before a state

13    court judge, and witnesses were called and testified.  All of

14    this is in connection with state legal issues that you don't

15    need to concern yourself with, but it is testimony about these

16    events, taken for another purpose, in connection with the

17    criminal trial or criminal proceedings.

18          As I understand it, Mr. Munoz wants to ask you,

19    Sergeant Reid, if during that prior testimony there were

20    questions asked to you, frequently, in fact, where you answered

21    "I don't remember."  Do you know whether or not you gave that

22    kind of answer during that state court testimony, frequently?

23          THE WITNESS:  I gave him that answer, but I didn't

24    give it -- I wouldn't say frequently.

25          THE COURT:  OK.  Mr. Munoz, next question.

1   BY MR. MUNOZ:

2   Q.  Did you say "I didn't see what happened, sir, but I did see

3   the officer with a bite mark on his arm"?

4               THE COURT:  Mr. Munoz, again, let's just focus on what

5   you want to establish the officer did or saw or heard in the

6   bodega.  Just put the prior testimony aside for a moment and

7   just ask him what you want to learn, and then if he says

8   something that's inconsistent with the prior testimony, we can

9   refer to the prior testimony.  What are you curious about

10  asking him right now?

11              MR. MUNOZ:  That what I just asked him, if he saw what

12  happened and if he saw, did he see the officer with a bite mark

13  on his arm at that time.

14              THE COURT:  OK.  Good.

15              THE WITNESS:  Is he asking me --

16              THE COURT:  Did you see a bite mark on an officer's

17  arm, Sergeant Reid?

18              THE WITNESS:  Yes, I did.

19  BY MR. MUNOZ:

20  Q.  And after you used, supposedly disarmed me by yourself,

21  what position my body was on after you took the firearm off my

22  hands?  How did you take the firearm; was it my left or my

23  right hand that you, that you retrieved it?

24              THE COURT:  There are two questions there:  Which hand

25  was the firearm in when you retrieved it?

1         THE WITNESS:  I don't know, because the firearm was

2    under his body.

3         THE COURT:  OK.  And what position was his body in

4    after you retrieved the firearm?

5         THE WITNESS:  Would that be during or after?

6         THE COURT:  After you had possession of the firearm,

7    what position was his body?

8         THE WITNESS:  When I took, when I took the firearm out

9    of his hands, he was laying -- the firearm was under his body.

10   BY MR. MUNOZ:

11   Q.  You know the description of what type of clothes I was

12   wearing that day?

13   A.  No.

14        MR. MUNOZ:  I got no further questions, your Honor.

15   Thank you.

16        THE COURT:  Thank you, Mr. Munoz.

17        Cross-examination.

18        MS. DEPOIAN:  Yes, your Honor.

19   CROSS-EXAMINATION

20   BY MS. DEPOIAN:

21   Q.  Good afternoon, Sergeant Reid.

22   A.  Good afternoon.

23   Q.  Are you currently employed?

24   A.  Yes, I am.

25   Q.  Where are you employed?

H3kWmun6                          Reid - Cross

1   A.   NYPD.

2   Q.   And what year did you begin working for the police

3   department?

4   A.   2001.

5   Q.   What's your current rank?

6   A.   Sergeant.

7   Q.   When were you promoted to the rank of sergeant?

8   A.   2014.

9   Q.   What was your rank before then?

10  A.   Police officer.

11  Q.   How many years were you a police officer for?

12  A.   13.

13  Q.   And in September of 2011, what was your rank?

14  A.   Police officer.

15  Q.   And what was your command at that time?

16  A.   43rd Precinct.

17  Q.   Were you assigned to a unit?

18  A.   Yes, I was.

19  Q.   What unit was that?

20  A.   Anticrime.

21  Q.   And what is anticrime unit, what does that mean?

22  A.   Plainclothes unit that responds to serious jobs in

23  progress.

24  Q.   Were you working on September 13, 2011?

25  A.   Yes, I was.

H3kWmun6                         Reid - Cross

1  Q.  Were you working with partners that day?

2  A.  Yes, I was.

3  Q.  Who with?

4  A.  Officer Jones, Officer Flynn, Sergeant Kelly.

5  Q.  Did you normally work with all three of these people?

6  A.  Yes, I did.

7  Q.  Were you in uniform or something else?

8  A.  Plain clothes.

9  Q.  I think you already described what you were wearing.  Did

10 you have any police equipment with you?

