H3l1mun1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NEHMIAS MUNOZ,

                    Plaintiff,

          v.                              14 Cv. 6628 (DLC)

POLICE OFFICER ROBERT REID,
POLICE OFFICER STEPHEN JONES,
SERGEANT BRIAN FLYNN, and
SERGEANT JAMES KELLY,

                    Defendants.

------------------------------x

                                          March 21, 2017
                                          9:13 a.m.

Before:

                    HON. DENISE COTE

                                          District Judge

                         APPEARANCES

NEHMIAS MUNOZ
     Pro Se Plaintiff

ZACHARY CARTER
     Corporation Counsel of the City of New York
ARIEL LICHTERMAN
CAROLYN K. DEPOIAN
     Assistant Corporation Counsel

H3l1mun1

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  Good morning, everyone.

4         ALL PRESENT:  Good morning.

5              THE COURT:  And Mr. Munoz, I believe we have returned

6    those materials that you asked us to keep for you overnight, so

7    I think you have your complete collection again, am I right?

8              MR. MUNOZ:  Yeah.  I kind of saw my papers on the

9    counter, but yeah.  Thank you, ma'am.

10             THE COURT:  Yes.  You're welcome.  You're welcome.

11   And this is our chance to review the jury charge and deal with

12   any other issues.

13             Let me ask the defendants, do you have any requests or

14   objections to the jury charge that was marked yesterday as a

15   court exhibit?

16             MS. DEPOIAN:  No, your Honor, we don't.

17             THE COURT:  Thank you.

18             And Mr. Munoz, I don't know that you needed to read

19   this with care.  I assure you that I tried to write this in

20   light of the prevailing law in the circuit in which I sit, in

21   which this Court sits, but did you have any requests or

22   comments that you'd like to make?

23             MR. MUNOZ:  Actually, you kind of rested yesterday, so

24   I read it also, you know.  I feel correct.  I have no problem

25   with it.

H3l1mun1

1          THE COURT:  Thank you very much.  Yes, you're right.

2     A lot of the fundamental principles I discussed several times

3     in preparation for this trial and during the trial, so you're

4     right, Mr. Munoz.  We've tried to stay within the boundaries of

5     the law respecting your rights and the defendants' rights.

6          So let's just discuss then what's going to happen this

7     morning.  At 9:30 we expect to have a jury.  We have a witness

8     on the stand, and when the testimony of that witness is

9     finished, as I understand it, we have one more witness to

10    testify.  And Mr. Munoz, it's my understanding you're going to

11    call the last defendant as your last witness, is that right?

12         MR. MUNOZ:  Yes, ma'am.

13         THE COURT:  Great.  And then, based on our

14    conversation yesterday, I understand the plaintiff will rest

15    except potentially for a photograph or two.

16         I think first thing this morning, if I remember

17    correctly, we needed to get the photograph of the gun admitted

18    into evidence.  Am I remembering that correctly, counsel?

19         MS. DEPOIAN:  Yes, your Honor.  That's our memory as

20    well.  And we'll just state for the record, I believe there's

21    only one copy in the courtroom of that in plaintiff's

22    possession, but we have no objection.

23         THE COURT:  Great.  Thank you so much.  So maybe we'll

24    do that first thing.

25         Mr. Munoz, can you give my deputy a copy of that

H3l1mun1

| | |
|---|---|
| 1 | photograph.  Oh, we have it.  We have it. |
| 2 | THE LAW CLERK:  And I've made copies. |
| 3 | THE COURT:  Good. |
| 4 | So we have copies made for everyone.  We'll return the |
| 5 | original to the plaintiff and my staff will hand out copies to |
| 6 | defense counsel.  I have retained a copy for myself.  So we'll |
| 7 | just do that first thing before we complete Sergeant Flynn's |
| 8 | testimony.  And I think -- |
| 9 | MR. MUNOZ:  Your Honor -- |
| 10 | THE COURT:  And I think, Mr. Munoz, that's the only |
| 11 | additional piece of evidence you wanted to offer at this trial. |
| 12 | Am I right, Mr. Munoz? |
| 13 | MR. MUNOZ:  I have two more I told you I was going to |
| 14 | bring today.  I have them right here. |
| 15 | THE COURT:  Okay.  My staff will pick those up, show |
| 16 | them to defense counsel, see if there's an objection. |
| 17 | MR. MUNOZ:  I mentioned it yesterday. |
| 18 | THE COURT:  Thank you. |
| 19 | MR. MUNOZ:  The one about the firearm, and this is |
| 20 | Flynn's -- I mean Jones' hand.  Not even a good copy at all. |
| 21 | MS. DEPOIAN:  Your Honor, would you like to hear our |
| 22 | objections now or -- |
| 23 | THE COURT:  Do you have objections? |
| 24 | MS. DEPOIAN:  Yes, your Honor, just to the one |
| 25 | photograph. |

H3l1mun1

1            THE COURT:  Which one do you not object to?

2            MS. DEPOIAN:  The gun.  We do not object to the gun.

3            THE COURT:  Thank you.  That will be marked as a

4    plaintiff's exhibit.

5            MR. MUNOZ:  Your Honor?

6            THE COURT:  Excuse me one second.

7            We're up to 3.  So the second picture of the gun will

8    be marked as Plaintiff's Exhibit 3.  There's no objection, so

9    at the beginning of testimony today, you will offer and we will

10   receive the two pictures of the gun, which are Plaintiff's

11   Exhibits 2 and 3.

12           So let me understand what the defendant's objection is

13   to what we're going to mark as Plaintiff's Exhibit 4.  And I

14   understand this to be a picture of defendant Jones' arm.  So

15   I'll hear the defendants for their objection and then I'll hear

16   you, Mr. Munoz.

17           MS. DEPOIAN:  Your Honor, we just object to the

18   exhibit since the photograph is very blurry and for that reason

19   it's very confusing to the jury.  You can't really even see

20   that it's an arm.  That's the basis of our objection.

21           THE COURT:  Give me just one second here.

22           So defendant Jones will be your last witness.  Am I

23   right, Mr. Munoz?

24           MR. MUNOZ:  Yes, ma'am.

25           THE COURT:  So you can use your picture, which has

H3l1mun1

1    been marked as Plaintiff's Exhibit 4, with him.  He will either

2    recognize it or not, and you can ask questions about it, and

3    depending on how the testimony goes, if you choose to continue

4    to want to offer that exhibit, which you may use during your

5    examination of him, I will rule based on the testimony that's

6    come in as of that time.  Okay?

7              MR. MUNOZ:  Thank you, ma'am.

8              THE COURT:  Thank you.  So I'm returning Plaintiff's

9    Exhibit 4 to Mr. Munoz.

10             Now we have copies as well of the special verdict

11   form.  We're going to mark that as a court exhibit and hand it

12   out to everyone.  No need to spend a lot of time with it now,

13   but I wanted you to have copies.  That's going to be Court

14   Exhibit?

15             THE DEPUTY CLERK:  3.

16             MR. MUNOZ:  Excuse me, your Honor.

17             THE COURT:  Hold on one second here, Mr. Munoz.  I

18   want to describe what's going to happen this morning.

19             So we're going to finish the testimony, the plaintiff

20   will complete his case, the defendants will rest.  We've had

21   the charging conference.  So the next thing that will happen

22   will be summations.  We'll start with a summation from the

23   plaintiff, and again, Mr. Munoz, it's that chance for you to

24   not testify -- you already did that under oath on the witness

25   stand -- but instead, standing behind that podium, to directly

H3l1mun1

1    address the jury and tell them what you think the evidence in

2    this trial has shown and why they should render a verdict in

3    your favor.  You can't ask for specific amounts of money, you

4    can't name a dollar figure, but you can ask for a verdict in

5    your favor and an award of damages in your favor.  Then the

6    defendants will have a chance to give their summation.  And I

7    will give you, Mr. Munoz, a brief opportunity to have the last

8    word to the jury, just to make sure that there's nothing left

9    that would be appropriate for you to say about the evidence

10   that came in during this trial.  And then I will give the jury

11   the charge and they will retire to deliberate on this case.

12            Let me ask defense counsel, any questions or other

13   issues to raise this morning?

14            MS. DEPOIAN:  Nothing, your Honor.

15            THE COURT:  Mr. Munoz, any questions or other issues

16   to raise this morning?

17            MR. MUNOZ:  Not really.  Just that I'm --

18            THE DEPUTY CLERK:  Please stand.

19            MR. MUNOZ:  I'm sorry.  Not really.  It's just -- is

20   it all right if I could get like a minute or two so I could do

21   my summation?  I didn't get a chance to do it.  I was just

22   capable of reading the --

23            THE COURT:  The charge?

24            MR. MUNOZ:  Yeah, jury charge.

25            THE COURT:  That's just fine.  We're going to take a

H3l1mun1

1    five-minute recess now.  And indeed, we won't resume until we

2    have all eight jurors.  So we have at least five minutes.

3    Ms. Rojas will let us know when all eight jurors have arrived.

4    Thank you so much.

5            MR. MUNOZ:  Thank you, ma'am.

6            THE DEPUTY CLERK:  All rise.

7            (Recess)

8            (In open court; jury not present)

9            THE COURT:  Bring in the jury.

10           (Jury present)

11           THE COURT:  Please be seated.

12           Good morning, ladies and gentlemen.

13           THE JURORS:  Good morning.

14           THE COURT:  We have just one housekeeping issue to

15   raise with you.  Plaintiff's Exhibit 1, which you may remember,

16   was a set of three photographs, and I need to formally receive

17   those on the record.  And I believe the plaintiff wishes to

18   offer two more photographs of a weapon, and they've been marked

19   as Plaintiff's Exhibits 2 and 3, and I'm going to receive those

20   as well now.

21           (Plaintiff's Exhibits 1, 2, and 3 received in

22   evidence)

23           THE COURT:  And at this point, Sergeant Flynn, if you

24   could retake the witness stand.

25           You may be seated.  I remind you you're still under

H3l1mun1                         Flynn – Direct

1    oath.

2              THE WITNESS:  Good morning.

3              THE COURT:  So Mr. Munoz, you may continue your

4    examination of Sergeant Flynn.

5              MR. MUNOZ:  Good morning, your Honor.  Good morning,

6    jury.

7              THE JURORS:  Good morning.

8     BRIAN FLYNN, resumed.

9    DIRECT EXAMINATION CONTINUED

10   BY MR. MUNOZ:

11   Q.  Sergeant Flynn, good morning.

12   A.  Good morning, Mr. Munoz.

13   Q.  So you said yesterday, as -- you saw me pull the firearm

14   with my right hand out of my waist, you said, or out of my

15   pocket?

16   A.  I don't know if it was your waist or your pocket, but down

17   by your waist area.

18   Q.  Okay.  Was you by yourself or Sergeant Kelly next to you?

19   A.  Sergeant Kelly and Officer Reid were already about to

20   engage you.

21   Q.  So all three of y'all was there then.

22   A.  Correct.

23   Q.  It wasn't you by yourself?

24   A.  No, not me by myself, no.

25   Q.  So you have -- you have -- at the time you were with the

1    officers, you have a sergeant and a fellow officer and you, and

2    if you telling me that I'm pulling the gun out and you couldn't

3    see or all three of y'all couldn't grab me and prevent the

4    tussle with the firearm, if there's three and there's only me,

5    when I'm actually pulling the gun out?

6            MR. LICHTERMAN:  Objection, your Honor.

7            THE COURT:  Sustained.  So again, Mr. Munoz, this

8    isn't an opportunity to --

9            MR. MUNOZ:  I'm trying to make it a question.

10           THE COURT:  Yes.  Just make it a question of fact.

11   BY MR. MUNOZ:

12   Q.  So you got two officers and a sergeant, and you see me

13   withdraw a gun.  You couldn't, all three of y'all, grab me to

14   prevent the struggle and the firearm falling on the floor and

15   all that?

16           THE COURT:  So Mr. Munoz, I think I understand what

17   you're trying to get at, but I'm just going to suggest a

18   question to you that may capture what you're trying to ask and

19   not be as much an argument as the question of fact, okay?

20           MR. MUNOZ:  Okay.

21           THE COURT:  Okay.

22   BY MR. MUNOZ:

23   Q.  Okay.  So all three of y'all couldn't grab me at that

24   moment when you see me withdrawing the gun?  That's a question.

25   A.  Within seconds, within split seconds, Officer Kelly and --

H3l1mun1                          Flynn - Direct

1    I mean, Sergeant Kelly and Officer Reid did grab you, grabbed

2    your arm to control your gun, and at this point I was able to

3    grab your upper torso from like the rear side, so we did try to

4    grab you, when you had the gun.

5    Q.  And then what happened?

6    A.  A little tussle kind of took place, and we all fell to the

7    ground at that point.

8    Q.  And I still had the gun on which hand?

9    A.  To my knowledge, you fell on the gun in your -- underneath

10   your chest on your right hand.

11   Q.  So the gun wasn't on my left hand, over my left rib.

12   A.  No.  It was in your right hand when you fell underneath

13   your body.

14   Q.  Okay.  So did you know who cuffed me?

15   A.  I was able to cuff your left hand at one point during the

16   struggle.

17   Q.  But you don't remember who actually cuffed me.

18   A.  I just said I cuffed your left hand during the struggle.

19   Q.  Both hands.

20   A.  I'm not sure.  I was able to secure your left hand during

21   the struggle and cuff that hand during the struggle and we were

22   able to eventually get another set of cuffs out and get it on

23   your right hand, and we put the two cuffs together to cuff you

24   easier.

25   Q.  But you're saying "we," but you don't know who.

H3l1mun1                          Flynn - Direct

1   A.  It was either one of the three other officers that were

2   here.

3   Q.  So you have no knowledge who was it then.

4   A.  I don't remember exactly who was the other officer who put

5   the cuff on your right hand, sir.

6   Q.  And what happened when we all fell down?

7   A.  Sergeant Kelly, I believe, landed right on top of you, I

8   was to your left, and Sergeant -- I mean Officer Reid was to

9   your right.  Against your body.

10  Q.  And as what I believe Sergeant Kelly had both knees on me,

11  both of you?  Was he also leaning on me with both knees?

12  A.  No.  It was on the left --

13       THE COURT:  I'm sorry.  One question at a time.  Which

14  question would you like the officer to answer?

15  Q.  So Sergeant Kelly had both knees on me.  Did you know who

16  was the other officer with both knees?

17       THE COURT:  Is that the question you want to ask,

18  Mr. Munoz?  Did Sergeant Kelly have knees on you?

19       MR. MUNOZ:  I take that back, your Honor.

20  Q.  Who was the other officer kneeing me also with the weight

21  on my back?

22  A.  From what I remember, Sergeant Kelly was on top of you, I

23  was to your left, and Officer Reid was to your right.

24  Q.  So when you was on top of me, what was you doing?

25  A.  I wasn't on top of you.  I was to your -- I was on the side

H3l1mun1                          Flynn - Direct

1    of you by your upper torso, your left torso, sir.

2    Q.  And what was you doing?

3    A.  I was striking and punching your left shoulder and your

4    left tricep or the back of your arm.

5    Q.  You wasn't striking me on my left rib?

6    A.  To my knowledge, I don't remember striking your left rib.

7    Q.  And you don't remember who punched me in my left eye.

8    A.  No, I do not, sir.

9    Q.  Did you acknowledge -- did you acknowledge the left eye

10   was -- had a -- had a cut?

11   A.  Yes.  You received a small laceration over your left eye

12   during the struggle.

13   Q.  So you don't remember who -- who caused that laceration on

14   my left eye.

15   A.  I don't know if it was from you falling on the ground, you

16   hit your head, or you were struck in the face.  I'm not sure.

17   I didn't really see somebody hit you in the face.

18   Q.  But I just told you standing up, so how can you say falling

19   down?

20           THE COURT:  Excuse me.  This isn't your chance to

21   testify.  It's just to ask a question, Mr. Munoz.

22   Q.  So who eventually fell on the ground?  Didn't the firearm

23   eventually fell out of my hand or was it Sergeant Reid the one

24   who recovered it?

25   A.  Sergeant Reid recovered it from your hand.

H3l1mun1                          Flynn - Direct

1   Q.  Can you explain to the jurors and me how he recovered it.

2   A.  I didn't actually see him recover it.  I just remember

3   hearing him say, "I have the gun."

4   Q.  So you was the one who -- who cuffed me.

5   A.  I cuffed your left hand, sir.

6   Q.  Okay.  And once again, you didn't see -- you didn't know

7   what other officer cuffed my right hand, both hands.

8   A.  At that point I was more concerned about keeping your left

9   hand cuffed and isolated from the rest of your body so you

10  wouldn't be able to pull it back in and possibly grab the gun

11  at that point.  I was more concerned about, you know, having

12  your left hand cuffed and me pretty much pinning it to the

13  ground so you couldn't move.

14  Q.  So you had the other cuff on the other hand; that's what

15  you're trying to tell me?  You cuffed me through my right or

16  left hand, or was it you cuffed me to the right hand?