11 A.  Yes, I did.  I had a shield displayed and a vest on.

12 Q.  When you say vest, what do you mean?

13 A.  Bulletproof vest.  I'm sorry.

14 Q.  Did there come a time when you had the occasion to respond

15 to 1890 Archer Street on September 13?

16 A.  Yes, there was.

17 Q.  What brought you to that location?

18 A.  A radio transmission stated that a larceny had been

19 committed.

20 Q.  And why did that lead you to the deli?

21 A.  We came to the scene looking for the perpetrator of the

22 crime.

23 Q.  Where was that armed robbery to have taken place?  I'm

24 sorry.  You said larceny.  Where was that larceny to have taken

25 place?

H3kWmun6                              Reid - Cross

A.  Approximately three blocks from 1890 Archer.

Q.  What happened when you arrived in the store at 1890 Archer
Street?

A.  I followed Sergeant Kelly inside the store, and upon
entering the store I seen Mr. Munoz using a firearm.

Q.  How far away was plaintiff from you when you first saw him?

A.  Approximately three to five feet.

Q.  And what was he doing when you saw him?

A.  He seemed like he's pulling a firearm from his waistband.
I didn't see where he pulled it from; I just saw when it was
out.

Q.  And can you describe that weapon?

A.  It was a black revolver.

Q.  What were you thinking when you saw him pull out the gun?

A.  I thought I was going to be shot or one of our partners
would be shot.

Q.  So what did you do?

A.  I grabbed his hand and I grabbed the gun.

Q.  Can you describe in a little more detail what you mean when
you say that?

A.  I grab -- I put one of my hands on his hand and I put one
of my hands on the gun, and I tried to get as close as possible
so I could have some type of leverage so I could take the gun
away from him.

Q.  What did you observe Officer Flynn doing at this point?

H3kWmun6                          Reid - Cross

1    A.   I didn't see Officer Flynn because he was behind me and my

2    main focus was just the gun and trying not to get shot.

3    Q.   What did you observe Sergeant Kelly doing at that point?

4    A.   He grabbed him around his upper torso.  I didn't see where.

5    Q.   What happened next?

6    A.   We ended up on the ground.

7    Q.   How did you fall on the ground?

8    A.   How did I get there, or --

9    Q.   Yeah.  How did you get on the ground?

10   A.   I don't know.  I just know I ended up on the ground.

11   Q.   Did plaintiff also fall to the ground?

12   A.   Yes, he did.

13   Q.   And how was he lying when he fell?

14   A.   He fell to his stomach.

15   Q.   And where were his arms when he fell to the ground?

16   A.   Underneath his body.

17   Q.   And where were your hands at this point?

18   A.   Underneath his body, holding onto the firearm.

19   Q.   So plaintiff fell on your hands, is that correct?

20   A.   Yes.

21   Q.   What was plaintiff doing when he was on the ground?

22   A.   Kicking, yelling, spitting, and attempting to bite.

23   Q.   And your hands were under plaintiff when he fell, is that

24   right?

25   A.   Yes.

H3kWmun6                              Reid - Cross

1    Q.   And other than spitting, what else was plaintiff doing?

2    A.   He was yelling.  He was kicking.

3    Q.   So what did you do?

4    A.   I attempted to take the firearm away.

5    Q.   What were you thinking at this point?

6    A.   I was actually waiting for it to go off, trying to brace

7    myself and hopefully nobody would get shot, including himself.

8    And I eventually pried it away from his arms.

9    Q.   Was plaintiff saying anything at this point?

10   A.   He was yelling, "You're going to have to f'ing kill me."

11   Q.   What was your impression of plaintiff's mental state at

12   this time?

13   A.   That he was out of his mind.

14   Q.   And so there was a time when you were able to recover the

15   firearm, is that right?

16   A.   Yes.

17   Q.   How were you able to recover it?

18   A.   My body leverage against his won out.

19   Q.   And what did you do after you recovered the gun?

20   A.   I stood up, looked at the gun to make -- try to make it as

21   safe as possible, as I could, and I placed it in my cargo pants

22   pocket.