17  A.  I cuffed your left hand, sir.

18  Q.  So you holding the other side of the cuff, so there's two

19  cuffs per hand.  You're holding the other side of the cuff.

20  A.  I stated that I cuffed your left side, your hand, and I'm

21  not sure who was able to put the other cuff on your right hand,

22  and then we brought the two cuffs together to completely cuff

23  you.

24  Q.  That's not the question.  The question is:  Was you holding

25  the other side of the handcuff?  There's two, two cuffs for

1   each hand, for one of each hand.  Was you holding the other

2   side of the other cuff?

3   A.  I stated I was holding your left hand and arm down to the

4   ground with my cuff on it.

5   Q.  I don't get it.  That's two sides of a cuff.  You got me

6   cuffed to the right hand or the left hand.  Which one?

7   A.  I have your left hand cuffed, your left hand is on the

8   ground, and I'm holding your left hand down.  At this point

9   another officer got a cuff onto your right hand and we

10  eventually were able to, after you stopped fighting, to get the

11  two cuffs together to cuff you.

12  Q.  So you never cuffed me to the machine.

13  A.  No, sir, I pinned down your arm on the ground.

14  Q.  How you manage to put that cuff on my left hand?

15  A.  I was able to pry your arm out from underneath you and I

16  was able to get the one cuff from my -- my cuff onto your left

17  hand and secure your arm.

18  Q.  But how?  Which way?  Behind my arm?  How did you do that,

19  with my arm extended?  How?  Bent it?

20  A.  Your arm was pretty much situated underneath your chest.  I

21  was able to, you know, pry it out and extend it out like this

22  and then pin it down and cuff it.

23  Q.  Was you there after I was already cuffed?  Did you escort

24  me outside to the vehicle or to the sidewalk?

25  A.  I was the officer that escorted you out to the sidewalk,

H3l1mun1                        Flynn - Direct

1   yes.

2   Q.   And what happened then when you -- once you escorted me

3   outside?

4   A.   I sat you on the curb.  At this point Sergeant Kelly

5   radioed for an ambulance, so you received medical care.

6   Q.   You didn't position me laying down first and then stood me

7   up and sat me down?

8   A.   I sat you down, and on your own power, you kept trying to

9   lean to the side and lay down, and I kept sitting you up and

10  explained to you that you had a laceration over your eye, and

11  bleeding, by laying down it's going to make it worse, so I kept

12  having you sit up on the sidewalk.

13  Q.   So you the one who escorted me by yourself or was it you

14  with the other officer?

15  A.   From the store, you're saying?  Officer Jones and I walked

16  you out.

17  Q.   Can you give me a breakdown of everything that happened in

18  the store, in your own -- what you saw that day, the whole

19  incident?  Do you have a quick summary for me and the jurors

20  and the judge, please?

21          MR. LICHTERMAN:  Objection, your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  Answer it?  Okay.

24  A.   Myself -- Sergeant Kelly went in first to the store,

25  Officer Reid was behind him, followed by myself.  As soon as we

1    all walked in, I saw a gun being removed from the lower part of

2    Mr. Munoz' waistband, started coming up to air.  At this point

3    Sergeant Kelly and Officer Reid were able to engage his wrists

4    to get control of the gun so he wasn't able to shoot anybody.

5    At this point I came and I grabbed him on his upper torso.

6    With a little brief struggle, couple seconds, we all fell down

7    to the ground.  Sergeant Kelly landed on top of him, I landed

8    to the left, Sergeant Reid landed to the right.  At this point,

9    to my knowledge, the gun obviously was in his hand so, you

10   know, we're just waiting for the gun to go off, so at this

11   point we're trying to get his hands free.  While I'm trying to

12   get his left hand free, Sergeant Kelly's on top of him, to pin

13   him down so he can't get his chest up off the ground to pull

14   the gun out, and Sergeant Reid is, you know, trying to get his

15   hands in there to get wrist control for the gun so he couldn't

16   have the capability of squeezing it.  So at this point, like I

17   said, you know, we're waiting for the gun to go off, because we

18   figure it's in his hand, it's eventually going to go off, so at

19   this point, you know, being feared for my own life and the rest

20   of the other officers, why -- I started striking Mr. Munoz in

21   his upper torso, his arm, and I'm trying to yank on his arm to

22   pry it out, so we can get the one hand secured so at least we

23   know the gun is not going to be, you know, in one hand.

24   Obviously it's going to be in the other hand.  So at this

25   point, finally, after fighting for you, know, two, three, four

H3l1mun1                         Flynn - Direct

1  minutes, like, you know, it was a struggle, we were able to get

2  the one hand out, or I got the one hand out, I was able to cuff

3  it and then secure it by like pretty much putting my whole body

4  weight on it.  At this point I heard all, you know -- I don't

5  know exact timing, but Sergeant Reid said, oh, I got the gun, I

6  got the gun.  At that point I was a little relieved 'cause,

7  thank god, you know, now it's a fair fight, you know, we

8  don't -- we're not taking our guns out, he's got a gun, so

9  we're able to finally subdue Mr. Munoz after a few minutes of

10 him still resisting without the gun, screaming and cursing at

11 us.  We finally were able to get another cuff on his right

12 hand, and at this point we were able to get both hands behind

13 his back, and that was the whole -- pretty much the whole

14 struggle.

15 Q.  Did I ever throw a punch at you?

16 A.  At myself?  I'm sorry.

17 Q.  Did I ever throw a punch at you?

18 A.  No, sir.

19 Q.  Or kick?

20 A.  You were kicking your legs and moving your torso.

21 Q.  Did I kick you?  Did I --

22 A.  I don't know if you personally kicked me.

23 Q.  Did I contact you, punch or kick?

24 A.  I don't remember if you kicked me.  You possibly could

25 have.  I don't really remember exactly.  But you never struck

H3l1mun1                        Flynn - Cross

1    me with your fists.

2    Q.  Okay.  Did I spit at you?

3    A.  You were spitting.  I don't --

4    Q.  Did I spit at you?  Did you --

5    A.  Did I personally get hit?  No.

6            MR. MUNOZ:  I got no further questions, your Honor.

7            THE COURT:  Thank you, Mr. Munoz.

8            Any cross-examination?

9            MR. LICHTERMAN:  Yes, your Honor.

10   CROSS EXAMINATION

11   BY MR. LICHTERMAN:

12   Q.  Good morning, Sergeant Flynn.

13   A.  Good morning.

14   Q.  Are you currently employed?

15   A.  Yes, I am.

16   Q.  And by whom?

17   A.  The New York City Police Department.

18   Q.  And what year did you begin working for the New York City

19   Police Department?

20   A.  July 2005.

21   Q.  And what's your current rank?

22   A.  Sergeant.

23   Q.  And what's your current command?

24   A.  The first precinct.

25   Q.  And do you have an assignment in the first precinct?

1   A.  Yes.  I'm the anticrime sergeant.

2   Q.  And what's anticrime?

3   A.  Pretty much a plainclothes unit, with unmarked vehicles.

4   We go out in plainclothes and we deal with either violent

5   crimes, robberies, shootings, larcenies, any kind of that

6   nature.

7   Q.  And when were you promoted to the rank of sergeant?

8   A.  May 2012.

9   Q.  And what was your rank before you were a sergeant?

10  A.  Police officer.

11  Q.  And how many years were you a police officer?

12  A.  Approximately six.

13  Q.  In September of 2011 what was your rank?

14  A.  Police officer.

15  Q.  And what was your command at that time?

16  A.  The 43rd precinct.

17  Q.  And what was your assignment at that time?

18  A.  I was an anticrime officer.

19  Q.  Now I'd like to draw your attention to September 13th of

20  2011.  Were you working that day?

21  A.  Yes, I was.

22  Q.  And were you working with anyone that day?

23  A.  Yes.  I had three partners for the day.

24  Q.  And who were you working with?

25  A.  Sergeant Kelly, Officer Reid, and Officer Jones.

H3l1mun1                         Flynn - Cross

1  Q.  And had you worked with them prior to that occasion?

2  A.  Yes.  Every day.

3  Q.  And what were you wearing that day?

4  A.  I believe it was shorts and a T-shirt.  It was warm out.

5  Q.  And what police equipment did you have with you?

6  A.  I had my radio, my handcuffs, my gun, and, thank god, my

7  vest that day.

8  Q.  And when you say vest, you mean bulletproof vest?

9  A.  Bulletproof vest, yes.  I'm sorry.

10 Q.  And did there come a time on September 13th of 2011 when

11 you had the occasion to respond to the bodega located at 1890

12 Archer Street?

13 A.  Yes, sir.

14 Q.  Had you been to that bodega before that occasion?

15 A.  I had -- that bodega is a high-crime area, between

16 shootings, slashings, a lot of robberies in that neighborhood

17 of Parkchester, so we had been to that store before.

18 Q.  Had you ever been to that bodega before due to drug sales

19 or purchases?

20 A.  Yes, many times.

21 Q.  And what brought you to that location on September 13th

22 of 2011?

23 A.  There was a radio transmission for a larceny in the

24 neighborhood.  Pretty much we were maybe a minute out or so,

25 and we decided to canvass in that neighborhood knowing that a

H3l1mun1                           Flynn - Cross

1    lot of the people who commit the crimes go to this location to

2    hang out or out front or they go in the store.  I guess they

3    feel safe there because most of the time that's where they, you

4    know, commit their crimes.

5    Q.  Now when you say canvass, what do you mean by that?

6    A.  We'd get a description over the radio of a perpetrator or

7    like a -- what the person's wearing, skin color, height, where

8    the crime was taking place, a direction of flight if they ran

9    anywhere.  Pretty much we'll just go out, you know, driving

10   around looking for someone that fits that description.

11   Q.  So when you arrived at the bodega on September 13th of

12   2011, did you know that the perpetrator of the robbery was

13   inside?

14   A.  No, I did not.

15   Q.  And about how far away was the bodega from where the

16   larceny had occurred?

17   A.  Maybe the equivalent of like four -- four blocks, maybe

18   like less than a quarter mile.

19   Q.  And about how long after you heard the radio call about the

20   larceny did you arrive at the bodega?

21   A.  Approximately maybe a minute and a half, maybe.

22   Q.  And what did you do when you arrived at the bodega?

23   A.  Sergeant -- I mean, sorry -- Officer Jones was driving the

24   vehicle, Sergeant Kelly was in the front seat, and myself and

25   Officer Reid were in the back.  Officer Jones pulled up to

1    maybe about 40, 50 feet before the store, not right in front,

2    and we exited the vehicle, and Sergeant Kelly went in,

3    obviously proceeded in first, followed by Officer Reid,

4    followed by myself.

5    Q.  And where was Officer Jones when you went into the bodega

6    along with Sergeant Kelly and Officer Reid?

7    A.  He was still parking the car.  He was the last one to come

8    out.

9    Q.  And what did you observe when you walked into the bodega?

10   A.  As soon as I walked in, like I said, I observed Mr. Munoz

11   at the counter.  At this point I did observe a black firearm

12   coming up from his waistband area, and like I said, we were in,

13   one, two, three, right after each other.  Sergeant Kelly and

14   Officer Reid were just pretty much about to engage him when I

15   was like directly behind them.

16        MR. LICHTERMAN:  Your Honor, I'm showing the plaintiff

17   what's been previously marked as Defendant's Exhibit L for

18   identification.

19        MR. MUNOZ:  Can I see it up closer, please.

20        I want to look at the logo.  Can't see the logo of the

21   gun.  Can I stand up, your Honor, just to see?

22        THE COURT:  I think you should remain seated,

23   Mr. Munoz.  It's being shown to you now.

24        MR. MUNOZ:  It's --

25        THE COURT:  Okay.  Mr. Munoz, don't speak.  You may

1    look at it.

2              MR. MUNOZ:  Okay, your Honor.  Thank you.

3              THE COURT:  Thank you, Mr. Munoz.

4              MR. LICHTERMAN:  May I approach the witness, your

5    Honor?

6              THE COURT:  Yes.

7              MR. MUNOZ:  Your Honor?

8              THE COURT:  Excuse me, Mr. Munoz.

9              MR. LICHTERMAN:  I'm showing the witness the exhibit

10   previously marked for identification as Defendant's Exhibit L.

11   BY MR. LICHTERMAN:

12   Q.  Sergeant Flynn, do you recognize this exhibit?

13   A.  Yes, I do.

14   Q.  And what do you recognize it to be?

15   A.  That was the gun I observed which Mr. Munoz had in his hand

16   prior to us approaching him.

17   Q.  And how do you know that's the gun that Mr. Munoz had on

18   the date of the incident?

19   A.  Well, not only did I see him with it, I'm the one who

20   vouchered it.

21   Q.  When you say voucher, what do you mean by that?

22   A.  Excuse me.  That's our -- our departmental procedure, as in

23   everything gets itemized on a list, typed up on a computer, you

24   know, each item gets individually documented saying, you know,

25   what it is, you know, the color, the make, the serial number.

H3l1mun1                          Flynn - Cross

1    In this case I have the serial number.  So that's, you know,

2    our vouchering process.

3    Q.  And is it the same or substantially the same condition as

4    it was the last time you saw it?

5    A.  Yes.

6          MR. LICHTERMAN:  Your Honor, I'd like to offer

7    Defendant's Exhibit L into evidence.

8          THE COURT:  Received.

9          (Defendant's Exhibit L received in evidence)

10   Q.  Sergeant Flynn, can you stand and demonstrate for the jury,

11   using the exhibit that you're now holding, how plaintiff pulled

12   the gun out when you walked into the bodega.

13   A.  Like I say, when I -- when I was in the store, I'm not sure

14   if it came out of his pocket or his waistband, but he was in

15   the process pretty much from my waist -- his waist, coming up

16   like this, pulling the waist up -- pulling the gun to shoulder

17   height.

18   Q.  And how far away from the plaintiff were you when you

19   observed him pull out the gun like that?

20   A.  Maybe 6, 8 feet, approximately.

21   Q.  Is that roughly the distance between you and the jury box?

22   A.  Yeah.  I'd say maybe an extra -- maybe the first juror.

23   Q.  Now at the moment that you saw plaintiff pull out the gun,

24   what were you thinking?

25   A.  Someone's getting shot.

H3l1mun1                          Flynn - Cross

1    Q.  And did you say anything to the plaintiff at that point?

2    A.  No.  I didn't have a chance.  Like I said, thank god these

3    two officers were able to grab his arm right away and try to

4    control his movement, and I -- since they had his arm, I was

5    just trying to grab his upper body because, you know, he was

6    torquing and trying to twist.

7    Q.  And why didn't you draw your own weapon at that point?

8    A.  It was pretty much a safety -- we didn't have time, number

9    one, and number two, it was a safety issue.  There's two

10   officers there, there's two employees there.  You know, natural

11   reaction isn't to take out a gun.  I mean, you see someone with

12   a gun, you just -- your first reaction is to just grab him, you

13   know, and especially in that situation, the close quarters it

14   was, it wasn't a big, big area we were in, so, you know,

15   instead of having one gun already out, there's no point in

16   taking another gun out.

17   Q.  And when you said there wasn't enough time for you to draw

18   your weapon, can you just explain what you mean by that.

19   A.  I -- from the time we stepped into the store, Sergeant

20   Kelly and Officer Reid stepped into the store, to the time I

21   was there, you're talking about less than two, three seconds.

22   There's no time to take out your firearm and engage or, you

23   know, hands up, freeze, you know, don't move.  You just -- it

24   was physically impossible.

25   Q.  Now could you demonstrate for the jury, using Defendant's

H3l1mun1                          Flynn - Cross

1   Exhibit L, how long it would take to move the gun from where

2   you saw plaintiff holding it to where it would be in a position

3   to have shot you.

4   A.   Would you like me to point it somewhere or can I point it

5   at the wall?  I know it's not loaded, but I don't want to point

6   a gun at somebody.

7   Q.   Use the wall.

8   A.   So pretty much just -- if he was holding it here, just go

9   like that.

10  Q.   Is that what you mean when you said you didn't have time to

11  draw your own weapon?

12  A.   Exactly.  That's less than a second.  If I just hold the

13  gun here and just go like that, you know, within less than a

14  second, you could shoot somebody and kill, kill somebody.

15  Q.   Now when you say that you grabbed plaintiff's upper torso,

16  what was the purpose of that?

17  A.   Just to try to restrain his upper body because, you know,

18  he is a shorter man, but the guy is -- Mr. Munoz, I'm sorry --

19  is a very powerful man, very strong individual, so when they

20  had his arm, you know, he was still able to move his upper

21  torso.  We were trying to limit all of his mobility so that he

22  had no option to go anywhere, his, you know, pretty much -- god

23  forbid he tried to run or was able to escape and shoot one of

24  us.

25  Q.   And what was the plaintiff doing while you were grabbing

H3l1mun1                              Flynn - Cross

 1  his upper torso?

 2  A.  He was verbally yelling, along the lines, you're gonna have

 3  to kill me, I'm not going back to jail, and obviously fighting.