23   Q.   And why did you do that?

24   A.   Because I needed to make sure it was safe first, because I

25   don't know the firearm.  And I also needed -- he wasn't placed

1   in handcuffs as of yet.

2   Q.  What, if anything, did you say after you placed the gun in

3   your pocket?

4   A.  "I have the gun."

5   Q.  What were you thinking after you recovered the gun?

6   A.  I was relieved that nobody was shot, but now we have to

7   still place him in custody.

8   Q.  So what happened next?

9   A.  He was eventually placed in custody.

10  Q.  What was plaintiff doing after, while you put the gun in

11  your pocket?

12  A.  He was still struggling.

13  Q.  So what did you do?

14  A.  I tried to grab his arm and place it behind his back.

15  Q.  Did you punch plaintiff after you had recovered the gun?

16  A.  Yes, I did strike him.

17  Q.  Plaintiff was not in handcuffs at this point, right?

18  A.  No, not at all.

19  Q.  Where did you punch plaintiff?

20  A.  To his upper torso, in his arm.

21  Q.  What were you trying to do?  What was the purpose of

22  punching him in the arm?

23  A.  To try, I tried to try to get his body to move in a certain

24  way, so to make it easier.  I wanted it to be easier for us to

25  place handcuffs on him.

H3kWmun6                          Reid - Cross

1    Q.  Did you observe anyone else punch plaintiff at this point?

2    A.  Yes.

3    Q.  Who punched plaintiff at this point?

4    A.  I can't tell you who, but I did see him being struck.

5    Q.  Did there come a time where plaintiff was placed in

6    handcuffs?

7    A.  Yes.

8    Q.  How was that able to happen?

9    A.  His both hands were eventually put behind his back and

10   handcuffs were placed on him.

11   Q.  Do you know who did that?

12   A.  No.

13   Q.  Did there come a time where plaintiff stopped resisting his

14   arrest?

15   A.  Yes.

16   Q.  Was that before or after he was placed in handcuffs?

17   A.  Before.

18   Q.  What did the inside of the bodega look like after plaintiff

19   was placed in handcuffs?

20   A.  It was just destroyed.  There is a rack of chips, cookies,

21   other items that would be sold that were open on the floor,

22   cans of soda, bottles broken.

23   Q.  What happened after plaintiff was placed in handcuffs?

24   A.  He was taken outside.

25   Q.  How long after plaintiff was in cuffs was he taken outside?

H3kWmun6                          Reid - Cross

1    A.  It was immediately.  Immediately take -- stood up and taken

2    outside.

3    Q.  After plaintiff was in handcuffs, did you punch him?

4    A.  No.

5    Q.  After plaintiff was in handcuffs, did you observe anyone

6    else punch him?

7    A.  No.

8    Q.  Was any force whatsoever used on plaintiff after he was

9    placed in handcuffs?

10   A.  No.

11   Q.  And what did you do after plaintiff was taken outside?

12   A.  I looked around the store to see if he, anything was

13   missing or left behind.

14   Q.  And did there come a time where you went to the hospital?

15   A.  Yes, I did.

16   Q.  What hospital was that?

17   A.  Jacoby Hospital.

18   Q.  Did you interact with plaintiff while you were at the

19   hospital?

20   A.  No, but he interacted with me.

21   Q.  What was he saying to you?

22   A.  A bunch of expletives, expletives, threats, and just really

23   aggressive towards me.

24   Q.  How did you respond to him?

25   A.  I didn't say anything.

H3kWmun6                          Reid - Redirect

1   Q.  Were you angry at plaintiff?

2   A.  No, not at all.  I was actually just relieved that no one

3   was hurt, like I said, including himself; no one was shot that

4   day.

5            MS. DEPOIAN:  Thank you, Sergeant Reid.  No further

6   questions.

7   REDIRECT EXAMINATION

8   BY MR. MUNOZ:

9   Q.  So you're saying that you disarmed me, right?  You're

10  saying you took, grabbed my hand and you was capable of

11  retrieving the gun and putting it in your pocket?

12  A.  Yes, I took the gun.

13  Q.  But you don't remember who else was hitting me, right, out

14  of your fellow officers at the time?  Right?