 4  Q.  And how did he fight?

 5  A.  Since his right arm was being immobilized by Sergeant Kelly

 6  and Officer Reid, pretty much just trying to get free at that

 7  point when we were standing.

 8  Q.  And did there come a time when you fell to the ground with

 9  him?

10  A.  Yes, we all fell to the ground.

11  Q.  And where was the plaintiff on the ground?

12  A.  He landed pretty much face -- face down or chest down.

13  Q.  And where did you land?

14  A.  I landed onto the -- it was like left upper body part, or

15  torso area.

16  Q.  And did any part of your body or your weight fall on top of

17  the plaintiff?

18  A.  I'd say probably three quarters of my weight fell on him.

19  Q.  And where did Sergeant Kelly fall to the ground?

20  A.  Directly on top of him.

21  Q.  And did you observe Sergeant Kelly's body weight

22  specifically on top of the plaintiff?

23  A.  Yes.  I knew he was direct -- Sergeant Kelly was directly

24  next to me so his body weight did fall on top of him.

25  Q.  And can you demonstrate for the jury, using Defendant's

H3l1mun1                          Flynn - Cross

1    Exhibit L, where plaintiff had the gun when he fell to the

2    ground.

3    A.   Pretty much when he, you know, when we were fighting with

4    him on the ground, he was -- he had the gun at some point

5    obviously face down on the ground like this, with both hands

6    underneath him.

7    Q.   If you can stand up to --

8    A.   Sorry.  You can't -- so pretty much he had the gun, two

9    hands were underneath his chest, and his body was pushing down

10   on the gun like this.

11   Q.   And that's where the gun was when you and Sergeant Kelly

12   landed on top of him?

13   A.   Yes.  He fell directly like this, both hands underneath

14   him.

15   Q.   Now what did the plaintiff do once he was on the ground?

16   A.   Like I said, besides yelling, you know, at that point his

17   arms were underneath him, so he was pretty much kicking, trying

18   to contort out, you know, shifting his body out, spitting, like

19   I said, yelling, cursing.  Pretty much at that time, he refused

20   to give us hands.  Multiple times we said, give us your hand,

21   five us your hand, and he refused and refused.  He would not

22   budge those hands out from underneath his chest.

23   Q.   And what were you thinking at this point?

24   A.   Someone's going to get shot or at least the gun was going

25   to go off and hopefully miss somebody, you know, but, you know,

H3l1mun1                        Flynn - Cross

1    when your head's down to the ground and the gun's pretty much

2    level with your head, you're just waiting for the loud bang to

3    go off at some point, but thank god it didn't.

4    Q.  What were you focused on doing at that point?

5    A.  Getting his left arm out from underneath his body.

6    Q.  And so what did you do to try and get the left arm out from

7    underneath his body?

8    A.  I was punching his upper left shoulder, the back blade,

9    punching his back of his arm, tricep, you know, trying to

10   loosen it up so I could be able to pry out the arm from

11   underneath him.

12   Q.  And why was it important to pry the left arm out from

13   underneath his body?

14   A.  Well, I knew he fell with the gun in his right hand but I

15   don't know if underneath him he could have switched it at any

16   point, you know, so you just want to -- pretty much your

17   ultimate goal is just to secure, get his arm, you know,

18   isolated so that he can't, you know, use it, you know, as a

19   weapon against us, whether he had the gun or not, his hand,

20   so -- and it's easier to cuff.  Once you get one arm, now he

21   only has one hand to fight with.

22   Q.  Were you worried about any other possible weapons

23   underneath him?

24   A.  I wasn't sure.  I know some -- some items fell on the

25   floor, so I didn't know if there was glass or anything like

1   that, but at that point my main concern was myself or my fellow

2   officers getting -- or even Mr. Munoz getting shot, you know,

3   that was it.

4   Q.  And what was your impression of plaintiff's mental state at

5   that point?

6   A.  During all this, he had to be on some kind of narcotics,

7   not just because he was being irate and, you know, yelling, but

8   the strength; he had the strength of like ten men.  It was

9   pretty scary at some points.

10  Q.  And after you were striking the plaintiff and trying to

11  pull his arm out, what happened?

12  A.  Eventually I was able to get free his left arm.  Like I

13  said, it was a lottery leap, because at that point I knew he

14  didn't have the gun in that hand, so like I said, eventually I

15  was able to get my cuffs out and cuff his one hand, his left

16  hand, and at that point I knew the other officers were on the

17  other side still trying to disarm him, so I just laid all my

18  body weight on top, I just pretty much pinned that arm down.

19  That was my goal, just pin that arm down so it couldn't come

20  free.

21  Q.  What was the purpose of pinning down the left arm?

22  A.  Well, this way he can't pull it back under, and if he did

23  want to switch hands up with the gun or, you know, he couldn't

24  either, you know, try to get up and push off or something like

25  that, but, you know, it's easier to fight someone with one hand

1   or one arm than it is with two arms.

2   Q.  And what was the plaintiff doing while you had his left arm

3   pinned to the ground?

4   A.  Still yelling, screaming, you know.  At that point, when I

5   was actually punching Mr. Munoz' upper torso, Officer Jones was

6   there with Officer Reid trying to dig in from -- pretty much

7   Officer Jones was maybe by -- would be by his head, and he was

8   trying to dig into his right side to get the gun as well, and

9   at that point I saw -- observed Mr. Munoz bite Officer Jones.

10  Q.  And where did you see Mr. Munoz bite Officer Jones?

11  A.  On his hand.

12  Q.  And what did you do at that point?

13  A.  Oh, I still -- like I said, I still had my job to do.  I

14  still contained that arm.  I pried that arm, you know, that was

15  my thing.  Eventually I got it out, you know, I just secured

16  it.

17  Q.  And did there come a point when plaintiff stopped

18  resisting?

19  A.  Eventually, yes.

20  Q.  And when did that happen?

21  A.  Even after the gun was removed from him, he was still

22  fighting and, you know, putting up a fight with us.

23  Q.  And did there come a time when the plaintiff was eventually

24  handcuffed?

25  A.  Yes, sir.

H3l1mun1                          Flynn - Cross

1   Q.  And how was plaintiff handcuffed?

2   A.  Like I said, I had the one handcuff already on his left

3   arm, we were able to get the other arm out and put a handcuff

4   on that and use the dual set of cuffs, which this way you don't

5   have to pull the defendant's arm so close and tight, you know,

6   you're able to cuff him still, but there was still enough room

7   that you didn't have to keep fighting his hands, you know, to

8   pull them together.

9   Q.  Now after plaintiff was in handcuffs, did you punch him?

10  A.  Absolutely not.

11  Q.  And after plaintiff was in handcuffs, did you observe

12  anyone else punch him?

13  A.  Absolutely not.  No one touched him.

14  Q.  Was any force whatsoever used against plaintiff after he

15  was placed in handcuffs?

16  A.  Absolutely not.

17  Q.  Now what happened after plaintiff was in handcuffs?

18  A.  After we stood up, pretty much catch our breath, it was --

19  the bodega wasn't air conditioned.  It was very hot.  We just

20  struggled for two or three minutes.  Myself, I stood him up

21  with Officer Jones, and we proceeded out to the -- in front of

22  the store to the sidewalk.

23  Q.  And when you and Officer Jones walked the plaintiff outside

24  of the store, where was Officer Reid and Sergeant Kelly?

25  A.  They were probably outside the store at that point, like,

H3l1mun1                          Flynn - Cross

1    you know -- like I said, we were all trying to catch our

2    breath, pretty much had a -- we just fought with somebody for,

3    like I said, three or four minutes, and not only was it a

4    physical, it was kind of a -- a mental draining too.  You're

5    fighting somebody with a gun.  So everyone was just trying to

6    get their bearings together, you know, and here we focused on

7    the next -- the next task we had.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  How did you feel at the end of this struggle?

2    A.  Relieved that, you know, thank God myself or my partners

3    didn't get shot, there were two workers in there, or that Mr.

4    Munoz didn't get shot.  It was relief that thank God the gun

5    was recovered and he was handcuffed.

6    Q.  Did there come a time when you learned that the gun was

7    loaded?

8    A.  Yes.

9    Q.  When did you learn that?

10   A.  When I got back from the hospital.

11   Q.  How did you learn that it was loaded at that point?

12   A.  Sergeant Kelly gave me the firearm with the bullets.

13   Q.  Now, once plaintiff was outside in handcuffs, what

14   happened?

15   A.  We sat him on the sidewalk.  At this point, Sergeant Kelly

16   called for an ambulance via radio.

17   Q.  Did an ambulance come?

18   A.  Yes, it did.

19   Q.  What happened when the ambulance arrived?

20   A.  Prior to that as well, we actually called for backup,

21   because there was a little bit of a crowd outside gathering.

22   So at this point marked vehicles did show up on the scene to

23   help kind of escalate -- the crowd, move them out, so we had

24   enough room to have an ambulance come in, back the crowd up and

25   everything.

H3L8MUN2                            Flynn - Cross

1   Q.  What happened when those other vehicles arrived?

2   A.  One of the vehicles that came was a marked van with two

3   officers and a complainant actually -- the complainant from the

4   earlier larceny was in the back of the van.

5   Q.  Did you speak with the victim?

6   A.  At first I only spoke with the officer.  I do remember the

7   victim pointing out the back window yelling, saying, that's the

8   guy, that's the guy.

9   Q.  How old was the victim?

10  A.  I believe he was 86 years old.

11  Q.  What happened after the victim had pointed out the

12  plaintiff?

13  A.  At some point he was searched and recovered Mr. LaCourt's

14  wallet from the defendant.

15  Q.  When you say the defendant?

16  A.  Mr. Munoz, yes.

17  Q.  Mr. Munoz have the victim's wallet on him?

18  A.  Yes, in his jeans pocket.

19  Q.  It was found when Mr. Munoz was searched?

20  A.  Yes.  Prior to getting out to the ambulance, we gave him a

21  search to make sure he had no other contraband or any kind of

22  weapons on him.

23  Q.  Was anything else found during that search?

24  A.  He had a crack pipe or a glass pipe containing black

25  tar-like residue.

H3L8MUN2                          Flynn - Cross

1    Q.  Was the plaintiff transported in the ambulance?

2    A.  Yes, he was, by EMS, as well as Officer Jones and myself

3    went in the ambulance as well.

4    Q.  What happened in the ambulance?

5    A.  The defendant was still being irate, cursing, yelling,

6    wasn't being cooperative with the medical personnel who were

7    trying to clean up his eye a little bit.  He stated at some

8    point, that's a loaded gun, that's a felony, I'm going back to

9    jail.

10   Q.  Where was plaintiff taken in the ambulance?

11   A.  To Jacobi Hospital.

12   Q.  What happened at Jacobi Hospital?

13   A.  We escorted Mr. Munoz in.  At that point ER, they were able

14   to get him a bed to situate him in because he was acting so

15   irate and cursing, yelling, using racial slurs at the staff and

16   other officers that were there.  They were able to get him a

17   bed and finally subdue him.

18   Q.  What was plaintiff yelling during this time?

19   A.  Just cursing, like I said, using profanity, racial slurs,

20   which I'm not going to repeat, but things that were

21   inappropriate for a public hospital.

22            MR. LICHTERMAN:  May I have just one moment, your

23   Honor?

24            Nothing further, your Honor.

25            THE COURT:  Mr. Munoz, did you have additional

1    questions for this witness?

2                MR. MUNOZ:  Yes, ma'am.

3    REDIRECT EXAMINATION

4    BY MR. MUNOZ:

5    Q.  When we was in the hospital, didn't I took out a glass pipe

6    out of my sneaker and gave it to you?

7    A.  No, because you wouldn't be digging in your shoes at the

8    hospital.  That glass pipe was removed before you were in the

9    hospital, you get searched.  You wouldn't be able to go in your

10   sneakers while you're in custody.  You were still handcuffed.

11   Your hands were never free in the hospital.

12   Q.  So I had both hands cuffed or one only?

13   A.  When you first walked into the hospital, you had both hands

14   cuffed.

15   Q.  I am talking about in the bed.

16   A.  In the hospital, you had one hand cuffed to the bed, but at

17   that point your shoes would have been off already.  The

18   hospital staff would have removed your clothing from you.

19   Q.  Before my shoes was on, I had given you a glass pipe, you

20   don't remember?

21   A.  The glass pipe was removed from the scene.  There is no way

22   possible we would have let you gone in your own shoes and dug

23   through your shoes.  If anything, we would have taken your

24   shoes off and found it.

25   Q.  Didn't I tell you, here's a glass pipe, don't put that as a

H3L8MUN2                          Flynn - Redirect

1   charge?

2   A.  Not to me, you did not, sir.

3   Q.  Was you sitting next to me or close to me on that hospital

4   bed?

5   A.  I was right next to your hospital bed.

6   Q.  Wasn't you the one who was giving me water in the medicine

7   cup when I asked you to give me water?

8   A.  When you're at the hospital, we don't distribute any

9   medication or water to you.  It would be the hospital staff.

10  I'm not a doctor.

11  Q.  You never gave me water then?

12  A.  At the hospital I don't believe I gave you water.

13  Q.  I remember it was you.

14          THE COURT:  I'm sorry.  Mr. Munoz, this is not your

15  chance to testify.

16          The jury should disregard.

17          Do you have a question to place to the witness?

18  Q.  When you removed the wallet, you was the one who did me the

19  search?

20  A.  I believe Sergeant Kelly removed the wallet from you.

21  Yesterday he testified he took the wallet out.

22  Q.  So you happen to know the sum in the wallet, the sum of

23  currency?

24  A.  At some point, yes, briefly, after I did find out how much

25  money was in the wallet or on your person, or was missing from

1   the complainant.

2   Q.  How much money was it?

3   A.  I believe it was approximately $195.

4   Q.  Can you remember the racial remarks I said that day?

5   A.  I do.  Would you like me to repeat them?

6   Q.  Yes.  I would like for everybody in this courtroom, please.

7   A.  It's fine.  I really don't want to say it, but you were

8   calling Officer Reid a nigger.

9   Q.  You're sure I didn't say gay?

10  A.  That's not a racial slur, gay.

11  Q.  That was the only thing, as far as from your knowledge, you

12  remember me saying as a racial remark?

13  A.  Racial slurs, yes, the "N" word was the only one you were

14  racially saying, yes.

15  Q.  Didn't you say I said also racial remarks in the hospital?

16  A.  I just stated, yes, that's what you said in the hospital.

17  You were using the "N" word in the hospital towards Officer

18  Reid and the staff.

19  Q.  So Officer Reid was also in the hospital?

20  A.  Eventually he showed up with Sergeant Kelly and himself

21  showed up at the hospital, yes.

22  Q.  Didn't I fell out in the hospital?

23  A.  Not right away.  They didn't sedate you for probably close

24  to an hour afterwards.

25  Q.  So was Officer Reid there before or after they sedated me?

H3L8MUN2                      Flynn - Redirect

1   A.  He was there before you were sedated, sir.

2   Q.  So I never said any racial remarks to anybody in the

3   hospital besides, as you say, Sergeant Reid?

4   A.  No.  You did to the staff.  There were people walking past

5   and you were yelling racial slurs out loud.

6   Q.  I asked you, can you mention them?  You said, nigger.  I

7   asked you to mention all the racial slurs.  I would like to

8   hear them.  Also, I would like the jurors to hear it.  And,

9   also, I would like the Honorable Ms. Denise Cote, please.  I

10  would like everybody to hear what were all the racial slurs.

11  A.  I just said the racial slur was the "N" word, yes, you were

12  using the "N" word.  The racial slur was the "N" word.

13  Q.  So I said that to everybody in the hospital besides Officer

14  Reid?

15  A.  If a person who was African American was walking past you,

16  you were yelling that, yes.

17  Q.  There were also doctors, black doctors walking around,

18  because the word nigger is for black people?

19  A.  I'm aware what it's for, but no one really uses that

20  nowadays.  There were nurses there that were of

21  African-American descent, and you were yelling out loud and you

22  were offending them, as well as other people that were sitting

23  there waiting to get medical attention.

24  Q.  Do you know the name of that nurse?

25           THE COURT:  So, Mr. Munoz, shall we move on to the

H3L8MUN2                          Flynn - Redirect

1   next topic?

2   Q.  When Sergeant Kelly gave you the firearm, as you say you

3   vouchered it, do you have a serial number for that, and how

4   many rounds did it have?

5   A.  My recollection, there were two rounds with the firearm.

6           The serial number to the firearm you're asking?  It

7   would be on the voucher.  I don't remember off the top of my

8   head.  Or it's on the firearm, if you would like me to read it.

9   Q.  Can you give a description of the two rounds to the juror

10  and the judge, please.

11          THE COURT:  So let me just make clear again.  I don't

12  think anyone is confused.  But all the fact issues are for the

13  jury.  My role is just to make rulings of law.

14          So please give your testimony to the jury.

15          THE WITNESS:  I'm sorry.

16  A.  Two .380 caliber bullets.  There is a live cartridge, a

17  shell, a firing mechanism on it, regular bullet, but the

18  caliber was a .380.