15  A.  No.

16  Q.  But you were right there, though, so how could you not

17  remember who else was hitting me?

18           THE COURT:  This is a time to ask factual questions,

19  not to argue with the witness.

20  Q.  Do you remember saying that you loved your job?  Why did

21  you say that as I was exiting out the store?

22  A.  Yes, I remember telling you I like my job.

23  Q.  What was the reason for that?

24  A.  You were yelling at me, trying to get me upset, and I

25  wasn't upset.  I was telling you I enjoy my job.

H3kWmun6                          Flynn - Direct

1   Q.  Didn't you say that before I said anything after you?

2   A.  No, sir.

3   Q.  You can't deny that you cuffed me either, right, and you

4   was right, present right there then?

5   A.  No, I cannot.

6           MR. MUNOZ:  OK.  I have no further questions, your

7   Honor.

8           THE COURT:  Any further questions for this witness?

9           MS. DEPOIAN:  Nothing further, your Honor.

10          THE COURT:  You may step down.

11          (Witness excused)

12          THE COURT:  Would you like to call another witnesses,

13  Mr. Munoz?

14          MR. MUNOZ:  Yeah.  I would like to call Officer Flynn,

15  which is, who is now Sergeant Flynn.

16   BRIAN FLYNN,

17      called as a witness by the Plaintiff,

18      having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. MUNOZ:

21  Q.  Sergeant Flynn, how are you, sir?

22  A.  Good, Mr. Munoz.  How are you?

23  Q.  Good.

24          Do you remember, was you the first one entering the

25  store and tapping me on the shoulder?

1    A.  No, I was not.

2    Q.  Was you behind me at any matter of time during that

3    incident?

4    A.  At one point, yes, I was behind you.

5    Q.  Isn't behind the counter nothing really in the way as what

6    they saying, that there was a lot of, a lot of sodas and chips

7    and all that?

8    A.  When you go into the store, there's a -- I guess straight

9    to the right, there's a rack of cookies, potato chips, and then

10   there's an aisle with refrigerators, and up front I think there

11   were some bottles of soda.

12   Q.  Aren't those in the back, where the sodas were at?

13   A.  That day they were in the front.  I'm not too familiar with

14   the store now.

15   Q.  And you had knowledge of the Arizona piña colada that I had

16   on top of the counter?

17   A.  No, sir.

18   Q.  You had knowledge that I was waiting for a sandwich also

19   that was given to me, I never had a chance to grab it?

20   A.  You might have been at the counter waiting for something.

21   I don't know what you ordered, though.

22   Q.  OK.  So was it you that gave me the first blow to my left

23   eye?

24   A.  No, sir.

25   Q.  Can you mention who did it?

1   A.  At that point I had your upper torso; I was behind you,

2   trying to grab your upper torso, from the rear.

3   Q.  When you approached me, didn't I took a step back and

4   withdraw the fire, firearm out of my left pocket?

5   A.  I was not the first one to engage you.  It was Sergeant

6   Kelly and Officer Reid and then myself.  They had contact with

7   you before I touched you.

8   Q.  So you're saying that the firearm was already, I already

9   had the firing arm.

10  A.  Correct.

11  Q.  Is that what you're saying?

12  A.  Correct.  The firearm was already in your hand, yes.

13  Q.  And the firearm, how was I holding it?

14  A.  I'd say you were, you pulled it out from below, so it was

15  kind of facing like this, with the muzzle facing down, but I'd

16  say it was maybe like shoulder length or chest height, the

17  firearm.

18  Q.  Well, how could you say you pulled it out when you said

19  that I already had it out?

20  A.  I never said I pulled it out.

21  Q.  How can you say that I had it out when you say right now

22  that I was pulling it out towards the shoulder, shoulder

23  length?  Did I have it out, or did you see me pull it out

24  shoulder length?

25  A.  When I walked in -- I said that when Sergeant Kelly,

1   Sergeant Reid, and myself, very briefly, right behind each

2   other, at that point your, I saw your hand coming up from your

3   waistband area.  I don't know if you pulled it out of your

4   pocket or waistband, and you were proceeding the gun up towards

5   your upper body.