19  Q.  So you're saying that a .380 caliber bullet could fit into

20  a .38, that's what you're saying?

21  A.  I apologize.  A .38.  .380, .38.

22  Q.  So now it's .38 bullets instead of .380?

23  A.  Mr. Munoz, it was an oversight.  I meant to say a .38

24  revolver.

25  Q.  Didn't the firearm have tissue around the handle?

H3L8MUN2                        Flynn - Redirect

1   A.  No.  It never had tissue around the handle.

2   Q.  Didn't you bend my arms and made me touch the firearm for

3   fingerprints?

4   A.  Absolutely not.

5   Q.  What do you remember inside the wallet?

6   A.  The thing that stands out most is the complainant had a

7   lucky two dollar bill that was stuffed in one of the slots of

8   the wallet, which Mr. Munoz obviously didn't know it was in

9   there because it was left in there.  So when we did open the

10  wallet, besides having his own personal information in there,

11  he was able to identify the wallet, 100 percent positive,

12  because that was his lucky two dollar bill he had.  I think he

13  told me his father gave it to him early in his life.

14  Q.  So you're saying that the sum is how much, how much

15  currency he had in his wallet?

16  A.  It was approximately $195, plus the two dollar bill.

17  Q.  From your knowledge?

18  A.  To my knowledge, yes.

19  Q.  So you're saying he also had valid IDs in there.  Can you

20  explain specifically what IDs he had?

21  A.  I don't recall exactly what IDs he had on him, sir.

22  Q.  So how can you know he had ID in his wallet if you can't

23  recall what type of ID he had in his wallet?

24  A.  It's almost six years ago.  I don't remember exactly what

25  he had in his wallet, but his personal identification was in

H3L8MUN2                         Jones - Direct

1    the wallet.

2    Q.  You know which one then?

3    A.  I don't remember exactly what credit cards or New York

4    state ID he had on him, sir.

5    Q.  You're saying there was a lucky two dollar bill.  Do you

6    remember the rest of the bills he had?  Were they 10s, 20s,

7    50s, 100s?

8    A.  I don't remember the denominations, whether he had like

9    50s, 20s, I don't remember the exact number of bills he had.

10   To my knowledge, it was approximately $195.

11   Q.  What is code 32, sir?

12   A.  That's a larceny in progress, sir.

13   Q.  So when you got the code 32, was a weapon involved, did it

14   say gun involved or no gun, no weapon?  What was the Sprint

15   code and the code 32?

16   A.  To my knowledge remembering, I don't remember there being a

17   weapon involved on the Sprint.

18   Q.  So it was a larceny, right?

19   A.  A 32 is a larceny, yes, in progress.

20   Q.  So here we go again.  A larceny is no weapon involved?

21   A.  Penal law definition, yes.

22              MR. MUNOZ:  I have no further questions.

23              Thank you, Sergeant Flynn.

24              THE WITNESS:  Thank you, Mr. Munoz.

25              THE COURT:  Any further questions, recross?

H3L8MUN2                          Jones - Direct

1                MR. LICHTERMAN:  No, your Honor.

2                THE COURT:  You may step down.

3                (Witness excused)

4                THE COURT:  Mr. Munoz, do you have an additional

5     witness to call?

6                MR. MUNOZ:  I would like to call Officer Jones,

7     please.

8                THE COURT:  Officer Jones, if you would take the

9     stand, please.

10               Take the stand and remain standing.

11     STEPHEN JONES,

12          called as a witness by the plaintiff,

13          having been duly sworn, testified as follows:

14               THE COURT:  State your full name and spell your last

15     name for the record.

16               THE WITNESS:  Detective Stephen Jones, J-O-N-E-S.

17     DIRECT EXAMINATION

18     BY MR. MUNOZ:

19     Q.  Good morning, Officer Jones.

20     A.  Good morning.

21     Q.  When you received you bit mark, when I bit you in your

22     hand, can you give a description of what the injury looked

23     like?  Can you give us a description of that bite mark that I

24     gave you?

25     A.  It was about the size of a half dollar coin, between that

1    and a quarter.  It was pretty deep.  It went down to the flesh.

2    It was red, it was bleeding.  It was gruesome.  It was an ugly

3    bite.

4    Q.  Did you ever have a photocopy of it?

5    A.  I believe they took a picture, but I don't have a personal

6    copy of it.

7    Q.  Did you get stitches for it?

8    A.  No.  They said not to stitch it.  It was too wide.  It was

9    more of just like, almost like if you had a spoon and you kind

10   of dug out something, instead of a sharp slash.  I was really

11   just concerned that --

12             THE COURT:  Don't add.

13             THE WITNESS:  OK.

14             THE COURT:  You may be asked a further question.

15             MR. MUNOZ:  Your Honor, with your permission, is it

16   possible that Officer Jones could show his arm where I bit him

17   at?

18             THE COURT:  Absolutely.

19             Officer, if you could stand where you are and display

20   the area of your body where the bite was.

21             THE WITNESS:  You can't really see it too much.  It

22   healed up, thankfully.  But right there is a discoloration

23   underneath the hair on my arm.  It healed though.  I'm left

24   with a small scar.

25             MR. MUNOZ:  Your Honor, he is showing it at a

H3L8MUN2                      Jones - Direct

1   distance.  The jurors can't see that.

2          THE COURT:  Officer Jones, if you would step down from

3   the witness stand, walk slowly in front of the jury, displaying

4   to them the area of your body that has the wound, and you may

5   point to it with your other hand.

6          Don't talk to them.

7          MR. MUNOZ:  Your Honor, can I see also?

8          THE COURT:  Absolutely.

9   BY MR. MUNOZ:

10  Q.  Officer Jones, can I see where I bit you at?

11         THE COURT:  Officer Jones, could you please approach

12  the plaintiff's table and display your hand to him.

13         Thank you, Officer Jones.  You may retake the stand.

14  Q.  Officer Jones, does that look like a spoon carved out your

15  hand, as you said?

16  A.  It was six years ago.  It was an ugly wound.

17  Q.  I see a little dot.

18         THE COURT:  I'm sorry.  Mr. Munoz, it's not your time

19  to testify.  Just ask a question.

20         MR. MUNOZ:  Your Honor, can I exhibit the picture that

21  I have of Officer Jones' bite mark?

22         THE COURT:  I am going to ask my law clerk to approach

23  and retrieve the document from you and walk up and show that

24  document to the witness.  I believe that is Plaintiff's Exhibit

25  4.  You may leave that with the witness.

1              Officer Jones, you're being shown a document that is

2      marked Plaintiff's Exhibit 4.

3              You may place a question, Mr. Munoz, to the officer.

4      BY MR. MUNOZ:

5      Q.  As you see, it's dark.  Does that look really more like

6      your wrist than your forearm?

7              THE COURT:  OK.  Are you asking Officer Jones whether

8      he recognizes what is in Plaintiff's Exhibit 4?

9              MR. MUNOZ:  Yes, ma'am.  I already explained it to

10     him.

11             THE COURT:  But the testimony has to come from him.

12             MR. MUNOZ:  OK.

13             THE COURT:  Officer Jones, do you recognize what is

14     shown in Plaintiff's Exhibit 4?

15             THE WITNESS:  No.

16             THE COURT:  You may just leave it there.

17     Q.  So I didn't bit you in the forearm?

18             MR. LICHTERMAN:  Objection.

19             THE COURT:  Mr. Munoz, overruled.

20             You want to know from Officer Jones whether you bit

21     him in the forearm, is that right?

22             MR. MUNOZ:  That's right, ma'am.  I apologize.

23             THE COURT:  So, Officer Jones, did the plaintiff bite

24     you in the forearm?

25             THE WITNESS:  No.

1   Q.  And you don't have a copy, and you're an officer?

2           THE COURT:  A copy of what?

3   Q.  You don't have a copy of the bite mark that I presented to

4   you, but I have a copy that's not clear, but you don't have

5   one.  So you don't have a copy then?

6           THE COURT:  Mr. Munoz, a simple question, just one

7   question at a time.

8           Do you have a copy, Officer Jones, of a picture of

9   your bite mark?

10          THE WITNESS:  No.

11  Q.  Can you explain to the Court, the jury, the judge and

12  everybody in here a summary of your story of what happened that

13  day during the incident of September 13, 2011?

14  A.  Yes.  We received a call for a 32 in progress, items taken,

15  wallet taken.

16          THE COURT:  Move the mic closer to you and keep up

17  your voice.

18  A.  A wallet taken.

19          We were canvassing the area of Archer and White

20  Plains.  We started to go towards 1890 Archer Street, which is

21  a problematic bodega in the area, in the Parkchester section,

22  where the robbery occurred.

23          I had to make a right on to the street.  I was

24  driving.  I was with Sergeant Reid, who was an officer then,

25  Sergeant Kelly, and Sergeant Flynn who was also an officer

1    then.

2              They exited the car first when I turned on to the

3    block just because there were a couple of cars building up.  So

4    they got out first, and I was going to stay in the car to park

5    it closer to the location in case I needed to use the car

6    again, just in case of any scenario.

7              I finally parked the car.  I entered the bodega.  When

8    I entered the bodega, to my right Officer Flynn, Officer Reid

9    and Sergeant Kelly were on top of Mr. Munoz, violently fighting

10   with him.  It was a violent struggle.

11             As I'm walking in, I hear one of the officers, I'm not

12   sure who it was, saying, He's got a gun, he's got a gun.  He

13   was on his stomach, meaning Mr. Munoz, with his right arm

14   clenched extremely tight against the floor.  So assume the gun

15   was in his right hand.  Mr. Munoz is screaming at the top of

16   his lungs, You're going to have to kill me.  I'm not going

17   back.  I get down from my crown.

18             So the other officers are on top of him, and I see his

19   right arm clenched.  So I go behind Mr. Munoz over his right

20   shoulder.  I try to dig my arm over his right shoulder, and I

21   get to the top of his hand.  I could feel he is clenching on to

22   something.  I try to yank it.  Then I feel this excruciating

23   pain on my wrist.  I have never been bit before so I didn't

24   really know what it was.  Then I looked down and I see he's

25   biting me.  I stand back up to get my bearings.  I look down

1    and my wrist is bleeding.  He's bleeding.  I am thinking maybe

2    I'm going to get HIV.  There are so many thoughts going through

3    your head.  It was a scary situation.

4            Then I proceeded to get back into trying to take the

5    gun away from him and get him handcuffed.  So I go down.  I

6    strike him maybe five to ten times in the ribs.  I am doing

7    this because the person is a lot stronger when they have their

8    arms close to them, and he's an extremely strong person just

9    with natural ability and being, as he said, on crack for three

10   days, he was almost superhuman.  So I was figuring if I punched

11   him in the ribs, I can get an arm maybe to pop out.  When

12   someone's arm is out at their side, they're a lot easier to

13   control just because you have less strength when you're prone

14   like this.

15           We were eventually able to get him handcuffed, when he

16   was still violently struggled.  We got him handcuffed and

17   brought him outside.

18   Q.  Thank you, Officer Jones.

19           Now, another question.  Do you remember who cuffed me?

20   A.  I don't.  I mean, it could have been me.  It could have

21   been any one of the officers.  But when you have four officers

22   together and everybody is trying to get an arm, it could have

23   been two people pulling on one arm and putting on a cuff.  It

24   was so chaotic, I don't remember that part.

25   Q.  Besides the bit mark, did I strike a punch at you?

1   A.   No.

2   Q.   Was I screaming as I was hitting you?

3   A.   You were screaming.

4   Q.   Obviously, was it a scream of pain?

5   A.   No, it was a scream of rage, in my opinion.  In my opinion,

6   if you were able to get up, you were going to hurt us, shoot

7   us.  You wanted to get out of there at all costs and it didn't

8   seem like we mattered.

9   Q.   When you were striking the blows on me, can you give us a

10  demonstration how you was hitting me?

11  A.   I was punching him in the ribs, hard.  We were fighting for

12  our lives.  He leans up to the left six inches, he could have

13  easily shot one of us.

14  Q.   So as a trained officer, it's easy to go like this, but as

15  a person who is not trained to use a firearm, isn't it not easy

16  to go just like that?

17          THE COURT:  Excuse me.  You're gesturing, so the court

18  reporter isn't going to be able to understand what you have

19  just done.

20  Q.   It's easy as a trained officer to pull out a firearm and

21  shoot in all different type of angles, am I correct?

22  A.   No.

23  Q.   So you was never trained how to shoot a firearm?

24  A.   I was.

25  Q.   How about a person who is never trained, isn't that kind of

1    different?

2            THE COURT:  So place the next factual question to the

3    witness.

4    Q.  You say you were punching me in the ribs?

5    A.  Yes.

6    Q.  What side of the ribs?

7    A.  Right side.

8    Q.  Not the left?

9    A.  I'm not sure.  I may have punched you in the left.

10   Q.  Was you punching me when I was on the ground, as Sergeant

11   Flynn said, when I had both of my arms on my chest with the gun

12   facing down, was you still punching me on my ribs?

13   A.  If you were on the ground, I was punching you in the ribs.

14   Q.  Did you never strike me as I was standing up?

15   A.  Sorry.  I don't understand the question.

16   Q.  Was you striking me as I was standing up with the firearm

17   supposedly shoulder length?

18   A.  When I entered the bodega, you were already on the ground.

19   I was the last one in.

20   Q.  So you was the last one so you didn't come in with at the

21   time Officer Flynn and Officer Reid at the time?

22   A.  No.

23   Q.  So you're the last one.  So you're the fourth guy coming

24   inside the store?

25   A.  Yes.

H3L8MUN2                          Jones - Direct

1   Q.  So if you was the last guy, how couldn't you have drawn

2   your gun and say freeze, when all officers are on top of me, if

3   I still had the firearm?

4   A.  If I would have pulled out my firearm, my officers, my

5   partners on top of him, we would have gained nothing.  I would

6   just be standing there with my firearm.  I couldn't have shot

7   or used it.

8   Q.  So you also didn't identify yourself as a NYPD officer,

9   right?

10  A.  I was wearing my uniform, my vest, my gun, my radio.  I had

11  my shield out.  At that point, it would have made no difference

12  to identify myself.  You were already engaged with these other

13  officers fighting.

14  Q.  I thought anticrime wear plain clothes?

15  A.  I was.

16  Q.  That's not NYPD uniform.  It's a difference between a NYPD

17  officer uniform and anticrime plain clothes uniform.  So am I

18  correct that anticrime uniform, it could be any casual clothes?

19  A.  Yes.

20  Q.  Do you know who cuffed me?

21  A.  Officer Flynn said he had your left arm.  I'm not sure who

22  ultimately got his right arm and put both of them together.

23  Q.  So when you was the last guy, which is the fourth guy

24  because it's four of you, coming inside the scene and you see

25  three officers, I believe almost six feet and better, except

1    for Sergeant Kelly, I think he is a little shorter, and you see

2    three guys pinning me down, you decide to hit me on the ribs

3    instead of going for my arms, instead of going for my hands

4    too?

5    A.   I tried to remove your arms and you were violently

6    struggling.   The situation was not under control.   Three

7    officers –– you know, it would could have been five officers.

8    The way you were violently struggling, this was a fight, this

9    was a real fight-for-your-life situation.

10   Q.   So you see three officers weighing over 200 pounds on top

11   of me, why couldn't you call for more backup?

12   A.   I had to get in there and help them.

13   Q.   So you couldn't call for backup?

14   A.   I could have.

15   Q.   You could have.   Why didn't you?

16   A.   Because I felt we would be able to handle the situation

17   eventually.   It was going to be a struggle.

18   Q.   Don't you think if you would have called more backup, more

19   guys on top of me, that would have never happened?

20   A.   It also would have been a lot more officers in a really

21   small space.   It was already a really tight space in a bodega.

22   Another five officers crowding into it, it wouldn't have helped

23   us.

24   Q.   Don't you think a small area with more officers is harder

25   for me to move?

1          THE COURT:  So I am going to ask you again, Mr. Munoz,

2     do you have a fact question to place to this witness?

3     Q.  So when you came inside the store, did you say NYPD

4     officer?

5     A.  No.

6     Q.  You said you had your shield out.  You never mentioned you

7     was an officer either?

8     A.  No, I didn't.

9     Q.  You also heard the code 32?

10    A.  Yes.

11    Q.  Which is larceny with no weapon involved?

12    A.  Yes.

13    Q.  Did you ever saw the Sprint call-out, did you ever see the

14    minutes of that code 32?

15    A.  No.

16    Q.  So you have no knowledge what it said?

17    A.  I know it said wallet taken, I remember from the radio

18    transmission.

19    Q.  Do you remember the description, my description that day?

20    A.  No.

21    Q.  So you have no knowledge what I was wearing, nothing?

22    A.  No.

23    Q.  What was your description?

24    A.  I was probably wearing jeans or a pair of shorts and a

25    T-shirt.

1   Q.  So you're assuming that's what you was wearing?

2   A.  I don't remember.  It was six years ago.

3   Q.  Did you have knowledge Officer Reid disarmed me?

4   A.  I did know he had the gun or when he took it.

5   Q.  You knew when he said he got the gun?

6   A.  I didn't hear it.

7   Q.  You was there close, though, so you didn't hear it?

8   A.  I didn't hear it.  It was a chaotic scene.  I don't know if

9   he took the gun away from you after I had stepped up, after you

10  biting me.  I didn't hear it.