6   Q.  So you didn't come inside the store and I already had

7   withdrawn the gun already in my hand; you saw me pulling,

8   withdrawing the gun out of my left pocket to the shoulder, and

9   that's what you're saying, right?

10  A.  No.  I'm saying I saw you with the gun in your right hand

11  pulling it up towards your upper torso while they were about to

12  engage you.

13  Q.  OK, but you say it was my right hand, not my left?

14  A.  I saw the gun coming up in your right hand, sir.

15  Q.  OK.  That's what I'm saying.  You saw the right hand?

16  A.  Yes.

17  Q.  Did it have tissue around the handle?

18  A.  I didn't see any tissue.

19  Q.  Was my index finger on that trigger?

20  A.  I don't recall.

21  Q.  You don't recall?

22  A.  It's a small revolver, sir.  I don't -- I wasn't able to

23  see where your hand was placed.  I know your hand was on the

24  grip of the gun.  I didn't see where your index finger was at.

25  Yes, that's the firearm.

1   Q.  This is the actual size of it.  Not that small, visible?

2   A.  Inside someone's hand, it's kind of small.

3   Q.  How close was you?  How close was you when you saw me pull

4   out the firearm in my right hand?

5   A.  Six to eight feet, approximately.

6   Q.  You was more towards the door then, front door?

7   A.  I was a few steps in the front door, yes.

8           THE COURT:  Mr. Munoz, could I interrupt one second.

9   I think you're holding a picture, is that right?

10          MR. MUNOZ:  Yes, ma'am.

11          THE COURT:  Did you want to offer that picture as an

12  exhibit?

13          MR. MUNOZ:  Yes, ma'am.

14          THE COURT:  OK.

15          MR. MUNOZ:  It's not a real good picture, though,

16  but --

17          THE COURT:  We'll just mark it with an exhibit tag.

18  It will be Plaintiff's Exhibit 2, and we'll get the document

19  from you and mark it as Plaintiff's Exhibit 2.

20          MR. MUNOZ:  Actually, it's two of them.  I only have

21  one right now.

22          THE COURT:  OK.  We'll start with this one, and that's

23  where we'll begin tomorrow morning.

24          Ladies and gentlemen, it's 5:00.  I'm going to remind

25  you, do not discuss the case.  We'll start tomorrow morning at

H3kWmun6

1    9:30.  Thank you so much.  You are dismissed.

2              (Jury not present)

3              THE COURT:  You may step down, Sergeant.

4              THE WITNESS:  Thank you.

5              (Witness excused)

6              THE COURT:  Mr. Munoz, when you held up that

7    photograph of the gun, I remembered you had told me earlier you

8    wanted to offer that photograph as an exhibit, didn't you?

9              MR. MUNOZ:  Yes, ma'am.  I see it as two photographs

10   that I have.  Did I do something wrong?

11             THE COURT:  You didn't.  We'll receive that in

12   evidence so the jury can see that photograph tomorrow, and if

13   you have another photograph of the gun or the ammunition that

14   you want to offer, you can show that to defense counsel

15   tomorrow morning.  OK?

16             MR. MUNOZ:  Yes, ma'am.  I believe I have more

17   paperwork in my cell, so I could be able to really look through

18   it, see what I could produce.

19             THE COURT:  Good.  Tomorrow we're going to finish

20   Sergeant Flynn's testimony, and then, Mr. Munoz, did you want

21   to call the fourth defendant as a witness?

22             MR. MUNOZ:  Actually, I still want to finish

23   questioning Sergeant Flynn, if it could be for tomorrow.