11  Q.  So you kept on striking me then, that's what you're saying?

12  A.  Yes, because you didn't give up, and I couldn't tell if you

13  had given up the gun or not, because his arm was still stuck

14  underneath him.  At that point you were still violently

15  struggling.  You weren't handcuffed.

16  Q.  So when Sergeant Reid retrieved the gun and he said, I got

17  the gun, I heard it.  You didn't hear it?

18          THE COURT:  I'm sorry, Mr. Munoz.  Do you have a

19  question for this officer?

20  Q.  You wasn't one of the officers that said, he got the gun?

21  A.  No.  No.

22  Q.  Do you have knowledge which officer said that?

23  A.  I told you I didn't hear it.

24  Q.  So let's rewind.  When I was towards my chest on the floor,

25  with both of my arms like this, right, to my chest, who was on

H3L8MUN2                          Jones - Direct

1    top of me?  Can you remember who was on top of me, what

2    position, where they were at?

3    A.   I don't remember exactly which spot each officer was in.  I

4    remember I was towards the right side of your body reaching

5    over your right shoulder.  It's the only point I really

6    remember.

7    Q.   So you was reaching over my shoulder as I was standing up

8    or on the ground?

9    A.   No, you were never standing up when I engaged you.  You

10   were on the ground.

11   Q.   So you're reaching for my shoulder on the ground, but at

12   the same time striking blows at my ribs?

13   A.   I was striking blows at his ribs, and then I was reaching

14   over trying to remove the firearm from his right hand.  That's

15   when he bit me.  Then I pulled my arm away.  I stood up, got my

16   bearings, noticed I was bit, and then went back down, and then

17   tried to remove your arm from underneath you, trying to

18   handcuff you.

19   Q.   So you're saying that I bit your arm before he got the gun?

20   A.   I'm not sure.  I believe you had the gun.  I told you I

21   grabbed your right hand and it felt like he was gripping

22   something.

23   Q.   You don't think that I bit you to give you a warning to

24   stop hitting me, because of the pain I was going through?

25   A.   I don't know why you bit me.

H3L8MUN2                         Jones - Cross

1    Q.  When you was punching me in my ribs?

2    A.  I don't know why you bit me.

3    Q.  So didn't you hear me scream (loud sound), you didn't hear

4    that either?

5    A.  I don't remember you screaming.  You were just screaming.

6    "I'm not going back to jail" you were screaming.  He was

7    kicking his legs.  He was squirming.

8    Q.  I am not going back to jail is different from screaming

9    like (loud sound).  That's totally different.

10            MR. LICHTERMAN:  Objection.

11   Q.  It's totally different.

12            THE COURT:  Yes, this is a time to ask this witness a

13   question, Mr. Munoz.

14   Q.  You came in already when Sergeant Kelly and Sergeant Reid

15   and Sergeant Flynn were all on top of me, so you came in last.

16   So you didn't acknowledge me pulling out the gun?

17   A.  No.

18   Q.  And you didn't acknowledge of who cuffed me?

19   A.  No.  I'm not sure.

20            MR. MUNOZ:  I have no further questions, your Honor.

21            THE COURT:  Thank you.

22            Cross-examination.

23   CROSS-EXAMINATION

24   BY MR. LICHTERMAN:

25   Q.  Detective Jones, did you use any force against plaintiff

H3L8MUN2                          Jones - Cross

```
 1    after he was in handcuffs?
 2    A.  No.
 3    Q.  Did you observe anyone use any force against plaintiff
 4    after he was handcuffed?
 5    A.  No.
 6    Q.  You testified about your bite wound.  Did you receive any
 7    treatment for your bite wound?
 8    A.  Yes.
 9    Q.  What treatment did you receive?
10    A.  They cleaned it up, bandaged it, and they gave me a tetanus
11    shot.
12    Q.  Did your bite wound heal?
13    A.  It did, over time.  I am left with a small scar.
14    Q.  How long did it take to heal?
15    A.  Weeks, a couple of months to get where -- it was red for a
16    long time, and then it just turned into a scar.
17              MR. LICHTERMAN:  Nothing further.
18              THE COURT:  Any additional questions, Mr. Munoz, about
19    just what this officer just said this moment?
20              MR. MUNOZ:  No, your Honor.  I'm good.
21              THE COURT:  You may step down.
22              (Witness excused)
23              THE COURT:  So, ladies and gentlemen -- well, let me
24    first ask you, Mr. Munoz.  Do you have any further evidence to
25    offer, Mr. Munoz?
```

H3L8MUN2

1          MR. MUNOZ:  Your Honor, just photocopies that I

2     presented to you this morning.

3          THE COURT:  They were received in evidence the first

4     thing when we began our trial again before the jury.  They have

5     been received in evidence as Exhibits 1, 2, and 3.

6          So you may use those Exhibits 1, 2 and 3 in your

7     closing remarks to the jury since they are part of the evidence

8     in this trial.

9          MR. MUNOZ:  I am going to need a photocopy of Officer

10    Jones' bite mark that's over there.

11         THE COURT:  OK.  That is Plaintiff's Exhibit 4 and it

12    has not been received in evidence.

13         MR. MUNOZ:  Can at least the jurors see that?  They

14    never got to see that photocopy.

15         THE COURT:  Thank you for that question.

16         No.  Because it's not part of the evidence in the case

17    because the witness could not and did not identify it.

18         But Exhibit 1, which is the photographs that you

19    offered, I believe from the hospital time, Exhibit 2 and 3 that

20    you offered are in evidence and are part of the evidentiary

21    record in this case.

22         MR. MUNOZ:  But the jurors didn't get to see that

23    photo.  I don't think that's fair.

24         THE COURT:  OK.  I have given you my ruling, Mr.

25    Munoz.

H3L8MUN2

1          Did you have any other evidence to offer?

2          MR. MUNOZ:  As far as photocopies, no.  Just the ones

3  from the hospital also --

4          THE COURT:  Yes.  They were received in evidence.

5          MR. MUNOZ:  -- that the jurors haven't seen.

6          THE COURT:  Well, you may show them to them.  They

7  will be sent into the jury room during their deliberations, so

8  they will each be able to look at them with care at that time.

9  But, also, you may hold them up and display them during your

10  summation, if you would like to see them at that time.

11          MR. MUNOZ:  OK, your Honor.

12          THE COURT:  So the plaintiff rests.

13          Do the defendants have evidence to offer?

14          MS. DEPOIAN:  No additional evidence.

15          THE COURT:  So the defendants rest.

16          So, ladies and gentlemen, you have heard all the

17  evidence in this case.

18          We are going to take our mid-morning recess now.  When

19  you come back, the parties will have an opportunity to make

20  their summation arguments to you, and then I will give you my

21  jury charge, and after that you may deliberate.

22          You may retire to the jury room.

23          (Jury exits courtroom)

24          THE COURT:  Yes, Mr. Munoz.

25          MR. MUNOZ:  After the day is over, can I get my

H3L8MUN2

1   photocopy back?

2            THE COURT:  Absolutely.  We can give it to you now.

3            MR. MUNOZ:  Also, can I get the transcripts of

4   yesterday?  And with your permission, will I be able to finish

5   my summation here?

6            THE COURT:  The jury will take five to ten minutes, I

7   expect, for the morning break.  Then it will be time for your

8   summation.

9            MR. MUNOZ:  Can I like prepare myself?

10           THE COURT:  Right now you may.  You may.  I don't

11   think anyone has ordered a transcript of the trial.  So there

12   is no transcript available for anyone.

13           Did the defendants order the transcript?

14           MS. DEPOIAN:  We thought we were ordered to get the

15   transcript by the Court.

16           THE COURT:  I ordered you to get the transcript of the

17   final pretrial conference.

18           MS. DEPOIAN:  In any event, we have the transcript.

19   We can provide Mr. Munoz with a copy as soon as we have access

20   to a photocopy machine.

21           THE COURT:  So that would be after the trial, Mr.

22   Munoz.  Right now we are going to move directly to the

23   summation in five to ten minutes, as soon as the jury is ready.

24           MR. MUNOZ:  So I will be able to get all my

25   transcripts from this trial, after trial, or when will I be

H3L8MUN2

1      able to get them?

2                  THE COURT:  After the trial.

3                  MR. MUNOZ:  Can I use the rest room now and then come

4      back and do my summation?

5                  THE COURT:  Absolutely.  We will all take a break.

6                  MR. MUNOZ:  Thank you, ma'am.

7                  (Recess)

8                  THE COURT:  So I understand the defendants wanted to

9      address the Court.

10                 MR. LICHTERMAN:  Yes, your Honor.

11                 At this time, defendants would like to move for

12     judgment as a matter of law pursuant to Rule 50 of the Federal

13     Rules of Civil Procedure on the following grounds.

14                 First, the plaintiff has failed to establish the

15     personal involvement of any of the defendants.  In order to do

16     so, he would have to put forth some sort of evidence to show

17     that they were actually personally involved in the alleged

18     force used after he was handcuffed.

19                 Here, he really failed to attribute any specific

20     actions to the individual defendants with respect to force

21     after he was handcuffed.  His testimony really was that he

22     didn't even recall what force was used after he was handcuffed

23     and what injuries resulted therefrom.  No reasonable jury would

24     be able to find, therefore, that any of these defendants used

25     excessive force against him after he was handcuffed.

H3L8MUN2

1          Additionally, there is no credible evidence that was

2     offered that plaintiff suffered any injuries from this alleged

3     force.  He failed to identify any injuries other than the two

4     lacerations and the ribs.  He couldn't identify what the cause

5     of those injuries was.  In fact, there was a significant amount

6     of testimony with respect to those injuries having happened

7     prior to plaintiff being handcuffed.

8          Additionally, there was no credible evidence in the

9     record that any jury could accept the plaintiff's version of

10    what happened as true.  Plaintiff repeatedly controverted

11    himself while testifying on the stand on cross-examination, and

12    even testified that his memory of the entire incident, and

13    particularly with respect to the force used, was lacking due to

14    his various psychological issues, the fact that he was high on

15    crack, and specifically stated that there were many things that

16    he did not in fact recall.

17         However, to the extent that plaintiff has shown that

18    any force was used against him after he was handcuffed, he

19    hasn't met his burden to show that no reasonable officer, faced

20    with the same circumstances that the defendants were faced

21    with, would have done what these officers did.  Therefore, the

22    defendants would also be entitled to qualified immunity.

23         THE COURT:  I will reserve on that motion.

24         Earlier this morning we marked as a court exhibit and

25    handed out copies of the special verdict form.

H3L8MUN2

1           Any objections or requests?

2           MS. DEPOIAN:  None, your Honor.

3           THE COURT:  Mr. Munoz, I take it you have no

4   objections or requests to the special verdict form, is that

5   right?

6           MR. MUNOZ:  Your Honor, pertaining to what you just

7   said?

8           THE COURT:  No.  We will give you another copy of the

9   form.  You were given a copy earlier this morning.  I don't

10  believe there is any ground for an objection.  Obviously, I

11  created this document.  But it's the form the jury will fill

12  out when they render their verdict.

13          MR. MUNOZ:  I believe I have it.

14          THE COURT:  Do you have a copy there?

15          MR. MUNOZ:  I have to look for it.

16          THE COURT:  We are giving you another copy.  You don't

17  have to look for it.  It's the one that has just been handed to

18  you by Ms. Rojas right in front of you now.

19          MR. MUNOZ:  I have it.

20          THE COURT:  OK.  Good.

21          Ms. Rojas, he has found his original copy.

22          Thank you very much, Mr. Munoz.

23          It just asks the jury a series of questions to see

24  whether or not they have a verdict in your favor or not.  OK?

25          MR. MUNOZ:  What was that?  Your Honor, I didn't hear

H3L8MUN2

1    you.

2                    THE COURT:  The form that you have in your hands is

3    the form the jury will fill out during their deliberations to

4    decide whether or not you have carried your burden to show a

5    violation of your rights.  OK?  I just want you to know what

6    that form is.

7                    MR. MUNOZ:  OK.

8                    THE COURT:  You don't have to do anything with it.

9    It's for the jury.

10                   MR. MUNOZ:  OK, ma'am.

11                   THE COURT:  Thank you.

12                   Bring in the jury.

13                   We are going to move the podium, Mr. Munoz, so that

14   you can use it like you did for your opening statement when

15   you're giving your summation.  You can stand right by it.  And

16   we will bring over a chair also.

17                   Bring in the jury.

18                   (Jury present)

19                   THE COURT:  Ladies and gentlemen, the evidentiary

20   portion of this trial is now concluded.  You have received all

21   of the evidence.  It was the testimony of the witnesses who

22   testified and the exhibits that were received in evidence.

23                   Now is an opportunity for Mr. Munoz and for defense

24   counsel to address you.  We call this their closing remarks or

25   their summation.  Nothing they say at this point is evidence.

1    But I know you will give them close attention.  It's their

2    opportunity to direct your attention to what they believe the

3    evidence has shown and to ask you to make whatever inferences

4    they believe is appropriate from that evidence.

5            We will begin with Mr. Munoz, who will address you.

6    Then defense counsel will have an opportunity to address you.

7    And, finally, we will give Mr. Munoz another brief chance to

8    address you, just to make sure there is nothing he didn't

9    forget to say when he first talked to you.

10           Mr. Munoz, you may approach the podium and address the

11   jury.

12           MR. MUNOZ:  Hi, jurors, again.

13           This is my summation.  I'm not really too

14   knowledgeable about this, but this is what I got.

15           I wrote that Sergeant Kelly doesn't know who cuffed

16   me, but during the struggle he was beating me.  And Reid

17   doesn't know when he was punching me.  Who else was punching

18   me?

19           Sergeant Reid was with Sergeant Kelly behind him, but

20   then he says he came in with Flynn and Jones.  They say there

21   were soda glass bottles broken on the floor, when the sodas are

22   kept in plastic bottles in the back of the store in the

23   refrigerators.

24           I specifically mentioned that I had a drink, an

25   Arizona Pina Colada -- that's how I know -- on top of the

1    counter, just about to receive my sandwich.

2            Sergeant Kelly said he had both knees on my back, with

3    his weight I believe.

4            Reid said he disarmed me when I fell on the ground

5    with them, with me on top of the gun on my right hand.  So that

6    couldn't have fractured -- that couldn't have fractured my left

7    rib if the gun was in my right hand when I fell.

8            And none of them can recall, when they were hitting

9    me, who cuffed me.

10           I hear "we," the word "we" cuffed him.  How I have

11   four NYPD at the time, three officers and one sergeant at the

12   time, I was being cuffed two times, one to a machine and then

13   cuffed eventually to my both hands, and none know who cuffed me

14   with both hands.

15           Reid don't recall, he denies, I was never cuffed to a

16   machine.  Flynn also.  It seems like none of them want to

17   confess who finally cuffed me the second time to both hands.

18           Sergeant Kelly came in first with my right hand

19   holding the firearm shoulder length.

20           Flynn says I was pulling it out, but not sure where

21   from the waist.

22           It seems that they haven't -- not a similar story.

23           Flynn wasn't sure, doesn't remember who cuffed me.  He

24   doesn't know how the laceration on my left eye, who caused it.

25   He doesn't see Reid recovering the firearm from me.

1          Flynn says he heard Reid, I retrieved the gun, I got

2     the gun.

3          All officers responded to a code 33, not a weapon

4     involved.

5          Flynn, Reid, Jones didn't say put the gun down.  Here,

6     you have three NYPD officers and one sergeant at the time.

7     These are all trained officers, who one could have drawn his

8     gun and instruct me to put the gun down.

9          The wallet had more than $195.  I counted it myself.

10    .380 caliber bullet, that's what I believe Sergeant Flynn said.

11    He can't remember what ID, credentials, there were in the

12    wallet.  He doesn't remember the bills in the wallet.  So how

13    could there be a lucky two bill in the wallet when I counted

14    it?

15         All in reality, I know I committed a crime.  And when

16    I was in possession of the wallet, I ran inside a building to

17    throw away Mr. Catalina LaCourt, my friend, who I robbed, all

18    his credentials, all his IDs, all of his American Express

19    credit cards.  I counted all the money.  It was 20s, 50s, 100s,

20    and the two singles -- or the one single that he was going to

21    give me when I snatched the wallet out of his hand.  The wallet

22    was brown.

23         THE COURT:  Mr. Munoz, this isn't the chance to

24    testify.

25         MR. MUNOZ:  They were 20s, 50s, 100s, no singles.  He

H3L8MUN2                        Summation - Mr. Munoz

 1   had almost $900.