24             THE COURT:  Yes.  We're going to begin with Sergeant

25   Flynn as the first witness tomorrow, to complete his testimony,

H3kWmun6

```
 1    and after his testimony is done, then you wanted to call the
 2    fourth defendant as your witness.  Do I understand that
 3    correctly?
 4              MR. MUNOZ:  That's correct, ma'am.
 5              THE COURT:  OK, good.
 6              MR. MUNOZ:  Can I say something?
 7              THE COURT:  Sure.
 8              MR. MUNOZ:  Addressing Sergeant Flynn?
 9              THE COURT:  No, no, no.  Obviously you can ask him
10    questions tomorrow.  OK?
11              MR. MUNOZ:  OK.  It's not really a question, though.
12    It's just thanking him for, after an arrest, after the crime,
13    when I saw him in the precinct.
14              THE COURT:  OK.
15              MR. MUNOZ:  He was a very good gentleman and treated
16    me real nice, so no hard feelings between me and him.
17              THE COURT:  Good.  Thank you for saying that to him.
18              Let's just talk about what's going to happen tomorrow.
19    We're going to finish the testimony of all four defendants, and
20    then did you have any other exhibits you wanted to offer,
21    Mr. Munoz?
22              MR. MUNOZ:  I'm not sure.  I would have to go in my
23    cell.  As I'm saying, your Honor, I haven't really, really
24    looked through my, through my paperwork like I should.  I mean,
25    as you see what was given to me, that's, that's a lot of work
```

H3kWmun6

1    right there, so --

2          THE COURT:  I think, actually, as I understand your

3    case, you want the Jacoby Hospital records in evidence, and

4    they have been received in evidence.  You wanted those pictures

5    of yourself received in evidence; they're in evidence.  And

6    we're about to get the picture of the gun into evidence.  OK?

7    That will be the first thing we'll do tomorrow morning.  If you

8    have other evidence that you want to offer, you'll tell me

9    about it in the morning.

10         MR. MUNOZ:  OK.

11         THE COURT:  And then the plaintiff will rest your

12   case.  That will be your complete case.

13         MR. MUNOZ:  OK.

14         THE COURT:  Are the defendants going to offer any

15   evidence after the plaintiff rests?

16         MS. DEPOIAN:  After the plaintiff rests, no, your

17   Honor.

18         THE COURT:  OK.  The next phase of the case is going

19   to be the jury charge -- I'm sorry, forget that -- the

20   summations and then the jury charge and then the jury will

21   deliberate, but before summations, you all have a chance to

22   read the charge I'm going to give to the jury, so I have a

23   draft of that charge I'm going to hand out now.  It's being

24   marked as a court exhibit.

25         THE DEPUTY CLERK:  Court Exhibit 2.

H3kWmun6

1              THE COURT:  Mr. Munoz, we're going to give you a copy.

2              MR. MUNOZ:  Yes, ma'am.

3              THE COURT:  And we're going to give copies to defense

4       counsel, and so we're going to meet tomorrow morning at 9:15 --

5       9:15, 15 minutes before the jury comes -- so I can hear any

6       objections you have to that jury charge or any requests you

7       have.  As you see, there are a couple of things in bold because

8       I didn't know if we'd have to include them in the charge or

9       not.  Don't worry.  When this charge is given to the jury, they

10      won't be in bold.  They'll either not be there or they'll be in

11      unbolded text.

12             Now, we've received the medical records essentially as

13      a stipulation.  The parties both agreed they could be received

14      in evidence, so I may rework that a little bit.  That's on page

15      20.

16             Good.  Let's talk a little bit tomorrow, Mr. Munoz.

17             MR. MUNOZ:  Yes, your Honor.

18             THE COURT:  And let's talk about tonight.

19             MR. MUNOZ:  Yes, ma'am.

20             THE COURT:  You can be seated.  You don't have to keep

21      standing.  Thank you, though, for standing.  I appreciate that.

22             You can read this jury charge, because it gives you a

23      sense of what I'm going to tell the jury tomorrow after

24      summations.

25             MR. MUNOZ:  OK.

H3kWmun6

1          THE COURT:  It explains what the elements of the claim

2     are, and what I mean by that is what you have to prove to the

3     jury in order to win your case.  Among other things, it defines

4     what excessive force is.  OK?  After all the testimony is done,

5     the last time you get to talk to the jury is the summation

6     argument, and that's a point in time, again, where we switch

7     this podium around, and just like in opening statement, you

8     won't be testifying, but you'll be speaking directly to the

9     jury, and that's the chance for you to tell them what you think

10    is most important for them to think about during their

11    deliberations.  It's your chance to tell them what you think

12    the evidence shows that is in your favor and means they should

13    return a verdict for you and award you damages.  Do you

14    understand that?