 2           MR. LICHTERMAN:  Objection, your Honor.

 3           MR. MUNOZ:  I counted them inside the building.

 4           THE COURT:  Mr. Munoz, can I interrupt a moment?

 5           MR. MUNOZ:  This is my first time doing a summation.

 6           THE COURT:  I know.  I am just going to interrupt you

 7   a moment here.

 8           The time to testify and tell the jury what you

 9   remembered was the time when you were under oath and at the

10   witness stand.

11           MR. MUNOZ:  OK.

12           THE COURT:  You can't add facts now.

13           MR. MUNOZ:  OK.

14           THE COURT:  What you can do --

15           MR. MUNOZ:  Afterwards?

16           THE COURT:  No.  You remind the jury of what you

17   believe were the important parts of the testimony and the

18   evidence that was received at trial.

19           MR. MUNOZ:  So everything is good just about the

20   wallet part, right?  Everything so far so good?

21           THE COURT:  Yes.

22           MR. MUNOZ:  I apologize.

23           THE COURT:  No problem.

24           MR. MUNOZ:  I apologize to the jurors, because I don't

25   really have the knowledge like that, like everybody else in

1    here.

2            Jones don't remember also who cuffed me in this

3    excessive force.  He was punching right side, but not sure the

4    left side of my ribs.  He is not sure who cuffed me also.  He

5    didn't never mention he was an officer.  He heard the code 32.

6            Sergeant Reid, he's not sure if -- he didn't hear him

7    say, I retrieved the gun, I got the gun.

8            After the gun was removed, it seems it's hard to

9    believe where I bit him was at the wrist, when he says he was

10   striking hard blows towards my rib.  However, I do admit I bit

11   him.

12           I feel like all three sergeants now and one officer

13   can't recall which officer cuffed me.  It looks like none of

14   these sergeants and officer want to take the blame for this

15   excessive force, of which officer cuffed me, that was taken

16   after being cuffed two times.

17           Jurors, I am asking for all of you to give me a fair

18   response to these facts that I have for you and that you all

19   heard.

20           Thank you.

21           MS. DEPOIAN:  Good morning, ladies and gentlemen.

22           Ladies and gentlemen, plaintiff wants you to believe

23   that he was victimized by these four defendants on September

24   13, 2011.  He wants you to feel sympathy for him.  Don't fall

25   for it.  Plaintiff is not a victim.  Plaintiff was not a victim

H3L8MUN2                    Summation – Ms. Depoian

1    at any time on September 13, 2011.  He was not the victim when

2    he robbed an 86-year-old man with a gun while he was high.  He

3    was not the victim when he pulled out a loaded gun out of his

4    pocket, when he saw four police officers enter a bodega on

5    September 13, 2011.  Plaintiff was not the victim when he

6    caused all four of these police officers to be terrified for

7    their lives, as he struggled with them for a gun, that could

8    have gone off and killed any one of them at any moment.  And

9    plaintiff was not a victim when he bit Detective Jones on the

10   wrist breaking his skin and causing him to bleed.

11            Now, ladies and gentlemen, this is the verdict sheet

12   in this case.  This is the sheet you will have with you when

13   you are in the jury room.  Are you able to see it in front of

14   you now?  It has a few questions on it.  But this one, the

15   first one, is the one that matters.

16            This question says:  "Did the plaintiff establish by a

17   preponderance of the evidence that his rights under Section

18   1983 were violated by?"  And it says, A, B, C and D, each of

19   the defendants.

20            The answer to that question for each of the defendants

21   is no.

22            Now, the judge is going to tell you that plaintiff

23   must prove that his rights were violated by the use of

24   excessive force after he was already in handcuffs.

25            The reason we know that they did not do this is

1    because, first of all, the officers all told you it didn't

2    happen.

3          We also know this didn't happen because plaintiff

4    never mentioned that any force was used after his handcuffing

5    when he spoke to investigators right after his arrest.  He was

6    told that day that he was being questioned to determine how he

7    received his injuries.  He was told that he was being

8    questioned to find out whether there was any police misconduct.

9          Plaintiff has testified at length about how he was

10   beat up before he let go of the gun.  But when plaintiff talked

11   to the investigators, he doesn't even mention that anything

12   happened to him after he was cuffed.  He just says he was

13   cuffed and then taken outside, which is, as we know, what

14   actually happened.

15         Plaintiff never complained about any force being used

16   after his handcuffing until long after his arrest on September

17   13, 2011, until he brought this very lawsuit.

18         The next reason the first answer to the question on

19   the verdict sheet is no is because plaintiff was high on crack

20   on September 13, 2011.  You have heard many times throughout

21   this trial he had been smoking crack for three straight days

22   when this happened.

23         We don't remind you of this fact to belittle plaintiff

24   in any way.  But plaintiff's use of this substance affected his

25   memory that day.  And this means that plaintiff can't meet his

H3L8MUN2                    Summation - Ms. Depoian

1    burden to prove his case by a preponderance of the evidence,

2    and the judge will tell you more about what that means when I

3    am done.

4             So let's talk about plaintiff's memory from that day.

5    He doesn't remember robbing Mr. LaCourt.  He doesn't remember

6    how he got to the bodega.  His memory of the whole day is all

7    over the place.  You heard how many of the questions about that

8    day he couldn't answer.  He doesn't remember being treated by

9    EMS at the scene, or riding in the ambulance to the hospital.

10   He doesn't remember who punched him when.

11            Now look at what plaintiff wants you to believe that

12   he does remember.

13            Plaintiff would have you believe that he pulled out

14   the gun because he was attempting to acknowledge that he

15   committed a crime.  But plaintiff testified he never actually

16   threw the gun on the ground.  Instead, plaintiff yelled at the

17   officers, This ain't for you, you're going to have to kill me,

18   I'm not going back to jail.  If someone was trying to show the

19   officers a gun to acknowledge that they committed a crime, they

20   would not say those things; they wouldn't keep holding on to a

21   gun while the police officers struggled to get it from them.

22            Once again, plaintiff wants you to believe that he is

23   a victim here.  He wants you to think that this was not his

24   fault, because when he pulled out the gun, it was pointed down

25   and his finger was not on the trigger, as he said, and the

officers didn't yell, drop the gun -- by the way, they didn't

have time to say that -- that plaintiff wasn't the one in the

wrong here.  Don't fall for it.  Plaintiff pulled out a gun on

police officers, who he knew were police officers, and the

officers did what they needed to do to get that gun from him

safely.

     Now, just to be clear, this case is not about what

happened before plaintiff finally let go of the gun and placed

in handcuffs.  The only thing you will need to decide is

whether you believe the officers used force on plaintiff after

he was already in handcuffs.

     I am bringing up what happened before plaintiff was

handcuffed for two reasons.

     First, because what plaintiff says happened before he

was placed in handcuffs utterly lacks believability.

     Second, what happened before he was placed in

handcuffs explains all of his injuries.

     Which brings me to the next reason we know that no

force was used on plaintiff after he was handcuffed.  Plaintiff

doesn't have any injuries from any force other than what was

used before he was in handcuffs and before he let go of the

gun.  Let's quickly go through each of plaintiff's injuries

from September 13 one at a time.

     First, plaintiff had that laceration to his eye.  He

testified on cross-examination the cut above his eye happened

1    before he let go of the gun.  He told you it was from the first

2    hit.  So this cut could not possibly have happened after

3    plaintiff was placed in handcuffs.

4           Now, there is plaintiff's fractured rib.  We know the

5    plaintiff was taken to the ground, and when he landed his gun

6    was underneath him.  Sergeant Flynn and Sergeant Kelly both

7    landed at least partially on top of plaintiff, and you can see

8    those are two big guys.  That fall alone certainly could have

9    broken his rib.  Officer Jones even testified that he punched

10   plaintiff in the rib to get the gun from him.  So it's just

11   common sense that the fracture to plaintiff's ribs was caused

12   before he was placed in handcuffs, while he was still refusing

13   to let go of the gun.

14          Next, you saw the plaintiff had a cut on his arm.

15   Plaintiff has no idea how his arm was cut, but again, common

16   sense tells you this probably happened somewhere in the

17   struggle for the gun.  He was taken to the ground.  There were

18   things falling all over the place in the bodega.  And it also

19   defies common sense as to how any officer could have cut

20   plaintiff's inner forearm after his arm was already behind him

21   in handcuffs.  From a punch?  So that injury didn't occur after

22   he was handcuffed either.

23          So now let's talk about what injuries plaintiff did

24   not have.  He had no broken bones in his face.  Other than his

25   left eye, he had no bruising on his face.  He had no bruising

1    on his body.  If these officers had continued to use force on

2    plaintiff after he his hands were cuffed behind his back, the

3    photographs that you saw during this trial would show these

4    injuries.

5          So why is plaintiff making up this story now?

6          Well, plaintiff was sentenced to ten years in jail for

7    the crime of armed robbery after he was caught with this gun.

8    That's exactly what plaintiff did not want to happen.  He even

9    told the officers that that day.  He didn't want to go back to

10   jail.  He's angry he got caught and he has to find some way to

11   blame someone else instead of taking responsibility for his own

12   actions.

13         So to plaintiff, the truth, which is that plaintiff

14   was injured after he pulled a gun out on these officers, now

15   becomes a story where plaintiff is the victim in the use of

16   excessive force by police officers.

17         Now, ladies and gentlemen, this is a sad case you have

18   been listening to for the last few days.  The effects of drug

19   addiction and mental illness are not easy to hear.  But the

20   reality is that the defendants encountered an intoxicated and

21   mentally ill man, inside of a bodega, on September 13, 2011.

22   And while it is true, as I mentioned, you are not here to

23   decide whether the officers' actions were appropriate before

24   plaintiff was in handcuffs, you should think about the fact

25   that the officers had split seconds to decide what to do when

1    they saw plaintiff.  You saw Officer Flynn, just maybe an hour

2    ago, show you how quickly it takes to pull a gun from here to

3    here.  They did what they had to do.  And think about how

4    quickly someone could just pull a trigger.  Microseconds.

5           The defendants were simply relieved to be alive after

6    plaintiff was in handcuffs, and none of them punched plaintiff

7    after everybody was safe.  Don't let the plaintiff play the

8    victim in this incident.  He is not the victim.

9           Soon the judge will read you some instructions and

10   then you will begin your deliberations.  When you do, when

11   you're back in the jury room looking at this verdict sheet, you

12   will be asked to answer the question of whether plaintiff

13   established by a preponderance of the evidence that his rights

14   were violated under Section 1983 by any of these four

15   defendants.  The answer to that question with respect to all

16   four officers is no.

17          Thank you.

18          THE COURT:  Now, Mr. Munoz, you have another

19   opportunity, if you would like, to briefly make remarks to the

20   jury.  Do you want to speak with them again or not?

21          MR. MUNOZ:  Yeah.  About what she just read, your

22   Honor?

23          THE COURT:  Yes.  If you would like to respond to that

24   briefly, feel free.  Just come up to the podium here and speak

25   to the jury again about what you think the evidence showed.

1             MR. MUNOZ:  Yes, ma'am.

2             Well, as you could see, I am representing myself.  I

3    know my name is Nehmias Munoz.

4             At that time, yes, I was intoxicated, I was high on

5    crack for three days, but I do remember of me pulling out the

6    firearm out of my left pocket.

7             MS. DEPOIAN:  Objection, your Honor.

8             THE COURT:  I think you're reminding the jury of what

9    you admitted on the stand.  Am I right?

10             MR. MUNOZ:  Yes.

11             THE COURT:  You may continue to describe the evidence

12    you gave.

13             MR. MUNOZ:  I never pointed the firearm towards any of

14    the officers.  That's why I believe I am still alive today.  I

15    believe if I would have had that finger on the trigger, which I

16    didn't, and I would have pointed like the officer showed the

17    jurors how quickly somebody could shoot somebody, I think I

18    wouldn't have been here today.

19             As I explained, and I try to defend myself, we don't

20    have the officer who actually cuffed me with both hands when

21    excessive force kept on.

22             I think I did the best I can representing myself,

23    defending myself, and I hope this will be credible for me.

24             That's about it.  I really thank each of you for

25    listening to me.

H3L8MUN2                        Charge

1          THE COURT:  So, ladies and gentlemen, we are now at

2     the point of the trial where I am going to give you my charges

3     to the law.

4          So, Ms. Rojas, would you please give the members of

5     the jury each a copy of the jury charge?

6          THE DEPUTY CLERK:  Yes, your Honor.

7          THE COURT:  Ms. Rojas, could you kindly announce the

8     charge?

9          Mr. Munoz, this is a second copy for you.  I know you

10    had a prior copy.  We are just giving you a fresh copy.

11         THE DEPUTY CLERK:  The Court is about to charge the

12    jurors.  Any spectator wishing to leave will do so now or

13    remain seated until the completion of the Court's charge.

14         THE COURT:  So, ladies and gentlemen, you have each

15    been given a copy of the jury charge.  I am going to read this

16    to you now.

17         You must listen carefully to me as I read this.  Some

18    people find it easier to understand what is being read to them

19    if they can read along.  If you would like to do so, you may

20    read along.  If you prefer to just listen to me, just put that

21    document under your chair and just listen to me.

22         I will now instruct you as to the law.  It is your

23    duty to accept these instructions of law and apply them to the

24    facts as you determine them.  If anyone has stated a legal

25    principle different than any that I state to you in my

H3L8MUN2                          Charge

1    instructions, it is my instructions that you must follow.

2              You should not single out any instruction as alone

3    stating the law, but you should consider my instructions as a

4    whole when you retire to deliberate.

5              (Continued on next page)

1          THE COURT:  Your role is to decide the fact issues

2     that are in the case.  You are the sole and exclusive judges of

3     the facts.  You must determine the facts based solely on the

4     evidence received in this trial.  You must weigh and consider

5     the evidence without regard to sympathy, prejudice, or passion,

6     for or against any party.

7          I remind you that nothing I have said during the trial

8     or will say in these instructions is evidence.  Similarly, the

9     rulings I've made during the trial are not any indication of my

10    views of what your decision should be.  What has been said in

11    the opening statements, closing arguments, objections, and

12    questions is not evidence.

13         The evidence before you consists of the answers given

14    by the witnesses and the exhibits that were received in

15    evidence.  You may not consider any testimony that I told you

16    to disregard or that was stricken from the record.

17         The plaintiff in this case is Nehmias Munoz.  As I

18    explained to you at the beginning of the trial, Mr. Munoz is

19    appearing pro se.  This means that he is exercising his right

20    to represent himself and to proceed without the assistance of

21    an attorney.  The fact that Mr. Munoz is proceeding pro se does

22    not mean that his claims should be given any greater or lesser

23    consideration by you.  All litigants are equal under the law.

24         You should treat the testimony Mr. Munoz gave while on

25    the stand as you do the testimony of all the other witnesses.

At all other times Mr. Munoz was functioning as an attorney.

His statements at the opening and close of the trial, as well

as his questions and objections, are not evidence in this case,

just as the statements of the defendant's attorneys are not

evidence.

          Also, the fact that Mr. Munoz is currently

incarcerated does not mean that his claims in this lawsuit are

entitled to any greater or lesser consideration by you.  Again,

all litigants are equal under the law.

          The four individual defendants in this case are

employed by the New York City Police Department.  Their

employment in the NYPD does not mean that they are entitled to

any greater or lesser consideration, again, by you.  Again,

once more, all litigants are equal before the law.

          In reaching your verdict, you must bear in mind that

each of the defendants is to be considered separately.  Your

verdict must be reached solely on the evidence or lack of

evidence presented against each defendant without regard to the

liability of the other defendants.

          The burden of proof in this case rests on Mr. Munoz.

The standard under which you will decide whether Mr. Munoz has

met his burden of proof is the preponderance of the evidence.

To establish by a preponderance of the evidence means that the

evidence of the party having the burden of proof must be more

convincing and persuasive to you than the evidence opposed to

H3l1mun3                       Charge

1    it.  The difference in persuasiveness need not be great.  It

2    requires only that you find that the scales tip, however

3    slightly, in favor of the party with the burden of proof, that

4    what that party claims is more likely true than not.

5           What is important is the quality of the evidence and

6    not the number of witnesses or the number or variety of

7    exhibits, or the length of the time spent on a subject.  In

8    determining whether any fact has been proven by a preponderance

9    of the evidence, you may consider the testimony of all the

10   witnesses and all the exhibits.

11          Simply because I've permitted certain evidence to be

12   introduced does not mean that I've decided on its importance or

13   significance.  That is for you to decide.

14          Mr. Munoz claims that on September 13, 2011, Officer

15   Reid, Officer Jones, Sergeant Flynn, and Sergeant Kelly

16   deprived him of his rights under the United States Constitution

17   by using excessive force against him after he was handcuffed

18   and/or failing to intervene in the use of excessive force

19   against him by another person after he was handcuffed.

20   Defendants deny this claim.

21          Mr. Munoz's claim against the defendants arises under

22   Section 1983, the federal civil rights law.  Section 1983 makes

23   it illegal for a person acting under color of state law to

24   deprive someone of his rights guaranteed by the Constitution or

25   laws of the United States.  Section 1983 provides -- and here I

H3l1mun3                          Charge

am quoting:

          "Every person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State...

subjects, or causes to be subjected, any citizen of the United

States... to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be

liable to the party injured."