15          MR. MUNOZ:  Well, yes, ma'am.

16          THE COURT:  OK.  Good.  Normally, because the

17    plaintiff has the burden of proof, the plaintiff would normally

18    give a summation second.  I think I'm going to depart a little

19    bit from that because you don't have a lawyer, so I'm going to

20    let you sum up first, then I'll let defense counsel sum up, and

21    then I'll give you a very brief chance to speak to the jury one

22    last time, just in case you think defense counsel said anything

23    wrong and you want to point that out to the jury.  OK?

24          MR. MUNOZ:  Yes, ma'am.

25          THE COURT:  Good.  How long do defense counsel think

H3kWmun6

1   their summation will be?

2           MS. DEPOIAN:  Your Honor, I can give you a better

3   approximation tomorrow, but I would say approximately 10 to 15

4   minutes.

5           THE COURT:  OK.  You have heard defense counsel

6   expects to speak to the jury for roughly 10 to 15 minutes.  I

7   just tell you that to give you some guidance about how long.

8   You can take 5 minutes or 10 minutes or 15 minutes or even a

9   little longer, if you want, but it's not two hours.  OK?  It's

10  something around, in the neighborhood of 10 to 15 minutes.

11  Does that make sense to you, Mr. Munoz?

12          MR. MUNOZ:  Yes, that makes sense, and that's fair.

13          THE COURT:  OK.  Good.  Then after the summations I

14  give the jury charge and the jury goes to deliberate.

15          Let me ask defense counsel, do you have any issues we

16  need to raise tonight?

17          MS. DEPOIAN:  Nothing, your Honor.

18          MR. LICHTERMAN:  No, your Honor.

19          THE COURT:  OK.  Good.  Mr. Munoz, before we break for

20  the evening, is there anything else you need to ask me or you

21  want to say?

22          MR. MUNOZ:  I just gonna need help with my legal work,

23  paperwork, because I'm cuffed and it's hard for me to carry all

24  this paperwork.  I don't have nothing to, to complain about.

25  I'm just having problems moving my paperwork.  That's all,

H3kWmun6

1    ma'am.

2              THE COURT:  OK.  Gather your papers together,

3    Mr. Munoz.  We're working out how you can carry them back to

4    the prison with you.  Pull your papers together.

5              MR. MUNOZ:  Yes, ma'am.  Can I stand up?

6              THE COURT:  Sure.  Mr. Munoz, my deputy has inquired,

7    and you will be handcuffed in front of your body and able,

8    then, to support the materials you want to carry back to the

9    prison cell.  I know there are a lot of papers you've brought

10   here and that you're using, but if you want to leave some here

11   because you don't think you'll need to look at them tonight,

12   we'll take them and give them back to you in the morning, if

13   that's helpful.

14             MR. MUNOZ:  Yeah, that would be helpful.

15             THE COURT:  Good.  If you just leave things on the

16   table, my staff will collect them and take them into my robing

17   room, and we'll put them back on your table in the morning.

18             Thank you, all.  See you tomorrow morning, 9:15.

19             (Adjourned to March 22, 2017, at 9:15 a.m.)

20

21

22

23

24

25

<pre>
1                        INDEX OF EXAMINATION

2    Examination of:                            Page

3    NEHMIAS MUNOZ

4    Direct Mr. Munoz . . . . . . . . . . . . . .53

5    Cross By Ms. Depoian . . . . . . . . . . . .64

6    JAMES KELLY

7    Direct By Mr. Munoz  . . . . . . . . . . . 116

8    Cross By Mr. Lichterman  . . . . . . . . . 122

9    Redirect By Mr. Munoz  . . . . . . . . . . 129

10   ROBERT REID

11   Direct By Mr. Munoz  . . . . . . . . . . . 132

12   Cross By Ms. Depoian . . . . . . . . . . . 146

13   Redirect By Mr. Munoz  . . . . . . . . . . 155

14   BRIAN FLYNN

15   Direct By Mr. Munoz  . . . . . . . . . . . 156

16                       DEFENDANT EXHIBITS

17   Exhibit No.                           Received

18    A1   . . . . . . . . . . . . . . . . . .99

19    A5   . . . . . . . . . . . . . . . . . 101

20    A4, A6 and A7  . . . . . . . . . . . . 103

21    F  . . . . . . . . . . . . . . . . . . 113

22

23

24

25
</pre>