          Here, the rights at stake are those secured by the

Fourth Amendment to the United States Constitution, which

forbids an "unreasonable" seizure, including the use of

excessive force.

          To establish a Section 1983 claim, a plaintiff must

establish, by a preponderance of the evidence, each of the

following three elements against the defendant you are

considering:

          First, that the defendant was acting under the color

of state law at the time of the incident on September 13, 2011.

That is not contested.

          Second, that the defendant's conduct deprived the

plaintiff of a right secured by the Constitution of the United

States -- that is, the right to be free from the use of

excessive force.

          Third, that the defendant's acts were the proximate

cause of damages sustained by the plaintiff.

          To establish that the defendant you are considering

H3l1mun3                          Charge

engaged in the excessive use of force against him, Mr. Munoz

must prove by a preponderance of the evidence each of the

following:

          That the defendant used force against him on

September 13, 2011, after he was placed in handcuffs;

          That at that time the defendant used some amount of

force intentionally or recklessly; and

          That the defendant used a level of force that was

objectively unreasonable.

          The defendant's use of some force must have been

intentional or reckless.  An act is intentional if it is done

knowingly -- that is, if it is done voluntarily and

deliberately and not because of mistake, accident, negligence,

or other innocent reason.  An act is reckless if it is done

with conscious disregard for its known probable consequences.

To be clear, Mr. Munoz is required to prove only that the

defendant used some amount of force intentionally.  He is not

required to show that the defendant intended to violate his

constitutional rights or intended to use excessive force.  In

deciding whether a person acted intentionally or recklessly,

you should remember that there is no way of looking into a

person's mind.  You must depend on what was done and what the

people involved said was in their mind and your belief or

disbelief of those facts.

          To show that the level of force was excessive,

H3l1mun3                          Charge

Mr. Munoz must show that any force used after he was placed in
handcuffs was objectively unreasonable in light of the facts
and circumstances confronting the defendant at that time,
without regard to the defendant's underlying intention or
motivation.  In other words, you must determine whether the
amount of force was that which a reasonable law enforcement
officer would have employed under similar circumstances.  You
should not make this determination, however, by considering how
the facts appear when assessed with 20/20 hindsight.  You may
make allowance for the fact that officers are often forced to
make split-second judgments about the amount of force that is
necessary in circumstances that are tense, uncertain, or
rapidly evolving.  You may consider, for instance, the severity
of the crime for which Mr. Munoz was being arrested, whether
Mr. Munoz posed an immediate threat to anyone, or whether
Mr. Munoz was actively resisting or attempting to resist
arrest.  When a person whom an officer attempts to detain
resists, any force used by the officer must be reasonably
related to the nature of the resistance and the force used,
threatened, or reasonably perceived to be threatened against
the officer.

         In addition, if a law enforcement officer witnesses
another officer using excessive force and has a realistic
opportunity to stop its use, the law requires him to intervene.
In deciding whether an officer had a realistic opportunity to

H3l1mun3                         Charge

intervene, you should consider all of the circumstances,

including whether he had sufficient time to intervene and was

capable of preventing the use of excessive force.  All law

enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement

by other law enforcement officials in their presence.  A

defendant who fails to intervene in the use of excessive force

is liable for the preventable harm caused by the actions of

others.

         The third element that the plaintiff must prove is

that the defendant's use of excessive force proximately caused

any injuries that the plaintiff has proven he sustained after

he was placed in handcuffs.  Proximate cause means that there

must be sufficient causal connection between the act of the

defendant and any injury or damage sustained by a plaintiff.

An act or omission is a proximate cause if it is a substantial

factor in bringing about or actually causing injury -- that is,

if the injury or damage was a reasonably foreseeable

consequence of the defendant's act.  A proximate cause need not

always be the nearest cause in time or space.  In addition,

there may be more than one proximate cause of an injury or

damage.  Many factors or the conduct of two or more people may

operate at the same time, either independently or together, to

cause an injury.

         If you find that the plaintiff was physically injured

H3l1mun3                      Charge

but that those injuries were caused by the actions that a law

enforcement officer or officers (1) took before or at the

moment the plaintiff was placed in handcuffs or (2) took after

he was placed in handcuffs but did not constitute a use of

excessive force, then the plaintiff has not shown that his

injuries were caused by the use of excessive force after he was

handcuffed.  If, however, the plaintiff proved by a

preponderance of the evidence that he suffered an injury after

he was placed in handcuffs and that a defendant's use of

excessive force at that time proximately caused that injury,

then he has carried his burden on this element of his claim.

You should not infer that Mr. Munoz is entitled to

recover damages for his claim merely because I'm instructing

you on the elements of damages.  It is exclusively your

function to decide upon liability, and I'm instructing you on

damages only so you will have guidance should you decide that

Mr. Munoz is entitled to recovery.

If you find a violation of Mr. Munoz's rights, then

Mr. Munoz is entitled to collect damages for the injuries he

has proven by a preponderance of the evidence were caused by

that violation.  The damages must be fair and reasonable,

neither inadequate nor excessive.  You should not award damages

for speculative injuries but only for those injuries that the

plaintiff has actually suffered because of the violation.  It

is the plaintiff's burden to prove the amount of damages and to

H3l1mun3                          Charge

prove that the damages were caused by one or more of the

defendants' intentional or reckless use of excessive force or

failure to intervene to stop another from using excessive

force.

Mr. Munoz also may be awarded damages for conscious

pain and suffering.  Pain and suffering means any mental

suffering, including emotional suffering, or any resulting

physical ailment caused by the wrongful acts of the defendants.

Conscious pain and suffering means pain and suffering of which

there was some level of awareness by Mr. Munoz.  In determining

the amount, if any, to award Mr. Munoz for pain and suffering,

you may take into consideration the effect that these injuries

may have had on his ability to enjoy life.  In order to recover

damages for mental and emotional stress, Mr. Munoz must present

credible evidence with respect to the claimed distress.

Psychiatric or other medical treatment is not a precondition to

recovery, nor is Mr. Munoz required to prove his claim through

expert medical testimony.  There is no requirement that

evidence of the monetary value of such intangible items as

mental anguish be introduced into evidence.

The purpose of a damage award is to compensate

Mr. Munoz for the actual harm he suffered, if any, as a direct

result of excessive force.  The purpose of such an award of

compensatory damages is not to punish defendants.

There is no exact standard for fixing the compensation

1    to be awarded for these damages.  Any award should be fair in

2    light of the evidence presented at trial.

3            If you find after considering all the evidence

4    presented that any of the defendants violated the plaintiff's

5    constitutional rights under Section 1983 but that the plaintiff

6    suffered no actual injury as a result of this violation, you

7    must award the plaintiff nominal damages.  Nominal damages are

8    awarded in recognition that the plaintiff's rights have been

9    violated.  You should award nominal damages of 1 dollar if you

10   concluded that the only injury that the plaintiff suffered was

11   a deprivation of his rights, without any actual damages.

12           You may also award nominal damages of 1 dollar if,

13   upon finding that some injury resulted from the deprivation of

14   the plaintiff's rights, you find that you are unable to compute

15   monetary damages except by engaging in pure speculation and

16   guessing.  You may not award both nominal and actual damages to

17   the plaintiff for a violation of Section 1983.  Either he

18   experienced actual damages, in which case you must award

19   compensatory damages, or else he did not, in which case you

20   must award nominal damages.  Nominal damages may not be awarded

21   for more than a token sum.

22           If you return a verdict against any of the defendants,

23   then you should decide whether to award Mr. Munoz punitive

24   damages against that defendant.  At this point you are only to

25   determine whether an award of punitive damages is appropriate.

1 You should not determine the amount of such award.

2   If you decide that the plaintiff is entitled to

3 punitive damages, then there may be some brief additional

4 evidence presented to you to assist you in determining the

5 amount of punitive damages.

6   You may award punitive damages if you believe that the

7 defendant should be punished for conduct that was motivated by

8 an evil motive or intent or that involved callous disregard or

9 reckless indifference to Mr. Munoz's rights.

10   Mr. Munoz is not entitled to punitive damages as a

11 matter of right.  You must make a judgment about an individual

12 defendant's conduct.  To make such a judgment, it's important

13 to keep in mind the reasons for awarding punitive damages: to

14 punish an individual defendant for malicious conduct against

15 the plaintiff or callous disregard or reckless indifference for

16 a plaintiff's rights and to deter such conduct of a defendant

17 or others like the defendant.  Thus, you should consider

18 whether the award of punitive damages will accomplish this dual

19 purpose of punishment and deterrence.

20   Now there are two types of evidence that you may

21 properly use in reaching your verdict.  One type of evidence is

22 direct evidence.  One kind of direct evidence is the witness'

23 testimony about something he knows by virtue of his own

24 senses -- something the witness has seen, felt, touched, or

25 heard.  Direct evidence may also be in the form of an exhibit.

1          The other type of evidence is circumstantial evidence.

2   Circumstantial evidence is evidence that tends to prove one

3   fact by proof of other facts.  There is a simple example of

4   circumstantial evidence that is often used in this courthouse.

5          Assume that when you came into the courthouse this

6   morning, the sun was shining and it was a nice day.  Assume

7   that the courtroom blinds are drawn and you cannot look

8   outside.  As you are sitting here, someone walks in with an

9   umbrella that is dripping wet.  Somebody else then walks in

10  with a raincoat that is also dripping wet.

11         Now you can't look outside under this hypothetical and

12  you cannot see whether or not it is raining.  So you have no

13  direct evidence of that fact.  But on the combination of the

14  facts that I've asked you to assume, it would be reasonable and

15  logical for you to conclude that between the time you arrived

16  at the courthouse and the time these people walked in, it had

17  started to rain.

18         That's all there is to circumstantial evidence.  You

19  infer on the basis of reason and experience and common sense

20  from an established fact the existence or nonexistence of some

21  other fact.

22         Many facts, such as a person's state of mind, can only

23  rarely be proven by direct evidence.  Circumstantial evidence

24  is of no less value than direct evidence.  The law makes no

25  distinction between direct and circumstantial evidence but

simply requires that you, the jury, decide the facts in

accordance with the preponderance of all the evidence, both

direct and circumstantial.

        Now for the important subject of evaluating testimony.

How do you evaluate the credibility or believability of the

witnesses?  The answer is, you use your plain common sense.

Common sense is your greatest asset as a juror.  You should ask

yourselves, did the witness appear to you to be honest, open,

and candid?  Or did the witness appear evasive or as though the

witness were trying to hide something?  How responsive was the

witness to the questions asked on direct examination and on

cross-examination?

        If you find that a witness is intentionally telling a

falsehood, that is always a matter of importance that you

should weigh carefully.  If you find that any witness has lied

under oath at this trial, you should view the testimony of that

witness cautiously and weigh it with great care.  It is,

however, for you to decide how much of the witness' testimony,

if any, you wish to believe.  Few people recall every detail of

every event precisely the same way.  A witness may be

inaccurate, contradictory, or even untruthful in some respects

and yet entirely believable and truthful in other respects.  It

is for you to determine whether such inconsistencies are

significant or inconsequential and whether to accept or reject

all or to accept some and reject the balance of the testimony

H311mun3                    Charge

of any witness.

          In evaluating the credibility of the witnesses, you
should take into account any evidence that a witness may
benefit or suffer in some way from the outcome of this case.
Such interest in the outcome creates a motive to testify
falsely and may sway a witness to testify in a way that
advances his own interests.  Therefore, if you find that any
witness' testimony you are considering has an interest in the
outcome of the trial, then you should bear that factor in mind
when evaluating the credibility of his testimony and accept it
with great care.

          On some occasions during this trial witnesses were
asked to explain an apparent inconsistency between testimony
offered at this trial and previous statements made by the
witness.  It is for you to determine whether a prior statement
was inconsistent and, if so, how much, if any, weight to give
to an inconsistent statement in assessing the witness'
credibility at trial.

          There is no magic formula by which you can evaluate
testimony.  You bring to this courtroom all your experience.
You determine for yourselves in many circumstances the
reliability of statements that are made by others to you and
upon which you are asked to rely and act.  You may use this
same test here that you use in your everyday lives.  Among the
factors you may consider are the witness' intelligence; the

ability and opportunity the witness had to see, hear, or know

about the things that the witness testified about; the witness'

memory; any interest, bias, or prejudice the witness may have;

the manner of this witness while testifying; and the

reasonableness of the witness' testimony in light of all the

evidence in the case.

You have heard testimony of law enforcement officers.

The fact that a witness is employed by the police department of

the city of New York does not mean that his testimony is

necessarily deserving of more or less consideration or greater

or lesser weight than that of any other witness.  It is your

decision, after reviewing all the evidence, whether to accept

or reject the testimony of the witness and give to that

testimony whatever weight you find it deserves.

You've heard evidence that the plaintiff was

previously convicted of a crime.  You may consider evidence of

a prior conviction only for what light you find it sheds, if

any, on his credibility.

Your verdict will be organized according to a special

verdict form.  This form will assist you in reaching a verdict.

It lists the questions you must resolve based on the

instructions that I've given you.  When the foreperson has

completed the form, each of you must sign your name, and the

form will be marked as a Court exhibit.

Your verdict must be based solely upon the evidence,

or the lack of evidence, developed at trial and the

instructions I've given you on the law.  It would be improper

for you to consider, in reaching your decision, any personal

feelings you may have about a party's race, ethnicity, national

origin, disability, or the plaintiff's status as a prisoner.

Your verdict must be based solely on the evidence

admitted at trial.  I've told you this many times.  And for

that reason, you may not discuss this case with anyone except

the jurors with whom you are deliberating when all of you are

gathered together in the jury room.  You may not do any

independent research about any of the people, facts, or issues

in this case, using the internet or any other research tool.

Do not communicate with each other by telephone or

computer during your deliberations.  Moreover, you should not

give anyone any information about your jury service on any

social networking website.  You should not update your status

on any website to tell anyone that you are a juror on a trial

or to give any information about the trial at all during your

deliberations.

The most important part of this case, members of the

jury, is the part that you as jurors are now about to play as

you deliberate on the issues of fact.  I know you will try the

issues that have been presented to you according to the oath

that you have taken as jurors.  In that oath you promised that

you would well and truly try the issues joined in this case and

H3l1mun3                        Charge

a true verdict render.

As you deliberate, please listen to the opinions of
your fellow jurors and ask for an opportunity to express your
own views.  Every juror should be heard.  No one juror should
hold the center stage in the jury room and no one juror should
control or monopolize the deliberations.  If after listening to
your fellow jurors and if after stating your own view you
become convinced that your view is wrong, do not hesitate
because of stubbornness or pride to change your view.  On the
other hand, do not surrender your honest convictions or beliefs
solely because of the opinions of your fellow jurors or because
you are outnumbered.  Your final vote must reflect your
conscientious belief as to how the issues should be decided.

Your decision must be unanimous.  You are not to
reveal the standing of the jurors -- that is, the split of the
vote -- to anyone, including the Court, at any time during your
deliberations.

Finally, I say this not because I think it is
necessary but because it is a custom in this courthouse to say
this:  You should treat each other with courtesy and respect
during your deliberations.

During your deliberations you will have some of the
exhibits available to you in the jury room.  You may also ask
for portions of the testimony, but please try to be as specific
as you can in requesting testimony.

H3llmun3

1          If you have questions for the Court, just send me a

2     note.  As I said, you have a copy of this set of instructions

3     to take with you into the jury room.  Each of you may take the

4     copy you're holding in your hand.

5          Your first task will be to select a foreperson.  The

6     foreperson has no greater voice or authority than any other

7     juror but is the person who will communicate with the Court

8     when questions arise.

9          All litigants stand equal in this room.  All litigants

10    stand equal before the bar of justice.  All litigants stand

11    equal before you.  Your duty is to decide between these parties

12    fairly and impartially to see that justice is done.  On your

13    oath as jurors, you are not to be swayed by sympathy.  You

14    should be guided solely by the evidence presented in the trial

15    and the law as I gave it to you, without regard to the

16    consequences of your decision.  You have been chosen to try the

17    issues of fact and reach a verdict on the basis of the evidence

18    or lack of evidence.  If you let sympathy interfere with your

19    clear thinking, there is a risk that you will not arrive at a

20    just verdict.  All parties to a civil lawsuit are entitled to a

21    fair trial.  You must make a fair and impartial decision so

22    that you will arrive at a just verdict.

23          I'm going to ask you to remain patiently in the jury

24    box without speaking to each other for one more moment while I

25    speak to the plaintiff and defense counsel at the sidebar.

H3l1mun3

```
 1              (At the sidebar)

 2              THE COURT:  So do the defendants have any objections

 3     to the jury charge as given?

 4              MS. DEPOIAN:  No, your Honor.

 5              MR. LICHTERMAN:  No.

 6              THE COURT:  Mr. Munoz, do you have any objection to

 7     the jury charge as given?

 8              MR. MUNOZ:  No, your Honor.

 9              THE COURT:  You may be seated.

10              (In open court)

11              THE COURT:  Ms. Rojas, would you please swear the

12     marshal.

13              (Marshal sworn)

14              THE COURT:  Ms. Rojas, would you please give Mr. Keith

15     a copy of the special verdict form.

16              Mr. Keith, if you're selected as the foreperson of the

17     jury, that is the form you must complete.  If someone else is

18     selected as the foreperson, would you please hand that form to

19     them.

20              Thank you.

21              Ladies and gentlemen, lunch has been ordered for you.

22     You may retire to the jury room to begin your deliberations.

23     You may choose, when lunch arrives, to take a break and just

24     eat and talk about other things with each other or you may

25     continue your deliberations at that time, if you would prefer.
```

H3l1mun3

```
1    But remember, you may not deliberate in this case unless all

2    eight of you are gathered together in the jury room, able to

3    listen to each other and talk with each other.

4              There were a few photographs or documents received

5    into evidence, and we will gather those together and send those

6    into the jury room to you now.

7              You may retire to begin your deliberations.

8              (At 12:18 p.m., the jury retired to deliberate)

9              THE COURT:  The charge is marked as Court Exhibit 4.

10             So I believe there are a few documents that were

11   received in evidence, so let's gather those together now and

12   review those and then we'll give them to Ms. Rojas, who can

13   give them to the marshal to hand to the jury.

14             Can defense counsel help me there with respect to

15   gathering those documents.

16             MS. DEPOIAN:  Yes, your Honor.

17             THE COURT:  Okay.  Can you announce on the record,

18   please, what documents you have gathered together to provide to

19   the jury.

20             MR. LICHTERMAN:  Yes, your Honor.  There's Defendant's

21   Exhibit A1, Defendant's Exhibit A4, Defendant's Exhibit A5,

22   Defendant's Exhibit A6, Defendant's Exhibit A7.

23             THE COURT:  And those generally are what?

24             MR. LICHTERMAN:  These are photographs of the

25   plaintiff.
```

H3l1mun3

1          THE COURT:  Thank you.  And hand those, if you would,

2     to Ms. Rojas.

3          Mr. Munoz, I believe that you have some exhibits as

4     well.  Ms. Rojas is just going to wait here.  Do you want to

5     give Ms. Rojas plaintiff's exhibits that were received in

6     evidence.

7          And defense counsel, if you, again, would help me

8     here.  But I think it is Plaintiff's Exhibits 1, 2, and 3.

9          Do you have those with you, Mr. Munoz?

10         MR. MUNOZ:  I only have 2 and 3.  I don't see 1.

11         THE COURT:  1 is the set of pictures.  Or maybe it's

12    the Jacobi hospital record.

13         MR. LICHTERMAN:  Your Honor, I believe the Jacobi

14    hospital records were a defendant's exhibit.  We have them

15    marked as Defendant's Exhibit F.

16         THE COURT:  Okay.  Hand that to Ms. Rojas too, please.

17         Now do we have all the defendant's exhibits,

18    documentary exhibits that were received in evidence?

19         MR. LICHTERMAN:  That's all the documentary exhibits.

20    We also had the gun, which was Defendant's Exhibit L.

21         THE COURT:  We are not sending that into the jury

22    room, just the documentary exhibits.

23         Mr. Munoz, do you have Plaintiff's Exhibits 1, 2, and

24    3?

25         MR. MUNOZ:  I see Mr. Lichterman has my picture over

H3l1mun3

1    there.  Do you want a copy of the picture that is of myself

2    that's -- that wasn't clear of me, and it's a couple more from

3    the ones in the hospital, the photocopies.

4              THE COURT:  Mr. Lichterman, can you help the plaintiff

5    here get 1, 2, and 3 together.

6              MR. LICHTERMAN:  Yes.  We have the photos here.

7    They're not marked.  So if we could just have a sticker and

8    we'll mark them, with a plaintiff's exhibit sticker.

9              THE COURT:  It wasn't given an exhibit sticker at the

10   time?

11             MR. LICHTERMAN:  This was a spare.  This is our spare

12   copy.

13             THE COURT:  Okay.  So where is the original?

14   Mr. Munoz?

15             MR. MUNOZ:  Those were taken from me yesterday, I

16   believe.

17             THE COURT:  Okay.  Mr. Lichterman, could you approach

18   Mr. Munoz and help him find 1, 2, and 3.

19             MR. LICHTERMAN:  Yes, your Honor.

20             THE COURT:  Mr. Munoz, can Mr. Lichterman help.

21             You know what, I'll have Ms. Rojas assist you.

22             Excuse me, Mr. Munoz.  Ms. Rojas is going to approach

23   you and see if she can assist you in finding Plaintiff's

24   Exhibits 1, 2, and 3.

25             MR. MUNOZ:  I have them right here.

H311mun3

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | THE COURT:  If you could just hand them to her.                        |
| 2  | Okay.  I'd like to see them.                                           |
| 3  | MR. MUNOZ:  And your Honor?                                            |
| 4  | THE COURT:  Just hold on, Mr. Munoz.  One step at a                   |
| 5  | time here.                                                             |
| 6  | Where are Exhibits 2 and 3?                                            |
| 7  | MR. MUNOZ:  Right here.                                                |
| 8  | THE COURT:  I'm going to staple the three documents                   |
| 9  | that constitute Plaintiff's Exhibit 1.  We're going to staple         |
| 10 | those together.                                                        |
| 11 | So I'm holding Plaintiff's Exhibits 1, 2, and 3.                      |
| 12 | Ms. Rojas?                                                             |
| 13 | I have A1, A4, A5, A6, A7, and F.                                     |
| 14 | Now I'm going to ask Ms. Rojas to show these exhibits                 |
| 15 | to defense counsel and then to you, Mr. Munoz, to make sure           |
| 16 | everyone is in agreement that these are the documentary               |
| 17 | exhibits that were received in evidence and that may now be           |
| 18 | sent back to the jury.                                                 |
| 19 | Ms. Rojas, if you could show those to defense counsel.               |
| 20 | THE DEPUTY CLERK:  Yes, your Honor.                                    |
| 21 | MR. LICHTERMAN:  Yes, they are, your Honor.                           |
| 22 | THE COURT:  Ms. Rojas, could you show these to                       |
| 23 | Mr. Munoz, please.                                                     |
| 24 | MR. MUNOZ:  Yes, your Honor.                                          |
| 25 | THE COURT:  Thank you.  If you can hand them back to                 |

H3l1mun3

1    Ms. Rojas.

2            MR. MUNOZ:  Thank you, Ms. Rojas.

3            THE COURT:  Ms. Rojas, would you please provide those

4    exhibits to the marshal to be handed to the jury.

5            THE DEPUTY CLERK:  Yes, your Honor.

6            THE COURT:  So it's time for us to take a luncheon

7    recess.  I don't know how long the jury will deliberate, so

8    we're going to take a 45-minute recess for lunch.  So I'm going

9    to need one of the defense counsel back in the courtroom at

10   1:15.  And the plaintiff will be given an opportunity now to

11   take a break and have lunch, and if we get a jury note, we will

12   call and have the plaintiff brought back to the courtroom

13   promptly.  So everyone can enjoy their lunch break now, but

14   I'll need at least one of the defense lawyers back in the

15   courtroom by 1:15 to respond promptly to any jury note.  Thank

16   you so much.

17           THE DEPUTY CLERK:  All rise.

18           (Luncheon recess)

19

20

21

22

23

24

25

```
1                        AFTERNOON SESSION

2                           1:33 p.m.

3             (In open court; jury not present)

4             THE COURT:  Please be seated.

5         We've received two jury notes.  Court Exhibit 5 reads,

6    "The jury would like to know what Plaintiff's Exhibit 1 is a

7    picture of."  We received this after I excused everyone for

8    lunch -- that's everyone in the courtroom -- and I excused you

9    until 1:15.

10            In the meantime, we got another note from the jury,

11   Court Exhibit 6, and it is a special verdict form.  So we did

12   not respond to Court Exhibit 5 before the verdict was returned.

13   The jury got their lunch at about 1:10, so we got the verdict

14   form after they had lunch for about 20 minutes.  It's now 25

15   minutes after they got their lunch.

16            Bring in the jury.

17            (Jury present)

18            THE COURT:  You may be seated.

19        Ladies and gentlemen, we received a note from you.  We

20   marked it as Court Exhibit 5.  Let me read it to you.

21            "The jury would like to know what Plaintiff's

22   Exhibit 1 is a picture of."

23        I had already excused the parties to have lunch, so we

24   could not respond to that note because they were having lunch.

25            Then, as we were assembling, we got a special verdict
```

H3l1mun3

 1     form from you, and we've marked it as Court Exhibit 6.  I'm now

 2     going to read that court exhibit to you, your special verdict

 3     form answers, and I'm going to ask each of you, after I read

 4     it, whether this is your verdict.  So please listen carefully.

 5             "Issue I:  Liability.  Use of Excessive Force or

 6     Failure to Intervene in Another's Use of Excessive Force.

 7             "Did the plaintiff establish by a preponderance of the

 8     evidence that his rights under Section 1983 were violated by:

 9             "Defendant Reid?  No.

10             "Defendant Jones?  No.

11             "Defendant Flynn?  No.

12             "Defendant Kelly?  No."

13             Mr. Keith, is that your verdict?

14             JUROR:  Yes.

15             THE COURT:  Ms. Goldstein, is that your verdict?

16             JUROR:  Yes.

17             THE COURT:  Ms. Pantano, is that your verdict?

18             JUROR:  Yes.

19             THE COURT:  Ms. Puchalsky, is that your verdict?

20             JUROR:  Yes.

21             THE COURT:  Mr. Foote, is that your verdict?

22             JUROR:  Yes, your Honor.

23             THE COURT:  Ms. Graham, is that your verdict?

24             JUROR:  Yes.

25             THE COURT:  Ms. Diamond, is that your verdict?

H3l1mun3

1          JUROR:  Yes.

2          THE COURT:  Mr. Tumminia, is that your verdict?

3          JUROR:  Yes.

4          THE COURT:  Is there any reason why I cannot now

5     dismiss this jury?

6          MR. LICHTERMAN:  No, your Honor.

7          THE COURT:  Mr. Munoz?

8          MR. MUNOZ:  I guess not.  I can't change their minds.

9          THE COURT:  Thank you, Mr. Munoz.  I appreciate that

10    response.

11         So ladies and gentlemen, you are now relieved of your

12    obligation not to discuss this case.  You may choose to discuss

13    it with whomever you would like.  I have one request for you in

14    that regard, though.  If you choose to talk about the jury

15    deliberations, why don't you share your own views and thoughts

16    but keep confidential what others said during the deliberations

17    and let them make their own decision whether to share their

18    views and thoughts from the deliberations process.

19         You've made a decision about the facts of this case

20    and rendered your verdict, so I'm not going to comment on the

21    verdict in that way, but I do want to extend, on my own behalf,

22    on behalf of Mr. Munoz, on behalf of each of the defendants,

23    our gratitude to you for your willingness to serve as jurors.

24    You've seen how justice works in this country, how important

25    the jury system is, how everyone has access to our court

H3l1mun3

1    system, everyone has a chance to bring a claim if they believe

2    they've been injured in some way, everyone has the chance to

3    hear that claim and the defenses offered in a courtroom and

4    have a determination made by their fellow citizens, according

5    to the instructions that I've given you as to the law, the

6    instructions that are written in our laws.  And so we thank

7    you, deeply, for your commitment to our court system, to your

8    duties as citizens, to helping the parties in this case get

9    their day in court.

10           And now Ms. Rojas will give you some final

11   instructions.  You may adjourn to the jury room.  You are

12   dismissed.

13           (Jury discharged)

14           THE COURT:  So Mr. Munoz, I wanted to thank you for

15   your cooperation with my staff and myself during this trial.  I

16   know it was challenging to represent yourself, but you brought

17   this lawsuit, you were entitled to have the factual disputes

18   about your claim addressed by a jury.  So you've had your day

19   in court, and I think the trial gave you an opportunity to

20   present your views and to do it under oath from the stand.

21           So is there anything else that we need to address at

22   this point?

23           MS. DEPOIAN:  Nothing from the defendants, your Honor.

24           THE COURT:  Anything from you, Mr. Munoz?

25           MR. MUNOZ:  Yeah.  I would like to know, am I going to

1    get a surcharge for this?

2              THE COURT:  I don't know what a surcharge is.  I don't

3    know what you're referring to.

4              MR. MUNOZ:  I'm referring to, do I have to pay

5    anything?

6              THE COURT:  I have no idea.  Not that I'm aware of.

7    As a plaintiff, you brought a lawsuit.  The jury has not ruled

8    in your favor, but there's been no verdict of damages issued

9    against you.

10             Now the filing of a lawsuit in federal court brings

11   its own complications with respect to a law called the PSLRA,

12   and it permits plaintiffs -- I prefer to really read from the

13   statute or the case law, but giving you my recollection, if

14   there are a certain number of cases that are filed by a

15   prisoner that are found not to be meritorious, at some point

16   you lose your right to bring federal claims or claims in court

17   without paying certain fees, but I know of no fee that you must

18   pay now because you lost this lawsuit.  Obviously if someone

19   has assessed a fee against you at some point, you'll have a

20   right to inquire as to why that fee is being assessed and they

21   will have to point you to the right regulation or explanation

22   under the law in order to answer your question.

23             MR. MUNOZ:  So you're telling me that I don't have

24   to -- as per your knowledge, I don't have to pay no fee?

25             THE COURT:  There is no damage award that this jury

H311mun3

```
 1    has entered against you.
 2              MR. MUNOZ:  Okay.
 3              THE COURT:  You asked for damages to be awarded by the
 4    jury in your favor against the defendants.  The defendants did
 5    not ask the jury to find, nor could they have in this case, for
 6    damages to be issued against you.  But there is a federal
 7    statute that says if people file frivolous lawsuits in federal
 8    court, at some point they cannot proceed with an additional
 9    lawsuit without a charge.
10              Give me one second.
11              We've checked the docket sheet.  You did not proceed
12    in this lawsuit -- there's a term of art, in forma pauperis,
13    that is, without a filing fee.  Indeed, you filed this lawsuit
14    by paying a filing fee.  So that fee has already been paid.  So
15    the consequences of your loss today in court will only
16    potentially affect you should you file another lawsuit or
17    claim, okay?
18              MR. MUNOZ:  Can I get a copy of that, of what you just
19    said, or would it be in my transcript?
20              THE COURT:  Well, actually, I am not ruling in any way
21    on any future fee that anyone may come to collect from you.
22              MR. MUNOZ:  All right.  Okay.  Got it.
23              THE COURT:  If there is a future fee that someone
24    comes to collect from you, they're going to have to explain
25    why.
```

H3l1mun3

1              MR. MUNOZ:  Okay, ma'am.

2              THE COURT:  But everything I've said, of course, is

3     taken down by the court reporter and there is a transcript.

4     But I doubt that anything I have to say now is going to have

5     much effect if there is a future fee charged against you for

6     some other complaint you file in some other case.

7              MR. MUNOZ:  So if there's, like, an appeal, if I was

8     to appeal, something like that?

9              THE COURT:  Oh, well, that is a separate issue.

10             MR. MUNOZ:  But I don't know yet.  I don't think so.

11             THE COURT:  Okay.  You don't think you're going to

12    appeal?

13             MR. MUNOZ:  No.  I just want to make sure I'm all

14    right.  I mean, I tried my best, and to be honest, I'm not

15    really -- I get family support and support from my fiancée.

16    But what I was explained was, by the lawyer that helped me over

17    there, in state prison, that if I was to lose, I was gonna get

18    a surcharge fee of maybe $400, so that's why the question came

19    up.

20             THE COURT:  Okay.  I don't know anything about that

21    $400.  I'm not aware of any fee that would be imposed.  So if

22    someone tries to impose a fee on you, ask them to explain to

23    you what the basis of that is.  They should do that in writing

24    so you can have it checked out.

25             MR. MUNOZ:  Okay, ma'am.

H3l1mun3

1              THE COURT:  Good.  Good.  Thank you, all.

2              THE DEPUTY CLERK:  All rise.

3              MR. MUNOZ:  Thank you, your Honor.

4              MS. DEPOIAN:  Thank you, your Honor.

5              MR. LICHTERMAN:  Thank you, your Honor.

6              THE COURT:  You're welcome, Mr. Munoz.  You're

7       welcome, everyone.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

BRIAN FLYNN

Direct By Mr. Munoz  . . . . . . . . . . . . 177

Cross By Mr. Lichterman  . . . . . . . . . . 187

Redirect By Mr. Munoz  . . . . . . . . . . . 206

STEPHEN JONES

Direct By Mr. Munoz  . . . . . . . . . . . . 213

Cross By Mr. Lichterman  . . . . . . . . . . 227

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1, 2, and 3   . . . . . . . . . . . . . . . 176

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 L   . . . . . . . . . . . . . . . . . . . . 193